# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE
# KNOXVILLE DIVISION

STATE OF TENNESSEE and
STUDENTS FOR FAIR ADMISSIONS, INC.,
*Plaintiffs*,

v.

No. 3:25-cv-270

UNITED STATES DEPARTMENT OF EDUCATION
and LINDA MCMAHON, in her official capacity
as Secretary of Education,
*Defendants*.

## COMPLAINT

1. The Department of Education cannot discriminate based on race or ethnicity—even when Congress orders it to. Yet under the Higher Education Act, the Department awards grants to colleges and universities *only if* they enroll a certain number of Hispanic students. These so-called Hispanic-Serving Institutions are eligible for millions in federal dollars—money they can spend on programs ranging from new lab equipment to STEM tutoring for low-income students. But the HSI program excludes colleges and universities that fall below its arbitrary ethnic threshold of 25% Hispanic.

2. The State of Tennessee operates many colleges and universities. Every one of them serves Hispanic students. Every one of them serves low-income students. But not one of them qualifies to receive grants under the HSI program. Why? Because they don't have the right *mix* of ethnicities on campus.

3. Take, for example, the University of Memphis. According to Department of Education data, 47% of the students it enrolls are low-income, receiving federal Pell Grants. And 62% of its students are racial or ethnic minorities. But because the University lacks the "right" ethnic make-up, it can't receive an HSI grant.

4. There is no valid reason to make federal funds turn on race or ethnicity. "Eliminating

racial discrimination means eliminating all of it." *SFFA v. Harvard*, 600 U.S. 181, 206 (2023). Funds should help needy students regardless of their immutable traits, and the denial of those funds harms students of all races. This Court should declare the HSI program's discriminatory requirements unconstitutional, letting colleges and universities apply regardless of their ability to hit arbitrary ethnic targets.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction because this case arises under the Constitution and laws of the United States. *See* 28 U.S.C. §1331.

6. An actual controversy exists between the parties under 28 U.S.C. §2201(a).

7. Venue is proper because Defendants are United States agencies and officers sued in their official capacities for acts performed under color of legal authority and Tennessee resides in every judicial district in its sovereign territory, including this one. *See* 28 U.S.C. §1391(e)(1).

8. The Department cannot invoke sovereign immunity. The APA's waiver of sovereign immunity extends to constitutional claims. *See Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 673 (6th Cir. 2013).

## PARTIES

9. Plaintiff the State of Tennessee is a sovereign State. Through its state-level agencies, Tennessee operates "institutions of higher education" within the meaning of the Higher Education Act, 20 U.S.C. §1001 *et seq.* It has a direct interest in its institutions' access to federal funds and programs. Jonathan Skrmetti, the Attorney General and Reporter of Tennessee, is authorized by statute to try and direct "all civil litigated matters … in which the state … may be interested." Tenn. Code Ann. §8-6-109(b)(1).

10. Plaintiff Students for Fair Admissions is a voluntary membership organization formed for the purpose of defending human rights and civil liberties, including the right of individuals to equal protection under the law, through litigation and other lawful means. SFFA is a nonprofit membership

group of tens of thousands of individuals across the country who believe that racial and ethnic preferences in higher education are unfair, unnecessary, and unconstitutional.

11. Defendant U.S. Department of Education is an executive agency of the federal government responsible for the enforcement and administration of the Higher Education Act and the HSI program.

12. Defendant Linda McMahon is the Secretary of the U.S. Department of Education. The Secretary is responsible for the administration and enforcement of the Higher Education Act and the HSI program. *See, e.g.*, 20 U.S.C. §§1003(17), 1067q(b)(1)(A), 1101(c), 1102a(a). She is sued in her official capacity.

## BACKGROUND
### I. The HSI program discriminates based on ethnicity.

13. The HSI program is in Titles III and V of the Higher Education Act. *See* 20 U.S.C. §1067q(a)(2); §1101(c); §1101a. The Act is a Spending Clause statute. *Williams v. Tenn. Student Assistance Corp.*, 2017 WL 262030, at *3 (E.D. Tenn. Jan. 18).

14. The HSI program is composed of three sub-programs: Developing Hispanic-Serving Institutions (Title V, Part A); Promoting Postbaccalaureate Opportunities for Hispanic Americans (Title V, Part B); and Hispanic-Serving Institutions – Science, Technology, Engineering, or Mathematics and Articulation (Title III, Part F). All three discriminate.

### A. Developing Hispanic-Serving Institutions

15. The Developing Hispanic-Serving Institutions program expressly discriminates. It "provide[s] grants and related assistance to Hispanic-serving institutions to enable such institutions to improve and expand their capacity to serve Hispanic students and other low-income individuals." 20 U.S.C. §1101(c). Its "purpose" is to benefit "Hispanic students" and those colleges and universities that are "helping large numbers of Hispanic students and other low-income individuals." §1101(b); *accord* 34 C.F.R. §606.1.

16. Though all colleges and universities serve Hispanic students, only some count as HSIs.

The Act defines "Hispanic-Serving Institutions" to mean an eligible institution of higher education that "has an enrollment of undergraduate full-time equivalent students that is at least *25 percent Hispanic students* at the end of the award year immediately preceding the date of application." 20 U.S.C. §1101a(a)(5) (emphasis added); *accord* 34 C.F.R. §606.2(a)(1) ("25 percent Hispanic students"). An institution that wishes to receive a grant "must submit, as part of its application for that grant, an assurance that" its "enrollment of undergraduate full-time equivalent students is at least 25 percent Hispanic students." 34 C.F.R. §606.5(b); *accord* 20 U.S.C. §1103(a) ("shall submit … such enrollment data").

17. This 25% ethnic quota has nothing to do with the history of the institution, like whether it has historically served (or discriminated against) Hispanics. This quota is not rooted in history at all. It's arbitrary: If a college has 24 percent Hispanic students, then it cannot apply, and *all* that college's students, including its Hispanic students, cannot benefit.

18. Apart from this discriminatory numerical requirement, institutions of higher education are otherwise "eligible" for the HSI program if they meet a few other criteria.

19. HSIs must be institutions that "awar[d] a bachelor's degree" or "a junior or community college," be "accredited by a nationally recognized accrediting agency," and be "located in a State." 20 U.S.C. §1101a(a)(2)(A)(iii)-(vi); *accord* 34 C.F.R. §606.2(a)(5)-(6).

20. HSIs must have "average educational and general expenditures" that are low compared to "institutions that offer similar instruction." 20 U.S.C. §1101a(a)(2)(A)(ii); *accord* 34 C.F.R. §§606.2(a)(4), 606.4(a). For example, in 2025 (based on 2022-2023 data), 2-year public institutions must spend on average less than $19,020 on educational and general expenditures per full-time equivalent undergraduate student, while 4-year public institutions must spend on average less than $39,396. *See* 90 Fed. Reg. 11,408, 11,410 (Mar. 6, 2025).

21. Finally, HSIs must have "an enrollment of needy students." 20 U.S.C. §1101a(a)(2)(A)(i). An institution satisfies that requirement two ways. First, "at least 50 percent" of

the relevant students are receiving "need-based assistance," §1101a(b)(1), meaning assistance like Pell Grants or Perkins Loans, 34 C.F.R. §606.3(a)(1). Second, a relatively "substantial percentage" of the relevant students are receiving federal Pell Grants, 20 U.S.C. §1101a(b), compared to "comparable institutions," 34 C.F.R. §606.3(a)(2). For 2- and 4-year public institutions, the median Pell grant percentage is currently 44% and 37%, respectively. *See* 90 Fed. Reg. at 11,410.

22. The eligibility process identifies an institution of higher education as eligible for funding under Titles III and V. It does not designate or certify that the institution is a Hispanic Serving Institution.

23. To become an HSI and get grants, an eligible institution "shall submit … an application" with the necessary information. 20 U.S.C. §1103(b)(1). The Secretary "may approve an application for a grant … only if" she "determines that" the institution is eligible and that the "application meets" certain requirements, including the discriminatory one. *Id.*; *see* 34 C.F.R. §606.5(a), (b).

24. HSIs can apply for planning grants. 20 U.S.C. §1101c. The "Secretary may award … to a Hispanic-serving institution" a planning grant "for a period of 1 year for the purpose of preparation of plans and applications for a [development] grant." §1101c(b). The Secretary evaluates an application for a planning grant "on the basis of … criteria" like "the quality of the planning process that the applicant will use," "the quality of key personnel to be involved," "the quality of the plan to manage the project effectively," and "the extent to which the proposed project costs are necessary and reasonable." 34 C.F.R. §606.20; §606.21(a)-(d). "Under a planning grant, a grantee shall formulate" a "comprehensive development plan" and an "application for a development grant." §606.10(a).

25. Grants under the HSI program "shall be used by Hispanic-serving institutions" to "assist the institutions to plan, develop, undertake, and carry out programs to improve and expand the institutions' capacity to serve Hispanic students and other low-income students." 20 U.S.C. §1101b(a). The statute lists "[a]uthorized activities" for which the "[g]rants awarded … shall be used."

5

§1101b(b). They include use for "laboratory equipment for ... instructional and research purposes"; "classrooms, libraries, laboratories, and other instructional facilities"; "[t]utoring, counseling, and student service programs"; and more. *Id.*; *accord* 34 C.F.R. §606.10(b). Grants can also be used for "[e]xpanding the number of Hispanic and other underrepresented graduate and professional students that can be served by the institution by expanding courses and institutional resources." §1101b(b)(14); *accord* 34 C.F.R. §606.10(b)(13).

### B. Promoting Postbaccalaureate Opportunities for Hispanic Americans

26. The Promoting Postbaccalaureate Opportunities for Hispanic Americans program facially discriminates. The program's two "purposes" are expressly race-based. 20 U.S.C. §1102. The program exists "to expand postbaccalaureate educational opportunities for, and improve the academic attainment of, Hispanic students." §1102(1). And it exists to improve certain colleges and universities because they "are educating the majority of Hispanic college students." §1102(2).

27. To those ends, the program uses expressly discriminatory means. Only "eligible institutions" can get grants. 20 U.S.C. §1102a(a). And to be eligible, an institution must be "a Hispanic-serving institution." §1102a(b). The program therefore incorporates the discriminatory requirements of the Developing Hispanic-Serving Institutions program.

28. Eligible institutions can apply for grants "to improve postbaccalaureate education opportunities for Hispanic and low-income students." §1102c(a). Authorized activities include "[s]upport for low-income postbaccalaureate students including outreach, academic support services, mentoring" and "scholarships, fellowships, and other financial assistance to permit the enrollment of such students in postbaccalaureate certificate and postbaccalaureate degree granting programs." §1102b(4). Authorized activities also include "[c]reating or improving facilities for Internet or other distance education technologies" and "[c]ollaboration with other institutions ... to expand postbaccalaureate certificate and postbaccalaureate degree offerings." §1102b(6)-(7). Grants can last up to "five years." §1102c(b).

### C. Hispanic-Serving Institutions – Science, Technology, Engineering, or Mathematics and Articulation

29. The HSI STEM and Articulation program is also discriminatory. An institution "is eligible to receive funds" under the program only if it is "a Hispanic-serving institution" as defined in Title V. 20 U.S.C. §1067q(a)(2). The program allocates "$100,000,000 … for … Hispanic-serving institutions." §1067q(b)(2)(A)(i), (B).

30. Under the HSI STEM and Articulation Program, "priority [is] given" to applications that propose "to increase the number of Hispanic and other low income students" attaining STEM degrees and "to develop model transfer and articulation agreements between 2-year Hispanic-serving institutions and 4-year institutions in such fields." *Id.*

31. Grantees can use their grant money for the activities authorized in the Developing Hispanic-Serving Institutions program. *Id.*

## II. The HSI program excludes Tennessee colleges and universities.

32. Tennessee public colleges and universities are institutions of higher education under the Act.

33. Tennessee operates, funds, and regulates its colleges and universities. Tennessee has strong sovereign, quasi-sovereign, and proprietary interests in the effective operation and success of its institutions of higher education. Tennessee's interests extend to the funding of its colleges and universities, the regulation of higher education in Tennessee, and the well-being of its students.

34. "[F]or 70 years a state has been able to assert Article III standing via injuries to a state university—the state's 'agency in the educational field.'" *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 588 (6th Cir. 2024) (quoting *Arkansas v. Texas*, 346 U.S. 368, 371 (1953)). And "the Supreme Court recently reaffirmed that a state 'seek[s] to protect its *own* interests' when it enters court to redress the harms of an instrumentality of the state, such as a state university." *Id.*

35. The HSI program harms Tennessee's public institutions of higher education.

36. Based on Defendants' data, at least four Tennessee public institutions of higher education already have "general eligibility" to receive grants:

- Cleveland State Community College
- East Tennessee State University
- Jackson State Community College
- University of Memphis

At least four more already have approved eligibility applications:

- Walters State Community College
- University of Tennessee at Chattanooga
- Dyersburg State Community College
- Middle Tennessee State University

These public institutions of higher education are not current grantees under the HSI program.

37. These Tennessee institutions are otherwise eligible for the HSI program and to receive grants under Titles III and V. They meet all neutral eligibility criteria or have approved eligibility applications.

    a. All award bachelor's degrees or are community colleges.

    b. All are accredited by a nationally recognized accrediting agency as recognized by the U.S. Department of Education. And all are legally recognized by the State of Tennessee.

    c. All either serve needy students or else have approved eligibility applications with an approved exemption request.

    d. These institutions also have relatively low average educational and general expenditures compared to the average of other institutions.

38. Despite their general eligibility, no Tennessee public institution of higher education is eligible for the HSI program. The reason? Tennessee's colleges and universities each have an enrollment of undergraduate full-time students that is lower than 25 percent Hispanic students. They are therefore not "Hispanic-serving institutions" within the technical, ethnicity-based definition of the program. In other words, they don't meet the program's discriminatory criteria.

39. To be sure, *all* Tennessee colleges and universities serve Hispanic students. They also serve needy, low-income students of all ethnicities. But under the statute, they get *no* HSI money because they lack enough members of one particular ethnic group. So *all* students at these schools suffer.

40. That ethnic bar leaves Tennessee's schools unable to compete on an equal footing for the tens of millions of dollars that Defendants give out every year under the HSI program. In FY 2022, for example, Defendants awarded 78 grants totaling $45,727,609, with each grant worth up to $600,000 per year for 5 years.

41. This inability to compete on a level playing field is ongoing. In FY 2024, Congress appropriated at least $228,890,000 for the Developing Hispanic-Serving Institutions program, and Defendants awarded $28,086,011 to fund 49 applicants that applied in FY 2023.

42. If given the equal opportunity to compete, these otherwise eligible institutions would apply for grants under each part of the HSI program in 2026 and beyond. Each institution already receives federal financial assistance that is akin to the grants available under the HSI program. And to best serve its students, each institution works to maximize the amount of federal funding that it receives from Defendants.

43. The colleges and universities, and their professors and students, would benefit significantly from federal grant money under the HSI program. They would seek and benefit from federal funds for improving laboratory equipment, classrooms, libraries, tutoring, counseling, and other programs or activities.

44. The HSI program also puts Tennessee's colleges and universities to an unconstitutional dilemma. Either they continue to serve their Hispanic students lawfully, in which case they are ineligible for grants under the program, or else they engage in affirmative action to satisfy the program's discriminatory criterion, which is illegal. As the Supreme Court recently confirmed, both Title

VI and the Fourteenth Amendment ban colleges and universities from using ethnicity in admissions. *See SFFA*, 600 U.S. at 198, 230-31. As a result of the program's discriminatory criteria, Tennessee's colleges or universities would subject themselves to liability if they tried to access the program's funds.

45. The dilemma does not end there. Even if Tennessee's colleges and universities did have enough Hispanic students to be eligible, the program still requires that they break antidiscrimination law. To receive grants, they'd have to develop plans for assisting "Hispanic students" versus others—dispositive evidence of a race- or ethnic-based intention for official government action. The HSI program therefore encourages Tennessee institutions and employees to violate the Constitution. Either way, the HSI programs force Tennessee's institutions of higher education to discriminate or lose access to federal funds.

46. These dilemmas directly harm Tennessee's interests and put its institutions at a competitive disadvantage in recruiting students and faculty.

47. Relatedly, the HSI program harms Tennessee's sovereign and quasi-sovereign interests in the continued enforcement of its antidiscrimination laws and regulations. "'[A] State clearly has a legitimate interest in the continued enforceability of its own statutes.'" *Tennessee*, 104 F.4th at 591 (quoting *Maine v. Taylor*, 477 U.S. 131, 137 (1986)).

48. Recently, Tennessee enacted a law that bans colleges and universities from discriminating "on the basis of race, color, ethnicity, or national origin," including by "consider[ing]" those criteria as a factor in admissions, scholarships, or financial aid. Tenn. Code. Ann. §49-7-190(b)-(d). The law expressly bans "affirmative action." §49-7-190(b).

49. Tennessee also bans racial discrimination in public accommodations generally. Tennessee law aims to "[s]afeguard all individuals within the state from discrimination because of race, creed, color, religion, sex, age or national origin in connection with … public accommodations." §4-21-101(3). To that end, Tennessee bans denying to any "individual the full and equal enjoyment of the

goods, services, facilities, privileges, advantages and accommodations of a place of public accommodation … on the grounds of race, creed, color, religion, sex, age or national origin." §4-21-501. Discriminatory practices include "any direct or indirect act or practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, or any other act or practice of differentiation or preference in the treatment of a person or persons because of race, creed, color, religion, sex, age or national origin." §4-21-102(4). Institutions of higher education are public accommodations. *See* §4-21-102(15) ("includes any … establishment … that is supported directly or indirectly by government funds").

50. The HSI program encourages Tennessee institutions of higher education to serve and benefit "Hispanic students" versus others. *See, e.g.*, 20 U.S.C. §1101(b); §1101b(a); §1102. The HSI program's discriminatory requirements therefore undermine Tennessee's laws and regulations prohibiting discrimination based on race, ethnicity, or national origin. *See Tennessee*, 104 F.4th at 595 ("the States have a sovereign interest in regulating education").

### III. The HSI program harms Students for Fair Admissions and its members.

51. The HSI program also harms SFFA's members.

52. SFFA has members who currently teach at undergraduate institutions that are otherwise eligible for the HSI program, except they do not have a high enough percentage of Hispanic students.

53. Member A, for example, is a professor at one of the eight eligible Tennessee institutions identified above. He teaches undergraduates, teaches graduate students, and conducts extensive research. Because his institution lacks enough funding to support his research, he often writes grant proposals to get funding from other sources. If his institution could receive grants under the HSI program, Member A would routinely help it draft grant proposals that the institution would submit. Most immediately, he would draft a grant proposal for a new research facility that would be housed on campus. That facility would provide statistical and other data to the State of Tennessee and others, as well as create new academic opportunities for undergraduate and graduate students.

54. SFFA also has members across the country who currently attend undergraduate institutions that are otherwise eligible for the HSI program, except they do not have a high enough percentage of Hispanic students. These students are harmed by the lack of federal funding for better equipment, classrooms, instruction, postbaccalaureate opportunities, and the like.

55. For schools that already receive federal funding (nearly all of them), institutions that can apply for grants under the HSI program do apply. Once schools hit the 25% ethnic threshold, they put out a press release heralding the achievement. *See, e.g.*, *University of Northern Colorado Achieves Federal Designation as Hispanic Serving Institution*, UNC (Mar. 21, 2024), perma.cc/Z4QM-6SD5 (announcing this "significant milestone"). Schools even adopt strategic plans to deliberately reach the 25% mark. *See generally* Heideman, *Hispanic-Serving Institutions and Emerging Constitutional Issues*, 24 Fed. Soc. Rev. 147, 148-49 (2023); *Why More Colleges Are Seeking Hispanic-Serving Institution Status*, Higher Ed Dive (Dec. 2, 2024), perma.cc/HL5A-5QFH. As one university official put it, "'Achieving an HSI status allows us to become eligible for a lot of funding. That then can support our students, our faculty and support our staff so it's really important to have the ability to have access to additional funding that is specifically designated for Hispanic-serving institutions.'" Heideman 147 (cleaned up). Most schools that have reached the 25% ethnic threshold have applied for grants under the HSI program.

## CLAIM FOR RELIEF

56. Plaintiffs repeat and reallege the allegations above.

57. Congress has the power to spend, as relevant here, to "provide for the … general Welfare of the United States." U.S. Const. art. I, §8, cl. 1.

58. Congress's spending power is "subject to several general restrictions" that are enforceable by courts. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). The "first" is that "the exercise of the spending power must be in pursuit of 'the general welfare.'" *Id.* Another is that any conditions on funding must not clash with "other constitutional provisions." *Id.*

59. The HSI program, as currently constituted, exceeds Congress' power under the Spending Clause.

60. The HSI program does not pursue the general welfare. It pursues the welfare of one ethnic group at the expense of everyone else, including other Hispanic students whose schools miss an arbitrary ethnic cutoff. Though Congress usually gets deference when it spends for the general welfare, "any deference" in the context of public education "must exist 'within constitutionally prescribed limits.'" *SFFA*, 600 U.S. at 217. Discrimination based on ethnicity is unconstitutional in public education, whether by state or federal governments. *See Brown v. Bd. of Educ.*, 349 U.S. 294, 298 (1955); *Bolling v. Sharpe*, 347 U.S. 497 (1954); *SFFA*, 600 U.S. 181. "All" laws "must yield to this [fundamental] principle." *Brown*, 349 U.S. at 298. Ethnic discrimination "in public education" is "arbitrary"; it is not "reasonably related to any proper government objective." *Bolling*, 347 U.S. at 499-500.

61. Separately, the HSI program imposes conditions that conflict with other constitutional provisions.

62. The Fifth Amendment's Due Process Clause includes an equal-protection principle that binds the federal government. That principle is no less strict than the Fourteenth Amendment's Equal Protection Clause that binds the States. *See Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224 (1995). Under our Constitution, "any person, of whatever race, has the right to demand that any governmental actor … justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Id.*

63. The Fourteenth Amendment also provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, §1, cl. 1. This "Citizenship Clause was adopted against a longstanding political and legal tradition that closely associated the status of citizenship with the entitlement to legal equality." *See United States v. Vaello Madero*, 596 U.S. 159, 171 (2022) (Thomas, J.,

concurring) (cleaned up). "[T]he right to be free of racial discrimination with respect to the enjoyment of certain rights is a constituent part of citizenship." *Id.* at 174. Accordingly, "the Citizenship Clause guarantees citizens equal treatment by the Federal Government with respect to civil rights." *Id.* at 179. And access to public education is one such right.

64. These constitutional bans on ethnic discrimination "operat[e] as a specific constitutional limitation upon the exercise by Congress of the taxing and spending power." *Flast v. Cohen*, 392 U.S. 83, 104 (1968); *see, e.g.*, *South Dakota*, 483 U.S. at 210-11 ("a grant of federal funds conditioned on invidiously discriminatory state action … would be an illegitimate exercise of the Congress' broad spending power").

65. The HSI program, as currently set up and operated, facially discriminates based on ethnicity. The program also unconstitutionally requires and encourages institutions of higher education to discriminate against or distinguish between students based on ethnicity.

66. The HSI program fails strict scrutiny. It does not employ measures that are "narrowly tailored" to "further compelling governmental interests." *SFFA*, 600 U.S. at 206-07.

67. The federal government asserts an "interest in remedying the disparities" "between the enrollment of non-Hispanic white students and Hispanic students in postsecondary education" and in "ensuring that Hispanic students have an equal opportunity to pursue postsecondary opportunities." 20 U.S.C. §1101(a)(2), (6).

68. But there are "only two compelling interests that permit resort to race-based government action": "remediating specific, identified instances of past discrimination that violated the Constitution or a statute" and "avoiding imminent and serious risks to human safety in prisons." *SFFA*, 600 U.S. at 207. The interest identified in the HSI statute fits neither category. And governments cannot "remedy the effects of societal discrimination through explicitly race-based measures." *SFFA*, 600 U.S. at 226.

69. Nor is the program narrowly tailored to further even its stated interests. The program is based in part on the finding that "Hispanic Americans are at high risk of not enrolling or graduating from institutions of higher education." 20 U.S.C. §1101(a)(1). The program's 25% ethnic quota bears no relation to that statement. The statement likely concerns factors other than ethnicity and thus could be solved by neutral programs that serve "low-income individuals." §§1101(b)(2), 1102. And the program *hurts* the thousands of Hispanic students who enroll or aim to graduate from institutions that do not satisfy the program's arbitrary quota.

70. The HSI program violates equal protection by engaging in the "patently unconstitutional" practice of "[o]utright racial balancing." *SFFA*, 600 U.S. at 223. It does not treat Hispanic or low-income students "'as individuals'" but as "'simpl[e] components of a racial … class.'" *Id.* (cleaned up).

71. The program's use of ethnicity also "lack[s] a 'logical end point.'" *Id.* at 221 (cleaned up). As written, the discriminatory aspects of the program are set in stone even if the findings that motivated them no longer obtain.

72. Congress's decision to add the discriminatory aspects of the program was irrational, a display of arbitrary power, and not an exercise of judgment. The HSI program, as currently set up and operated, is therefore not a valid exercise of Congress's power under the Spending Clause.

73. For similar reasons, the program's ethnic discrimination is not necessary and proper to further any other enumerated or otherwise valid congressional power or objective.

74. As a result of the program's unconstitutionally discriminatory criteria, otherwise qualified Tennessee institutions—including ones that serve Hispanic and needy students—can't compete for tens of millions of dollars that are allocated to HSI programs.

75. Because the discriminatory criteria injure Tennessee's institutions and SFFA's members, and because they exceed Congress's power, they should be declared illegal and enjoined.

15
Case 3:25-cv-00270    Document 1    Filed 06/11/25    Page 15 of 16    PageID #: 15

# PRAYER FOR RELIEF

Plaintiffs ask the Court to enter judgment in their favor and to grant the following relief:

a. A declaratory judgment that the HSI program's ethnicity-based requirements are unconstitutional;

b. A permanent injunction prohibiting the Secretary from enforcing or applying the HSI program's ethnicity-based requirements when making decisions whether to award or maintain grants to Tennessee's institutions of higher education;

c. All other relief that Plaintiffs are entitled to, including attorneys' fees and costs.

Respectfully submitted,

Dated: June 11, 2025

*/s/ Cameron T. Norris*

JONATHAN SKRMETTI
*Attorney General of Tennessee*

J. MATTHEW RICE
*Solicitor General of Tennessee*

JOSHUA D. MINCHIN
*Assistant Solicitor General*

AARON L. BERNARD
*Assistant Solicitor General\**

*Counsel for Plaintiff State of Tennessee*

Thomas R. McCarthy*
Cameron T. Norris
Matt Pociask*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22201
(703) 243-9423
cam@consovoymccarthy.com

Adam K. Mortara
Lawfair LLC
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

*Counsel for Plaintiff SFFA*

*\* pro hac vice application forthcoming*