**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TENNESEE and<br>STUDENTS FOR FAIR ADMISSIONS, INC. | ) )<br>) | |
| *Plaintiffs,* | ) )<br>) | |
| v. | ) )<br>) | Case No. 3:25-cv-270 |
| UNITED STATES DEPARTMENT OF<br>EDUCATION and LINDA MCMAHON, in<br>her official capacity as Secretary of Education | ) )<br>) )<br>) | |
| *Defendants.* | ) )<br>) | |

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

**MEMORANDUM OF LAW IN SUPPORT OF PROPOSED DEFENDANT-INTERVENOR
HISPANIC ASSOCIATION OF COLLEGES AND UNIVERSITIES'
MOTION TO INTERVENE**

In this litigation, Plaintiffs challenge the legality of the congressionally designated Hispanic-Serving Institutions Program, which expands educational opportunity and provides capacity-building resources to not-for-profit colleges and universities where at least twenty-five of undergraduate student enrollment is Hispanic. Under Federal Rule of Civil Procedure 24, Proposed Defendant-Intervenor, the Hispanic Association of Colleges and Universities, respectfully moves to intervene to defend the constitutionality of the Hispanic-Serving Institutions program. The Hispanic Association of Colleges and Universities is the only national educational association representing the interests of over 500 Hispanic-Serving Institutions. Proposed Intervenor satisfies each of the prerequisites for intervention as of right under Rule 24(a)(2). Alternatively, Proposed Intervenor also meets the requirements for permissive intervention under Rule 24(b).

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................ 4

III.   ARGUMENT ..................................................................................................... 8

   A.  Proposed Intervenor is Entitled to Intervene as a Matter of Right. ................... 8

     1.  Proposed Intervenor's Motion to Intervene Is Timely. ................................... 9

     2.  Proposed Intervenor Has Substantial Protectable Interests in the Underlying Litigation. 11

       a.  Proposed Intervenor led the legislative advocacy effort to create the challenged program and has specific, cognizable interests in the program's preservation......... 12

       b.  Proposed Intervenor has consistently advocated for subsequent federal programs to support Hispanic-Serving Institutions. ......................................................... 14

       c.  Proposed Intervenor and its members are directly affected by the outcome of this litigation and risk losing millions in federal funding. ............................................... 14

       d.  Proposed Intervenor has a cognizable interest in defending the constitutionality of the HSIs Program. ................................................................................ 15

     3.  Disposition of This Litigation Is Likely to Impair Proposed Intervenor's Interests. ..... 17

     4.  Existing Defendants Do Not Adequately Represent Proposed Intervenor's Interests.. 18

   B.  Alternatively, the Court Should Grant Permissive Intervention. ...................................... 21

IV.   CONCLUSION ................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 37 (2024) ............................................... 2

*Berger v. North Carolina State Conference of the NAACP*, 597 U.S. 179 (2022) ........................... 8

*Blount-Hill v. Board of Educ. of Ohio*, 195 Fed. App'x 482 (6th Cir. 2006) ................................ 15

*Blount-Hill v. Zelman*, 636 F.3d 278 (6th Cir. 2011) ..................................................................... 17

*Bradley v. Milliken*, 828 F.2d 1186 (6th Cir. 1987) ................................................................. 10, 12

*Dauscha v. UP Commc'ns Servs. LLC*, No. 4:13-cv-50-HSM-SKL, 2013 WL 6388566 (E.D. Tenn. Dec. 6, 2013) .................................................................................................................. 10, 21

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524 (3d Cir. 2011) ................................... 20

*Grubbs v. Norris*, 870 F.2d 343 (6th Cir. 1989) ............................................................................. 10

*Grutter v. Bollinger*, 188 F.3d 394 (6th Cir. 1999) .................................................................. 14, 19

*Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995) ........................................... 13

*Jansen v. City of Cincinnati*, 904 F.2d 336 (6th Cir. 1990) ............................................... 9, 10, 18

*Keyes v. School Dist. No.1, Denver, Colo.*, 413 U.S. 189 (1973) ..................................................... 1

*Mendez v. Westminster*, 64 F. Supp. 544 (S.D. Cal. 1946) ............................................................. 7

*Meriwether v. Trustees of Shawnee State University*, No. 1:18-cv-753, 2019 WL 2052110 (S.D. Ohio May 9, 2019) .................................................................................................................... 16

*Michigan State AFL-CIO v. Miller*, 103 F.3d 1240 (6th Cir. 1997) ......................... 12, 13, 14, 17

*Mid-America Milling Co. v. U.S. Dep't of Transp.*, No. 3:23-cv-00072-GFVT-EBA, 2025 WL 1461818 (D. Ky. May 21, 2025) .............................................................................................. 11, 17

*Mountain Top Condominium Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361 (3d Cir. 1995) ............................................................................................................................................ 15

*Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999 (6th Cir. 2006) .............................. 18

*Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323 (6th Cir. 2007) ..................... 13, 14

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007) ........................ 2

*Pasqua Yaqui Tribe v. EPA*, No. 20-cv-266-TUC-RM, 2021 WL 2576939 (D. Ariz. May 5, 2021) ........................................................................................................................................... 20

*Purnell v. City of Akron*, 925 F.2d 941 (6th Cir. 1991) .......................................................... 12, 17

*Spurlock v. Fox*, 716 F.3d 383, 399 (6th Cir. 2013) ................................................................. 2, 16

*Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977) .......................................................... 11

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ................................................................................................................................. 1, 19, 20

*Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 338 F.R.D. 364 (N.D. Tex. 2021) ............................................................................................................. 15

*U.S. v. City of Detroit*, 712 F.3d 925 (6th Cir. 2013) ................................................. 11

*U.S. v. Michigan*, 424 F.3d 438 (6th Cir. 2005) ........................................................ 21

*U.S. v. Tennessee*, 260 F.3d 587 (6th Cir. 2001) ....................................................... 15

*United States v. State of Oregon*, 839 F.2d 635 (9th Cir. 1988) ................................ 18

**Statutes**

20 U.S.C. § 1067q .......................................................................................................... 5

20 U.S.C. §§ 1101 et seq. ............................................................................................... 5

20 U.S.C. §§ 1102 et seq. ............................................................................................... 5

42 U.S.C. § 300u-6(g)(2) ............................................................................................... 2

**Other Authorities**

Rachel Moran, *Diversity's Distraction's Revisited: The Case of Latinx Higher Education*, 2022 S.C.L. REV. 579 (2022) ............................................................................... 6, 7, 8

Stella M. Flores et al., *Race, Place, and Citizenship: The Influence of Segregation on Latino Educational Attainment*, 40 LAW & INEQ. 69 (2022) ......................................... 6

**Rules**

Fed. R. Civ. P. 24(a)(2) .................................................................. 1, 3, 8, 9, 18, 21, 22

Fed. R. Civ. P. 24(b) ......................................................................................... 1, 21, 22

Fed. R. Civ. P. 24(c) ..................................................................................................... 22

# I.   __INTRODUCTION__

Ending discrimination is imperative.[1] It requires "star[ing] at racial [or ethnic] disparity unblinkingly, and then do[ing] what evidence and experts tell us is required to level the playing field . . . and achieve true equality for all Americans."[2] In 1998, Congress did just that. In furtherance of "a national interest" to remedy disparities, Congress authorized the Secretary of Education to appropriate grants and related assistance for Hispanic-Serving Institutions (hereinafter "HSIs" or "HSIs program"). 20 U.S.C. § 1101(a)(2), (6).[3] The HSIs program funds activities such as purchasing laboratory materials and equipment, providing curriculum development and capacity-building.

Proposed Defendant-Intervenor, Hispanic Association of Colleges and Universities ("HACU"), seeks to intervene in this lawsuit principally to defend the constitutionality of the HSIs program—challenged in this case—which enables institutions so defined to afford equal educational opportunity to all students. Congress defines a Hispanic-Serving Institution ("HSI") as one—among other criteria—whose undergraduate full-time equivalent student enrollment is at least 25% Hispanic students. Today, HSIs are spread across thirty states, the District of Columbia,

---

[1] Plaintiffs profess "[e]liminating racial discrimination means eliminating all of it." Compl. ¶ 4, ECF No. 1 (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023)). Yet they inexplicably sidestep congressional power rooted in the national interest to redress glaring and, oftentimes, government engineered racial and ethnic disparities denying true equality to many Americans. *See, e.g. Keyes v. School Dist. No.1, Denver, Colo.*, 413 U.S. 189, 197 (1973) (noting that "Hispan[ics] suffer the same educational inequities as [Blacks] and American Indians").
[2] *Students for Fair Admissions*, 600 U.S. at 408. (Jackson, J., dissenting).
[3] Congress first created the HSIs designation in 1992. It then provided federal funding for the first time in 1995, and in 1998, the HSIs program was codified under Parts V(A) and (B) of the Higher Education Act. For elaboration, *see infra* Part II, Factual Background.

1

and Puerto Rico. Collectively, they educate about 67% of all Hispanic[4] undergraduate students, approximately 43% of Asian, 23% of Black, and 18% of White students in the U.S. and Puerto Rico.

"[T]here is nothing nefarious about [Congress'] awareness of racial demographics" or ethnic disparity. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 37 (2024). Racial and ethnic demographic data are regularly "used in a variety of legislative and policymaking contexts and [the Supreme Court] has made clear that the use of such data, without more, does not offend the Constitution." *Spurlock v. Fox*, 716 F.3d 383, 399 (6th Cir. 2013) (citing *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 745 (2007)). Asking Congress—as Plaintiffs do—to turn a blind eye to ethnic disparity or forego affording resources to students who need them "impose[s] a counterproductive duty of ignorance on the part of public officials." *Spurlock,* 716 F.3d at 399. That is not required under the United States Constitution.

Enrollment in an HSI is open to all students. Take, for example, Southern Adventist University, a HACU-member organization and an HSI, based in Tennessee, whose student population is about 40% White and which serves 28% Hispanic students.[5] The HSIs program does not mandate racial or ethnic preference to achieve an enrollment threshold. It does not require an institution to consider the race or ethnicity of a student for admission. It does not treat individual students differently on account of race or ethnicity. In fact, it does the exact opposite. It directs

---

[4] The term "Hispanic" refers to individuals who originate from Spanish-speaking countries. *See* 42 U.S.C. § 300u-6(g)(2). "Latino" or the gender neutral "Latinx" refers to individuals whose origins are from Latin America. *See* Hugo Lopez *et al*., *Who Is Hispanic?*, PEW RSCH. CTR. (Sept. 23, 2021), https://www.pewresearch.org/fact-tank/2021/09/23/who-is-hispanic/. Proposed Intervenor, HACU, uses the terms interchangeably not because they mean the same thing but to cover the range of races and ethnicities within the Latino umbrella, including Afro-Latinos and Indigenous people who self-identify as Latino.
[5] For Southern Adventist University's racial and ethnic demographics, *see generally Southern Adventist University Students Fall 2024 Undergraduate Statistics*, https://www.southern.edu/administration/records/docs/BOARD_REPT.F24_5yr_DRAFT.pdf

2

resources to underserved students who are geographically concentrated. It acknowledges that institutions of higher learning that educate traditionally underserved students and prepare them for our nation's workforce deserve capacity-building resources. That does not offend the Equal Protection Clause of the Fourteenth Amendment.

Proposed Intervenor will defend the constitutionality of the HSIs program. It meets Federal Rule of Civil Procedure 24(a)(2)'s intervention standard. First, Proposed Intervenor's motion to intervene is timely. There has been no filing in this litigation since the Complaint was docketed six weeks ago on June 11, 2025. Second, Proposed Intervenor has several substantial protectable interests that will be impaired if intervention is not granted. For one, Proposed Intervenor led advocacy for passage of the HSIs program. Proposed Intervenor represents the interests of more than 500 institutions designated as HSIs, including Tennessee-based member organization Southern Adventist University, which receive millions of dollars in federal funding that they risk losing. These interests will be impaired absent intervention.

Third, Proposed Intervenor's *raison d'être* is to represent the interests of its membership and to champion the academic success of the students they educate. Proposed Intervenor has done just that, scoring numerous legislative and funding victories for its members and the students they serve. Fourth, Defendants will not adequately represent Proposed Intervenor's interests. In fact, their interests are entirely adverse to Proposed Intervenor's. Defendant Linda McMahon, the Secretary of Education, is on a "final mission" to eliminate the very agency that administers the HSIs program and thereby end the program's benefits to Proposed Intervenor's constituents, including the 5.6 million students attending HSIs.[6]

---

[6] *See, e.g.*, Mackenzie Wilkes, *Linda McMahon Lays Out Education Department's 'Final Mission'*, POLITICO (March 4, 2025).

Intervention is thus necessary to ensure a vigorous and full-throttled defense of the constitutionality of the HSIs program and to afford Proposed Intervenor an opportunity to mount an appeal in the event of an adverse ruling. Proposed Intervenor has no other avenue to protect its cognizable legal interests absent intervention. Accordingly, Proposed Intervenor requests that it be granted intervention as of right. Alternatively, permissive intervention should be granted for the reasons set forth below.

## II.     <u>FACTUAL BACKGROUND[7]</u>

Before the official federal recognition of Hispanic-Serving Institutions ("HSIs"), the movement to achieve HSI designation had begun at the grassroots level, with advocacy led by Proposed Defendant-Intervenor's founding members and allies. Decl. of Antonio R. Flores, Ex. A, ("Flores Decl.") at ¶ 8. Then, in 1986, the Hispanic Association of Colleges and Universities ("HACU"), was officially formed to "coalesce institutions of higher learning with sizeable Hispanic enrollment to heighten awareness about the role of these institutions in educating Hispanic youth and preparing them for the nation's workforce." Flores Decl. at ¶ 6. HACU's goal was, and remains, to champion Hispanic success in higher education, including by improving access to and the quality of post-secondary educational opportunities for Hispanic students.[8] *Id*. at ¶ 7.

HACU successfully advocated that the federal government recognize HSIs under Title III of the Higher Education Act ("HEA") in 1992. *Id*. at ¶ 8. After nearly ten years of sustained advocacy led by HACU, Congress distributed the first HSI appropriations in 1995. Congress further solidified its support to HSIs in 1998 by creating a title specific to HSIs, Title V, under the HEA. Today, also because of HACU's advocacy efforts, HSIs apply to receive designated funding

---

[7] Proposed Intervenor dispensed with a procedural history section because other than the filing of the Complaint, there has been no procedural activity in this litigation.
[8] *Hispanic Association of Colleges and Universities Home Page*, HISP. ASS'N OF COLLS. & UNIVS., https://hacu.net/.

4

under both Title III, Part F and Title V, Parts A and B, of the HEA. As of 2025, the number of institutions eligible for HSI funding exceeds five hundred. *Id*. at ¶ 14. But HSI designation does not guarantee funding. Institutions must compete for the limited grant funds available under Title III and Title V. Historically, only about one-third of eligible institutions have received funds designated under these titles.[9]

The Department of Education grants for which HSIs are eligible to apply fall into three categories. The first is the Developing Hispanic-Serving Institutions Program, created under Title V, Part A of the HEA. With a focus on undergraduate education and degree attainment, this category of grants is meant to help awardees expand academic opportunities and help their Hispanic and low-income students attain postsecondary degrees. 20 U.S.C. §§ 1101–1101d. The second category, Promoting Postbaccalaureate Opportunities for Hispanic Americans, is meant for HSIs to build their capacity, expand access for Hispanic and low-income students, and enhance the quality of their postbaccalaureate degrees.[10] *See* 20 U.S.C. §§ 1102–1102c. The third category is the HSI Science, Technology, Engineering, or Mathematics and Articulation Programs. It is geared towards increasing the number of Hispanic and other low-income students attaining degrees in the fields of science, technology, engineering, or mathematics and is designated under Title III, Part F of the HEA, 20 U.S.C. § 1067q.

In its findings, Congress enumerated a list of reasons why the HSIs program was necessary. The lawmakers found that Hispanic Americans were far less likely to enroll in or complete college than non-Hispanic white students and that, between 1973 and 1994, that disparity had increased. 20

---

[9] *Hispanic-Serving Institutions*, EXCELENCIA IN EDUC., https://www.edexcelencia.org/research-policy/hispanic-serving-institutions-hsis (last visited July 24, 2025).
[10] *Promoting Postbaccalaureate Opportunities for Hispanic Americans*, U.S. DEP'T OF EDUC. (July 11, 2025), https://www.ed.gov/grants-and-programs/grants-special-populations/grants-hispanic-students/promoting-postbaccalaureate-opportunities-hispanic-americans.

5

U.S.C. § 1101(a)(1)–(2). Congress further found that HSIs were underfunded—including because they "receive significantly less in State and local funding, per full-time equivalent student," than non-HSIs—which "limit[s] the ability of [HSIs] to expand and improve [their] academic programs." 20 U.S.C. § 1101(a)(4)–(5). Because almost 70% of all Hispanic undergraduates attend HSIs, closing the funding gap between HSIs and non-HSIs could also narrow the degree attainment gap between Hispanic and non-Hispanic students. Flores Decl. ¶ 15.

HSIs have made a demonstrable impact in students' lives. For example, HSIs represent over one-third of the country's "top 20 percent of institutions regarding economic mobility," and enroll a significant proportion of students from low-income backgrounds.[11] HSIs are key to developing STEM pathways for Hispanic students and low-income students.[12] As of 2020, 44% of the STEM students—from all backgrounds—at four-year HSIs fell within the lowest income quartile.[13] Nevertheless, the degree completion gap between Hispanic and non-Hispanic white adults has grown in recent years, including due to economic inequality, language access disparities,[14] and segregation.[15] Additionally, as the population of Hispanic college students has burgeoned, the modest federal funding appropriated to HSIs has failed to keep pace.[16]

---

[11] STEPHANIE AGUILAR-SMITH, THIRD WAY, SERVING MANY IN MANY WAYS: HISPANIC-SERVING INSTITUTIONS AS DRIVERS OF OPPORTUNITY AND SOCIOECONOMIC MOBILITY 9 (2024).

[12] *Id.*

[13] *Id.*

[14] *See generally* Stanford Univ., Calif. Inst. for Rsch. on Educ. Fin. & Governance, *Bilingual Education for Hispanics: Issues of Language, Access and Equity*, 2 IFG POL'Y NOTES 1 (Autumn 1981); .

[15] Stella M. Flores et al., *Race, Place, and Citizenship: The Influence of Segregation on Latino Educational Attainment*, 40 LAW & INEQ. 69, 71 (2022); *see also* Rachel Moran, *Diversity's Distraction's Revisited: The Case of Latinx Higher Education*, 2022 S.C.L. REV. 579, 606 (2022) ("As the Latinx experience demonstrates, the effects of stratification in higher education are compounded by ongoing segregation by race, ethnicity, and income in colleges and universities.").

[16] Moran, *supra* note 15 at 586.

6

While HSIs play a key role in remedying disparities created by discrimination, including in public education (*see, e.g.*, *Mendez v. Westminster*, 64 F. Supp. 544, 545 (S.D. Cal. 1946) (holding unlawful "a concerted policy and design of class discrimination against persons of Mexican or Latin descent") (internal quotation marks omitted)),[17] the HSIs program does not restrict the benefits of funding to Hispanic students alone. The grants simply allow eligible institutions that have been historically underfunded to strengthen their programs for all students, including the large population of Hispanic students they serve. The definition of an HSI in the statute itself is inherently "numbers-driven rather than normative" and the program does not "demand any intentionality in serving Latinx [or Hispanic] students."[18]

Tennessee institutions access funding streams aligned with the needs of the students its universities serve. For example, several Tennessee public and private institutions are designated as Minority-Serving Institutions (MSI) or rural institutions and eligible to apply for corresponding funding. At 7%, Tennessee ranks among the eighteen states with the smallest percentages of Hispanic residents.[19] None of those eighteen states have a designated public two-year or four-year

---

[17] Continuing discrimination against Latinos, including in public K-12 education, can have a significant impact on their access to higher education. Recent bills introduced in the 114th Tennessee General Assembly sought to erect significant barriers to accessing education for Latino children and may demonstrate animus toward Latinos. *See, e.g.*, EDTRUST TENNESSEE, PROTECTING UNDOCUMENTED STUDENT ACCESS TO K-12 PUBLIC SCHOOL 3 (2025) (describing, *inter alia*, HB 793/SB 836, "allow[ing] school districts and charter schools to refuse to allow students who are unlawfully present in the U.S. to enroll in school"). While the overwhelming majority of Latino students in higher education are U.S. citizens or permanent residents, a significant proportion of undocumented school-age children are Latino or Hispanic.

[18] Moran, *supra* note 15, at 585.

[19] *Hispanic Population by State 2025*, WORLD POPULATION REV., https://worldpopulationreview.com/state-rankings/hispanic-population-by-state (last visited July 24, 2025).

7

HSI within their borders.[20] Indeed, because Latino students "regularly attend a college near home," it follows that "HSIs are geographically concentrated in areas with substantial Latinx populations."[21]

At bottom, this case is about ensuring equal educational opportunity. But the opportunity at issue is not the funding program Plaintiffs attack; the opportunity at issue is higher education and whether one can access it at all. Many Hispanic individuals have struggled to access higher education for decades. Among higher education institutions as a whole, congressional findings documented nearly three decades ago that Hispanic students trailed; today, they still do.

## III.  ARGUMENT

### A.  PROPOSED INTERVENOR IS ENTITLED TO INTERVENE AS A MATTER OF RIGHT.

Under Federal Rule of Civil Procedure 24(a)(2), a movant is entitled to intervention as a matter of right upon timely showing that it "claims an interest relating to the . . . subject of the action, and is so situated that disposing of the action may . . . impair or impede [its] ability to protect its interest . . . unless existing parties adequately represent that interest." *Berger v. North Carolina State Conference of the NAACP*, 597 U.S. 179, 190 (2022) (quoting Fed. R. Civ. P. 24(a)(2)).

The Court of Appeals for the Sixth Circuit has established that a proposed intervenor must show four elements—that (1) the motion to intervene is timely; (2) the proposed intervenor has a substantial legal interest in the subject matter of the pending litigation; (3) the disposition of the action may impair the movant's ability to protect their legal interest; and (4) the existing litigants

---

[20] *Id.;* HACU Membership Directory, HISP. ASS'N OF COLLS. & UNIVS., https://my.hacu.net/assnfe/CompanyDirectory.asp?SEARCH_TYPE=21 (last visited July 24, 2025).

[21] Moran, *supra* note 15, at 606.

8

cannot adequately protect the movant's interest—to be granted intervention of right. *Jansen v. City of Cincinnati*, 904 F.2d 336, 340 (6th Cir. 1990).

Here, Proposed Defendant-Intervenor Hispanic Association of Colleges and Universities ("HACU") satisfies all four requirements and is entitled to intervene in this litigation as a matter of right under Rule 24(a)(2). First, Proposed Intervenor's motion to intervene is timely. HACU moves to intervene during the earliest stages of the litigation, such that no other party would be prejudiced by its intervention. Indeed, there has been no filing in the case since the Complaint was docketed six weeks ago. Second, HACU has substantial legal interests. Plaintiffs seek to fundamentally alter the statutory framework of the HSIs program that provides millions of dollars annually to HACU's member institutions, including one in Tennessee, which they risk losing. HACU also has an interest in defending the constitutionality of the HSIs program, as Congress has the power to take account of and seek to redress ethnic or racial disparity. Third, HACU's interests are highly likely to be impaired absent intervention. A judgment declaring the HSIs program unconstitutional would decimate resources to HACU's membership and vitiate HACU's mission. Disposition of this case without granting HACU intervention will impair its ability to protect its legal interests. Lastly, Defendants are unlikely to adequately represent HACU's interests because Defendant McMahon seeks to eliminate the very agency that administers and enforces the HSIs program. As elaborated *infra*, Proposed Intervenor satisfies all four required elements, entitling it to intervene as of right.

### 1. Proposed Intervenor's Motion to Intervene Is Timely.

The Proposed Intervenor's motion to intervene as a Defendant in this case is timely. Given the recency of this lawsuit and the minimal steps taken thus far in the litigation, HACU's intervention at this time would neither pose prejudice to either party nor delay resolution of this case.

9

The Sixth Circuit requires courts to look at "all relevant circumstances" surrounding a motion to intervene to assess its timeliness. *See Jansen*, 904 F.2d at 340 (citing *Bradley v. Milliken*, 828 F.2d 1186, 1191 (6th Cir. 1987)). *Jansen* instructs courts to consider five factors in doing so— "(1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene . . . and (5) the existence of unusual circumstances militating against or in favor of intervention." *Jansen*, 904 F.2d at 340 (citing *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir. 1989)). Application of these factors weighs in favor of Proposed Intervenor.

**First**, the litigation has not progressed beyond the docketing of the Complaint on June 11—six weeks before the date of the filing of this motion to intervene. *See, e.g.*, *Dauscha v. UP Commc'ns Servs. LLC*, No. 4:13-cv-50-HSM-SKL, 2013 WL 6388566 (E.D. Tenn. Dec. 6, 2013) (finding timeliness where motion to intervene was filed within about a month of proposed intervenor's learning about the lawsuit). This consideration—minimal time lapsed—alone meets the timeliness factor. But other timeliness considerations also weigh in HACU's favor.

**Second**, intervention is sought to protect HACU's substantial interests, set forth *infra* Section III.A.2. HACU seeks to intervene to protect its central mission to represent, support, and develop HSIs; its institutional members' continued existence as HSIs and their eligibility for funding under the challenged program; and its student members' interests in accessing the resources that only HSIs funding makes possible. Flores Decl. ¶¶ 5, 7, 8, 11–18.

**Third**, HACU seeks intervention merely weeks after learning about the Complaint and its potential to impair HACU's substantial legal interests. *See Mid-America Milling Co. v. U.S. Dep't*

*of Transp.*, No. 3:23-cv-00072-GFVT-EBA, 2025 WL 1461818, at *4–5 (D. Ky. May 21, 2025) (concluding motion to intervene was timely where it was submitted soon after issuance of Executive Orders that put intervenors on notice that defendant's position materially changed). The same outcome should prevail here.

**Fourth**, given the minimal time that has lapsed since the filing of the Complaint, that there is no pending substantive motion, and that discovery has not yet begun, there is no prejudice to any of the original parties. Analysis of this consideration "must be limited to the prejudice caused by the *untimeliness*, not the intervention itself." *U.S. v. City of Detroit*, 712 F.3d 925 (6th Cir. 2013) (citing *Stallworth v. Monsanto Co.*, 558 F.2d 257, 267 (5th Cir. 1977) (emphasis in original). Because HACU has promptly moved to intervene, its intervention at this early stage of litigation would not cause delay or otherwise prejudice the existing parties. The penultimate factor, therefore, weighs in favor of intervention as well.

**Lastly**, no unusual circumstance on HACU's part militates against granting intervention, as argued *infra* Section III.A.4. But the federal government is not likely to defend the constitutionality of its own funding program. Ample record evidence demonstrates the current federal administration's resistance to preserving and enforcing congressional programs, including the HSIs program.[22] Proposed Intervenor easily meets the timeliness factor.

## 2. Proposed Intervenor Has Substantial Protectable Interests in the Underlying Litigation.

Proposed Intervenor satisfies the second intervention requirement because it has "substantial protectable interest[s]" in the underlying matter. The Sixth Circuit has "opted for a

---

[22] While the Executive Branch has, in other moments of history, failed to respect the other branches' authority, "historians are hard-pressed to recall an instance when a president defied federal courts as blatantly as President Donald Trump has done." Matthew DeWees, *When Does President Donald Trump's Defiance of Courts in Deportation Case Cross the Line into Constitutional Crisis?*, Const. Accountability Ctr. (April 25, 2025).

11

rather expansive notion of the interest sufficient to invoke intervention of right." *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997) (citing, *inter alia*, *Bradley*, 828 F.2d at 1192). The question of whether a proposed intervenor has a sufficient interest is "fact-specific," but the movant need not have "a specific legal or equitable interest." *Michigan State AFL-CIO*, 103 F.3d at 1245 (citing *Purnell v. City of Akron*, 925 F.2d 941 (6th Cir. 1991) ("[A] party seeking to intervene need not possess the standing necessary to initiate a lawsuit.")).

HACU has four substantial protectable interests in this litigation as (1) lead advocate whose efforts led to the creation of the HSIs program challenged here; (2) a repeat player in legislative and administrative victories to grow, preserve, and sustain the HSIs program; (3) the sole entity whose mission is to represent the interests of HSIs and the students they educate and whose members would be adversely impacted by elimination of federal funding; and (4) the sole entity that, adverse to Plaintiffs, seeks to defend the constitutionality of the HSIs program.

<blockquote>a. <u>Proposed Intervenor led the legislative advocacy effort to create the challenged program and has specific, cognizable interests in the program's preservation.</u></blockquote>

HACU has a cognizable interest because, as Intervenor, it would be protecting a victory it achieved in the political process. From its inception and even before its formal incorporation, HACU led advocacy that culminated in the creation of the HSI designation and its attendant federally funded programs. Flores Decl. ¶ ¶ 6, 8–9. By intervening here as a defendant, it seeks to protect the constitutionality of a designation that it helped achieve and is recognized in the federal Higher Education Act. *Id.* at ¶ 8.

Protecting a win achieved in the political process is a cognizable interest sufficient to grant intervention. In *Michigan State AFL-CIO v. Miller*, the Sixth Circuit accepted the Michigan Chamber of Commerce's assertion that it had a significant protectable interest by way of its

"involvement in the political process that culminated in adoption of the [challenged amendments]." *Michigan State AFL-CIO*, 103 F.3d at 1245–46 (citing, with approval, *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995) (finding that "[a] public interest group is entitled as a matter of right to intervene in an action challenging the legality of a measure it has supported" (citations omitted))). The *Michigan State AFL-CIO* court also named, as other favorable factors, that the Chamber was "a repeat player in [relevant] litigation," "a significant party which is adverse to the [plaintiffs]" in the pertinent political process, and, most importantly, "an entity also regulated by . . . the statutory provisions challenged by the plaintiffs." *Michigan State AFL-CIO*, 103 F.3d at 1247. The Sixth Circuit further clarified its pronouncements in *Michigan State AFL-CIO,* highlighting the importance of an intervenor having other interests beyond its initial legislative advocacy victory around a challenged law. *See Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 345 (6th Cir. 2007) (explaining that proposed intervenor's case for intervention was weaker than the intervenor in *Michigan State AFL-CIO*, in part because its interest in the legislation, after the law's passage, diminished to a general interest). In other words, an intervenor's must possess characteristics analogous to those recognized in *Michigan State AFL-CIO*. *Id.* at 346.

Here, Proposed Intervenor's advocacy secured passage of the HEA Amendments that created the HSIs program, secured funding for the program, and led to HSIs codification in a separate part under the HEA. It therefore meets the *Idaho Farm Bureau Federation* criterion that was adopted by the *Michigan State AFL-CIO* court. But its interests extend far beyond its early victory.

13

b. Proposed Intervenor has consistently advocated for subsequent federal programs to support Hispanic-Serving Institutions.

After it successfully advocated for the creation of the HSIs program, HACU remained a consistent voice—a "repeat player"[23]—advocating for programs to benefit HSIs. Flores Decl. ¶ 12. In 2007, for example, HACU's advocacy led Congress to "recognize[] the Hispanic Serving School Districts designation to create a seamless educational pathway for student success from kindergarten to graduate school, particularly in STEM." *Id.* In 2017, because of HACU's leadership, Congress created a National Science Foundation program to support STEM education at HSIs. *Id.* More recently, HACU's advocacy led the Government Accountability Office to conduct a novel study "spotlighting critical infrastructure needs for HSIs." *Id.*

c. Proposed Intervenor and its members are directly affected by the outcome of this litigation and risk losing millions in federal funding.

Most importantly, HACU is largely composed of members who are directly impacted by the challenged program. This characteristic and HACU's legislative advocacy together are sufficient to demonstrate HACU's substantial interest in this litigation. *See Northland Family Planning Clinic,* 487 F.3d at 345 ("To be sure, public interest groups . . . whose members are affected by the [challenged] law[] may likely have an ongoing legal interest in its enforcement after it is enacted" (citing *Grutter v. Bollinger*, 188 F.3d 394, 410 (6th Cir. 1999)).

Core to HACU's longstanding mission is ensuring the success and development of HSIs. As "the only national educational association that represents Hispanic-Serving Institutions," HACU's key objectives include "ensuring that HSIs continue to thrive as dynamic engines of educational excellence." Flores Decl. ¶ 11. In furtherance of its mission, HACU has worked to secure millions of dollars in federal funding to advance its members' priorities. For example, in

---

[23] *Michigan State AFL-CIO*, 103 F.3d at 1247.

2023 alone, HACU helped secure over $250 million in federal funding for its members. *Id*. at ¶ 13. HSIs—including HACU-member organization Southern Adventist University—also received $94.3 million in federal funding under the HSI STEM and articulation programs. *Id*. HACU and its membership risk losing these and other sources of essential federal funding if its bid to intervene is not granted. Courts have found the risk of losing federal funding to be a cognizable legal interest. *See, e.g.*, *Mountain Top Condominium Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 366 (3d Cir. 1995) ("[A]n intervenor's interest in a specific fund is sufficient to entitle intervention in a case affecting that fund.").

Further, there is no question that HACU has a protectable interest in maintaining HSIs for the students who are the direct beneficiaries of the educational opportunity provided by HSIs. *See, e.g.*, *Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 338 F.R.D. 364, 370 (N.D. Tex. 2021) (finding "students are beneficiaries of [university's] admissions policy" and have sufficient interest warranting intervention). For many of HACU's constituents—including students who attend HSIs—the challenged program "represent[s] an important access and affordability point into higher education." Flores Decl. ¶ 17.

### d. Proposed Intervenor has a cognizable interest in defending the constitutionality of the HSIs Program.

Proposed Intervenor's fundamental interest here is directly adverse to Plaintiffs'. HACU's primary concern in seeking intervention is to defend against "the constitutional . . . violation[] alleged in the litigation." *Blount-Hill v. Board of Educ. of Ohio*, 195 Fed. App'x 482, 486 (6th Cir. 2006) (quoting *U.S. v. Tennessee*, 260 F.3d 587, 596 (6th Cir. 2001). The constitutionality of the funding designation is at stake here. This is true even if the challenged program is tied to funding streams that HACU seeks to preserve. HACU cannot adequately defend the constitutionality of this designation in any way other than by intervening here as a defendant. *Id*. at 486.

15

HACU's interest in ensuring that the HSI program survives a constitutional challenge is very similar to the movant's interest in *Meriwether v. Trustees of Shawnee State University*, No. 1:18-cv-753, 2019 WL 2052110 (S.D. Ohio May 9, 2019). In *Meriwether*, the Southern District of Ohio found that a membership organization had a substantial legal interest in seeing that the non-discrimination policy at a state university survived a constitutional challenge because its members were the beneficiaries of the policy. No. 1:18-cv-753, 2019 WL 2052110, at *9 (S.D. Ohio May 9, 2019). This legal interest weighed in favor of the court granting the movant intervention. Here, HACU's student constituents similarly are the beneficiaries of the HSIs program and HACU has a substantial legal interest in ensuring that the program survives this constitutional challenge that precipitated HACU's interest in intervening. As previously noted, the Equal Protection Clause of the Fourteenth Amendment does not forbid Congress' awareness of racial or ethnic disparity nor does it bar all measures to redress government-enabled disparities. *See Spurlock*, 716 F.3d at 399 (recognizing racial or ethnic "demographic data is used in a variety of legislative and policymaking contexts and . . . the use of such data, without more, does not offend the Constitution.").[24]

Ultimately, HACU seeks to protect the very existence of a program upon which its members rely and without which HACU's mission would be fundamentally frustrated. *Blount-Hill*

---

[24] Congressional designation of institutions serving discrete groups abound. For example, an Alaska Native Serving Institution requires a 20% student enrollment, an Asian American, Native American and Pacific Islander-Serving Institution requires a 10% student enrollment, and a Historically Black College or University requires a 17% student enrollment. *See eeWhat Are MSIs?*, RUTGERS-NEW BRUNSWICK GRADUATE SCHOOL OF EDUCATION, CENTER FOR MSIs, https://cmsi.gse.rutgers.edu/content/what-are-msis. The oldest of the minority group designations—the Historically Black College or University—arose, in part, because under the Morrill Act of 1862, the federal government made land grants to exclusively white institutions. There is documented history of exclusionary education practices targeting Native Americans, Asian Americans, and Latinos. The HSIs designation is not an anomaly.

16

*v. Zelman*, 636 F.3d 278, 285 (6th Cir. 2011). Even if the sufficiency of HACU's interests were a "close case,"—which it is not—Sixth Circuit precedent would counsel a "resol[ution] in favor of recognizing an interest under Rule 24(a)." *Michigan State AFL-CIO*, 103 F.3d at 1247. HACU readily surpasses the threshold for what qualifies in the Sixth Circuit as a substantial protectable interest.

### 3. Disposition of This Litigation Is Likely to Impair Proposed Intervenor's Interests.

Disposition of this case in favor of Plaintiffs would harm HACU's interest in protecting its members' access to key federal resources. HACU would be bound by the precedent created by such a decision and denied the opportunity to participate or to appeal an adverse ruling. For these reasons, HACU easily satisfies the third intervention requirement.

To show that disposition of the case may impair HACU's legal interest, Proposed Intervenor must demonstrate "only that the impairment of its substantial legal interest is possible if intervention is denied." *Michigan State AFL-CIO*, 103 F.3d at 1247 (citing *Purnell*, 925 F.2d at 948). Because this impairment need only be possible—not certain—Proposed Intervenor's burden is only to show that the impairment "may" occur. *Purnell*, 925 F.2d at 948.

As recently as May 2025, courts in the Sixth Circuit have found this "minimal" burden met in cases concerning the constitutionality of federal programs that could result in the proposed intervenor losing a federal benefit. *See, e.g.*, *Mid-America Milling Co.*, No. 3:23-cv-00072-GFVT-EBA, 2025 WL 1461818 (D. Ky. May 21, 2025) (granting motion to intervene where Intervenors sought to defend the constitutionality of a program from which they received special access to government contracts).

HACU meets this burden because the litigation seeks to end the federal HSIs program. HACU represents and is composed largely of institutional members eligible for HSIs funding. If

17

successful, the litigation would eliminate designated grants for HSIs, which would harm HACU's members by ending a key source of federal funding. It would also harm HACU's student members and students attending HSIs, many of whom have been able to access higher education due to scholarship funds and support services built under the auspices of HSIs grants.[25]

Importantly, the precedential nature of a ruling in favor of Plaintiffs is likely to materially prejudice any future attempts by Proposed Intervenor to protect the interests described at length in *supra* Section III.A.2. *See Jansen*, 904 F.2d at 342 (6th Cir.1990) (agreeing with other federal circuits "in holding that the possibility of adverse *stare decisis* effects provides intervenors with sufficient interest to join an action") (citing *United States v. State of Oregon*, 839 F.2d 635, 638 (9th Cir. 1988)). HACU plainly satisfies the third requirement for intervention, given the impacts of a ruling made in favor of Plaintiffs.

### 4. <u>Existing Defendants Do Not Adequately Represent Proposed Intervenor's Interests.</u>

As to the last Rule 24(a)(2) factor—adequacy of representation—the current federal administration's actions demonstrate that Defendants will not sufficiently defend Proposed Intervenor's interests in the litigation. Proposed Intervenor carries only a "minimal" burden to show that it's interests "may" not be adequately represented by the existing parties to this litigation. *Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1008 (6th Cir. 2006). Proposed

---

[25] Students at HSIs may face similar inequities to students at rural institutions or from rural communities. If federal grant programs like the Rural Postsecondary & Economic Development program were terminated, eligible institutions would lose access to tailored funding that has "expand[ed] access [to higher education and workforce training], buil[t] local partnerships, and align[ed] academic offerings [in Rural-Serving Institutions] with regional workforce needs." Angélica Gutiérrez, Deborah Martin & Erika Roberson, *FIPSE Programs Deserve Sustained Federal Support*, INSTITUTE FOR COLLEGE ACCESS & SUCCESS (July 8, 2025), https://ticas.org/college-completion/fy-26-skinny-budget-fipse-blog-july-2025/. There is some overlap, but just as not all RSIs are eligible for funding under the HSIs program, not all HSIs are eligible for funding under program targeted to aid RSIs.

18

Intervenor is not required to show that the representation will, in fact, be inadequate. *Id.*; *see also Grutter*, 188 F.3d at 400–01 (6th Cir. 1999) ("The proposed intervenors need show only that there is a *potential* for inadequate representation.") (emphasis in original). Notably, the fact that the government is the defendant in this action has no bearing since the Sixth Circuit "has declined to endorse a higher standard for inadequacy when a government entity is involved." *Grutter*, 188 F.3d at 400.

Here, it is clear that Defendants are unlikely to defend a program that is aimed at supporting HSIs, which is what Proposed Intervenor intends to do. There are several reasons why that is so. One, the Administration's very first action was to rescind Executive Orders, one of which aimed to strengthen HSIs.[26] Two, Defendant McMahon said she is on a "final mission" to eliminate the very agency—the Department of Education—that administers and oversees funding for HSIs.[27] Three, the Department is on record denouncing programs like HSIs, that take account of and seek to redress ethnic or racial disparity. For example, in its February 14, 2025 "Dear Colleague Letter," the Department warned educational institutions to cease "diversity, equity and inclusion" practices which it decries as illegal.[28] In a corresponding Frequently Asked Questions document and its accompanying press release, Defendants implied that the *SFFA v. Harvard* decision was dispositive on whether diversity, equity, and inclusion programs are unlawful, and relied on the decision to make categorial interpretations about lawful and unlawful activities.[29]

---

[26] Exec. Order. Initial Recissions of Harmful Executive Orders and Actions (January 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/initial-rescissions-of-harmful-executive-orders-and-actions/.

[27] *See supra* n.6 and accompanying text.

[28] *See* U.S. DEPT. OF EDUC., "Dear Colleague Letter" (Feb. 14, 2025), https://www.ed.gov/media/document/dear-colleague-letter-sffa-v-harvard-109506.pdf. Several challenges contest the legality of the "Dear Colleague Letter."

[29] Press Release, U.S. Department of Education, U.S. Department of Education Releases Frequently Asked Questions on Dear Colleague Letter About Racial Preferencing (March 1, 2025),

19

Proposed Intervenor recognizes that *SFFA v. Harvard* establishes what is required for race-conscious admissions program, but it will argue that Plaintiffs' heavy reliance on the decision here is an improper attempt to extend the reach of *SFFA v. Harvard* beyond what is constitutionally required. Compl. ¶ 66 (quoting *SFFA v. Harvard* to make conclusory statements that the HSIs program must fail strict scrutiny). Congress' "awareness or consideration of race is not racial [or ethnicity] classification." *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011). The HSIs program does not invidiously exclude any student from admission on account of race or ethnicity. Nevertheless, given the administration's support for Plaintiffs' interpretation of *SFFA v. Harvard*, it is unlikely that it will defend the constitutionality of the HSIs program.

Four, the Department of Justice, which litigates on behalf of Defendants, has shown antipathy to programs like the ones at issue here: in March of this year, it sent a letter to Speaker of the House Mike Johnson indicating that it will no longer defend race- and sex-based preferences in federal agricultural relief programs.[30] The actions described here strongly suggest that this administration has a policy to *not* defend programs like the HSIs program at issue in this litigation. *See Pasqua Yaqui Tribe v. EPA*, No. 20-cv-266-TUC-RM, 2021 WL 2576939, at *1 (D. Ariz. May 5, 2021) (holding that intervenors had shown that their interests would likely not be adequately protected by the government defendants given that the "recent change in administration and

---

https://www.ed.gov/about/news/press-release/us-department-of-education-releases-frequently-asked-questions-dear-colleague-letter-about-racial-preferencing; *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act*, U.S. DEP'T OF EDUC. (March 1, 2025), https://www.ed.gov/media/document/frequently-asked-questions-about-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf.

[30] Mackenzie Guy, *DOJ Stands for Equality and Abandons Defense of Race- and Sex-Based USDA Relief Programs*, MTN. STS. LEGAL FOUND. (Mar. 14, 2025), https://mslegal.org/2025/03/doj-stands-for-equality-and-abandons-defense-of-race-and-sex-based-usda-relief-programs/.

20

Environmental Protection Agency leadership" meant that it was "unclear to what extent the Agency Defendants will oppose Plaintiffs' arguments in this litigation").

Taken together, these actions convincingly demonstrate that HACU *may not* be adequately represented by the existing parties to this litigation. *See Mid-America Milling Co.*, No. 3:23-cv-00072-GFVT-EBA, 2025 WL 1461818, at *6–7 (D. Ky. May 21, 2025) (agreeing that evidence of potential changes in the federal government's position was sufficient for proposed intervenors to establish inadequate representation of their interest.). The same is true here. Accordingly, this Court should grant Proposed Intervenor intervention as of right.

## B. ALTERNATIVELY, THE COURT SHOULD GRANT PERMISSIVE INTERVENTION.

Despite Proposed Intervenor's convincing showing of Rule 24(a)(2) intervention as of right, should the Court decline to rule favorably, the Court, alternatively, may grant permissive intervention under Rule 24(b). Proposed Intervenor meets that standard as well.

Under the permissive intervention standard, Proposed Intervenor need only "establish that the motion for intervention is timely and alleges at least one common question of law or fact." *U.S. v. Michigan*, 424 F.3d 438, 445 (6th Cir. 2005). The Court will also weigh countervailing factors such as undue delay and prejudice to the original parties. *Id.*

The Court should grant permissive intervention for the reasons previously established in Section III.A, *supra*. HACU's motion to intervene is timely as it is filed a mere six weeks after the filing of the Complaint. There are no pending discovery or substantive motions. *See supra* section III.A.1. Further, HACU's interest in defending the constitutionality of the HSIs program stems from a common question of law or fact with this action. *See supra* Section III.A.2. There is no prejudice to the existing parties. *See supra* section III.A.1; *see also, Dauscha*, No. 4:13-cv-50-HSM-SKL, 2013 WL 6388566, at *3 (E.D. Tenn. Dec. 6, 2013) (noting "the court would exercise its discretion to grant intervention under Rule 24(b)" even if movant had not meet the requirements

21

for intervention as of right.). This Court should grant permissive intervention if it does not grant intervention as of right.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Proposed Intervenor, Hispanic Association of Colleges and Universities, respectfully requests that this Court grant its motion to intervene under Rule 24(a)(2) or Rule 24(b), and permit it to file the attached Answer in accordance with Rule 24(c).

Dated this <u>24th</u> day of July, 2025

                                                        Respectfully Submitted,

/s/  Stella Yarbrough
Stella Yarbrough                                        Francisca D. Fajana*
BPR No. 033637                                          LatinoJustice PRLDEF
ACLU Foundation of Tennessee                            475 Riverside Drive, Suite 1901
P.O. Box 120160                                         New York, NY 10115
Nashville, TN 37212                                     212.219.3360
615.320.7142                                            FFajana@latinojustice.org
syarbrough@aclu-tn.org

                                                        *Application for Pro Hac Vice
                                                         admission pending

22