# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

| | |
|---|---|
| STATE OF TENNESSEE and | |
| STUDENTS FOR FAIR ADMISSIONS, INC., | |
| *Plaintiffs,* | No. 3:25-cv-270-KAC-DCP |
| v. | |
| UNITED STATES DEPARTMENT OF EDUCATION and LINDA MCMAHON, in her official capacity of Secretary of Education, | |
| *Defendants.* | |

## OPENING BRIEF IN SUPPORT OF MOTION TO INTERVENE

# INTRODUCTION

The National Association of Scholars ("NAS") and Faculty, Alumni, and Students Opposed to Racial Preferences ("FASORP") (together, the "Applicants") seek to intervene as plaintiffs in this case to join in challenging the unconstitutional federal statutes, regulations, and practices already called into question by the existing plaintiffs the State of Tennessee ("Tennessee") and Students for Fair Admissions ("SFFA") (together, the "Initial Plaintiffs"). The Applicants seek to intervene and assert the rights of their members, whose interests are directly implicated by the challenged practices, but many of whom are not yet directly represented in this case: the faculty and students of affected schools inside *and outside* of Tennessee. Both NAS's and FASORP's members include faculty around the nation—both inside and outside of Tennessee—affiliated with schools that are excluded from the HSI Programs challenged here. FASORP's members also include students enrolled at non-HSI schools both inside and outside of Tennessee.

Although both the Applicants and SFFA have faculty members at non-HSI schools in Tennessee, only the Applicants have identified a faculty member at a non-HSI school *outside* of Tennessee. And only the Applicants have identified *any* student members.

The Applicants and their members have a direct interest in the outcome of this litigation. Their intervention will not delay this proceeding. And the existing plaintiffs do not adequately represent the interests of the Applicants' members—especially those at non-HSI schools outside of Tennessee.

1

The Applicants' student and faculty members are victims of the Defendants' racially discriminatory allocation of federal funding and, in some cases, the direct victims of school-level racial discrimination incentivized by the Defendants' racially discriminatory funding programs. The Applicants are uniquely suited to represent the interests of such individuals whose substantive rights are at issue in this case, and whose ability to vindicate those rights may well turn on this case's disposition.

Prior to filing the motion to intervene, counsel for the Applicants conferred with counsel for the Initial Plaintiffs. Counsel for the Initial Plaintiffs confirmed that they do not oppose the Applicants' motion to intervene, in writing, on July 29, 2025.[1]

## BACKGROUND

### A.    The HSI Programs

This case presents two main issues.

The first is whether the federal government may base university funding decisions on the racial composition of universities' student bodies. The federal government makes certain funding available to a college or university only if it qualifies as a Minority Serving Institution ("MSI").[2] To qualify for that status, an

---

[1]    The Applicants simultaneously sought to confer with the proposed intervenor-defendants. On July 29, 2025, their counsel responded that because HACU "has not yet been granted party status and has not reviewed any grounds for your client's [sic] intervention, we cannot take a position on your client's [sic] intervention."

[2]    As used here, a Minority Serving Institution is one authorized to participate in any of nine parallel federal programs: (i) the Developing Hispanic Serving Institutions Program; (ii) the Hispanic-Serving Institutions—Science, Technology, Engineering, or Mathematics and Articulation Program; (iii) the Promoting Postbaccalaureate Opportunities for Hispanic Americans Program (programs (i)-(iii), together, the "HSI Programs," with each an "HSI Program"); (iv) the Alaska Native-Serving Institutions Program; (v) the Native Hawaiian-Serving Institutions

2

institution must demonstrate that a specified proportion of its student body is a particular race. *See* Alexander M. Heideman, *Hispanic-Serving Institutions and Emerging Constitutional Issues*, 24 Federalist Soc'y Rev. 147, 149 & nn.19-22 (2023) (documenting the different racial thresholds that apply to each MSI Program).[3] The largest and most lucrative of these MSI Programs are the HSI Programs at issue in this case. A college or university can qualify as a Hispanic Serving Institution ("HSI" or "HSI school") only if and so long as it certifies to the U.S. Department of Education that at least 25% of its students are Hispanic. Complaint, Dkt. 1, ¶ 16. But the Constitution forbids the government to engage in such blatant racial discrimination. Doubters need only employ the "flip it" rule to see this. If Congress had established a program under which a college or university could receive funding only if at least 25% of its students were *White,* the courts would have shut it down years ago and no one would try to defend its constitutionality. It would be in every high school history book as an example of a blatantly unconstitutional and racist policy.

This HSI system classifies and determines the treatment of Americans because of their races, and every American is entitled to live in a country free of such racial discrimination. But it most directly affects the students and faculty of non-HSI institutions of higher education, including the schools cited by the Initial Plaintiffs

_____

Program; (vi) the Asian American or Native American Pacific Islander-Serving Institutions Program; (vii) the Native American-Serving Nontribal Institutions Program; (viii) the Predominantly Black Institutions Program; and (ix) the Master's Degree Programs at Predominantly Black Institutions Program (programs (i)-(ix), together, the "Minority Serving Institutions Programs" or the "MSI Programs," with each an "MSI Program").

[3] As used in this brief, the term "race" includes ethnicity.

as excluded from participation in the HSI Programs because of their students' races.[4] They are the ones the HSI Programs deny the benefits of federal funding, because of the skin color of their classmates and students. The educational opportunities offered through the HSI Programs are denied to students at non-HSI schools. And the HSI Programs likewise deny faculty members at non-HSI schools the opportunity to fairly compete for grants to support their facilities, services, and research unless they affiliate with a faculty member at an HSI school.

The second issue is whether encouraging colleges and universities to discriminate on the basis of race either to target particular racial balances or to provide benefits specifically to a racially defined clientele is a constitutionally permissible use of federal funds.

Racial discrimination in admissions is illegal for all federal funding recipients and unconstitutional for all public schools. *Students for Fair Admissions v. President & Fellows of Harvard University*, 600 U.S. 181 (2023). Racial balancing of a university's student body for its own sake has *long* been forbidden. *Id.* at 223 ("'[O]utright racial balancing' is 'patently unconstitutional.'" (quoting *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311 (2013))). But the same federal government that bans discrimination in admissions for federal funding recipients runs a generous bounty program to reward discrimination that results in *successfully maintaining*

---

[4]     Those institutions are: Cleveland State Community College, East Tennessee State University, Jackson State Community College, the University of Memphis, Walters State Community College, University of Tennessee at Chattanooga, Dyersburg State Community College, and Middle Tennessee State University (together, the "Cited Schools"). Complaint, Dkt. 1, ¶ 36.

designated racial results. The MSI Programs reward illegal race discrimination—if it's successful enough—with approximately *one billion dollars* annually.[5] Any school within striking distance of the quota needed to qualify for HSI status will fall over itself to get there. Admissions preferences based on race, coupled with intentional disparate treatment of existing enrolled students across racial lines, while illegal and unconstitutional, are the obvious solution for such a school. The HSI Programs present overwhelming incentives to engage in them.

More, the HSI Programs require their funds to be spent by recipient institutions specifically to benefit Hispanic students.[6] And the HSI Programs structurally prefer grant applications designed to confer benefits on Hispanic students.[7] But it's long been clear that intentionally crafting programs for the purpose of benefitting or penalizing a particular race—even if crafted to employ only

---

[5] *See* Cassandria Dortch, *Programs for Minority-Serving Institutions Under the Higher Education Act*, CONG.: CONG. RSCH. SERV. (Mar. 23, 2023), https://crsreports.congress.gov/product/pdf/R/R43237/19. This likely understates the impact of the MSI Programs' discriminatory criteria, as it omits all MSI funding administered by agencies other than the Department of Education. *Id.* at 1.

[6] 20 U.S.C. § 1011b(a) (requiring that HSI Program "grants awarded . . . be used . . . to plan, develop, undertake, and carry out programs to improve and expand the institutions' capacity to serve Hispanic students and other low income students").

[7] *E.g.*, 34 C.F.R. § 606.12(a) (requiring HSI Program development grant applications to include "[t]he institution's comprehensive development plan"); *id.* § 606.8(b)(5) (requiring such "comprehensive development plans" to include an applicant's "five year plan to improve its services to Hispanic and other low-income students"); *id.* § 606.10(a) (requiring that development grant recipients "implement [their] comprehensive development plans" through activities that may "include . . . (13) Expanding the number of Hispanic and other underrepresented graduate and professional students that can be served by the institution by expanding courses and institutional resources.").

5

facially race-neutral means—violates equal protection[8] (and that even private entities receiving federal funds doing the same violates Title VI).[9]

The problem applies to faculty hiring as well. To attain a student body that is at least 25% Hispanic, colleges and universities are often counseled that they should show they have a welcoming and supportive environment for Hispanic students (often referred to in the literature as demonstrating "servingness"). While they could take many steps to make such prospective students (indeed, *all* students) comfortable, in practice, they are often told that they should obtain a faculty that reflects their targeted future demographics.[10] But Title VII of the Civil Rights Act barred non-remedial racial employment discrimination long before Congress created the HSI Programs, and courts often consider whether employment discrimination by public employers simultaneously violates the Fourteenth Amendment's Equal Protection

---

[8]     *E.g.*, *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

[9]     Title VI bars federal funding recipients from engaging in at least all "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment." *Harvard*, 600 U.S. at 198 n.2 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003)). Title VI may prohibit *all* racial discrimination by public funding recipients, even where such discrimination is narrowly tailored to serve a compelling purpose. *See id.* at 310 (Gorsuch, J., concurring) ("Title VI bears independent force beyond the Equal Protection Clause. . . . Nothing in it endorses racial discrimination to any degree or for any purpose. Title VI is more consequential than that.").

[10]     *E.g.*, Gina Ann Garcia, *Defining "Servingness" at Hispanic-Serving Institutions (HSIs): Practical Implications for HSI Leaders*, AMERICAN COUNCIL ON EDUCATION: IDEAS AND INSIGHTS (2019), https://www.equityinhighered.org/wp-content/uploads/2019/12/Garcia-Essay-FINAL.pdf (last visited, Jul. 30, 2025) (including as an "indicator[ ] of servingness" "experiences that are validating and positively influence sense of belonging, such as interactions with same racial-ethnic peers and Spanish-speaking peers, faculty, and staff" and lauding a related "compositional diversity of faculty, staff, administrators, and graduate students[.]").

6

Clause.[11]  Schools regularly pursue racial matching for their faculties anyway—openly—as part of their declared pursuit of HSI status and the HSI Programs' grants.

This means that—practically speaking—the HSI Programs actively encourage institutions across the nation to pursue illegal employment discrimination against individuals like the Applicants' faculty members.

The HSI Programs (and the parallel grant programs of other federal agencies) also discriminate against the Applicants' faculty members based on their affiliation with student populations of the wrong races.  The HSI Programs exclude these faculty members' institutions from obtaining funding for their facilities, their work, and their services to their students because of their students' racial mix.  The parallel versions of the HSI Programs maintained by other federal agencies then expressly qualify and disqualify institutions from receiving additional funding for the faculty members' work because of the racial mix of their students.  *See* Heideman*, Hispanic-Serving Institutions*, 24 Federalist Soc'y Rev. at 156-58 (documenting these parallel programs).[12]

---

[11]      *E.g.*, *Ricci v. DeStefano*, 557 U.S. 557, 593 (2009) (resolving public employer's liability under Title VII and therefore not reaching issue of constitutionality).

[12]      Updating Heideman's information, agencies continuing to maintain such follow-on programs include at least: the Department of Health & Human Services (through the Centers for Medicare & Medicaid Services (Minority Research Grant Program, https://www.cms.gov/priorities/health-equity/grants-awards/minority-research (last visited, July 20, 2025)), the Department of Defense (through the Department of the Navy (Department of Navy's HBCU/MI Program, https://www.onr.navy.mil/hbcu (last visited, July 20, 2025)), the Department of Homeland Security (The Department of Homeland Security Notice of Funding Opportunity FY 2023 Scientific Leadership Awards for Minority Institutions and Other Minority Serving Institutions (MSI), https://apply07.grants.gov/apply/opportunities/instructions/PKG00277925-

7

The harm caused by the federal government's incentivization of discrimination is obvious. Applicants for admission (including current students seeking to enroll in a different institution) who don't happen to be the correct race get discriminated against. Applicants for faculty positions (including current faculty members seeking either promotion or employment at a different institution) face a similar problem.

Thus, the HSI Programs, like all the other MSI Programs (and *unlike* tribal or historically black colleges and universities, which *don't* share this constitutional defect, *see* Intervenors' Complaint, ¶¶ 25-28) discriminate based on race and lead to race discrimination by their beneficiaries.[13]

## B.  The Applicants

Applicant NAS is a non-profit organization that seeks to reform higher education. Intervenors' Complaint, ¶ 14. Since 1987, NAS has upheld the standards of a liberal arts education that fosters intellectual freedom, searches for the truth, and promotes virtuous citizenship. *Id.*, ¶ 14. To accomplish this mission, NAS defends the academic freedom of faculty members, students, and others through individual advocacy; investigates issues affecting the academic freedom, integrity, and purpose of the university and publishes its findings as in-depth reports; and educates the public about policies and legislation that would preserve the liberal arts

---

instructions.pdf (last visited, July 20, 2025)), and NASA (Research Infrastructure and Capacity Building: NASA's Minority University Research and Education Project, https://www.nasa.gov/murep-research-infrastructure-and-capacity-building/ (last visited, July 20, 2025)).

[13]    For a variety of additional reasons, programs for tribal and historically black colleges and universities are on a different constitutional footing and are not implicated in this litigation. *See* Intervenors' Complaint, ¶¶ 25-28.

and protect academic freedom. *Id.*, ¶ 14. These efforts create three pillars on which NAS's work stands: individual advocacy, research reports, and public advocacy. *Id.*, ¶ 14. NAS has members around the nation affiliated with non-HSI schools (including at least one who is a faculty member of a Tennessee public university and at least one who is a faculty member at a public university located outside of Tennessee). *Id.*, ¶ 14. These faculty members have taught undergraduates and would assist their institutions in applying for HSI-Program grants (and/or would apply to other federal agencies for grants which limit eligibility solely to affiliates of institutions with MSI-status), if the federal government abandoned its discriminatory funding criteria. *Id.*, ¶ 14.

Applicant FASORP is a voluntary, unincorporated, non-profit membership organization formed in 2018 for the purpose of restoring meritocracy in academia and fighting corrupt and illegal race and sex preferences that subordinate academic merit and educational excellence to so-called diversity considerations. *Id.*, ¶ 15. FASORP has at least two members who are enrolled students at one of the Cited Schools. *Id.*, ¶ 15. FASORP also has faculty members around the nation affiliated with non-HSI schools (including at least one who is a faculty member of a Tennessee public university and at least one who is a faculty member at a public university located outside Tennessee). *Id.*, ¶ 15. These faculty members have taught undergraduates and would assist their institutions in applying for HSI-Program grants (and/or would apply to other federal agencies for grants which limit eligibility solely to affiliates of

9

institutions with MSI-status), if the federal government abandoned its discriminatory funding criteria. *Id.*, ¶ 15.

Individual A is a member of NAS and FASORP. *Id.*, ¶ 40. Individual A serves on the faculty of a public university in Tennessee. *Id.*, ¶ 40. Individual A at times teaches courses to graduate and undergraduate students. *Id.*, ¶ 40. Individual A's institution regularly applies for grants from numerous sources, including the federal government. *Id.*, ¶ 40. Individual A would work with Individual A's institution to apply for grants earmarked for HSIs, if that institution were not ineligible based on the aggregated races of its students. *Id.*, ¶ 40. Individual A is not Hispanic. *Id.*, ¶ 40.

Individual B is a member of NAS and FASORP. *Id.*, ¶ 41. Individual B serves on the faculty of a public university located outside of Tennessee. *Id.*, ¶ 41. Individual B at times teaches courses to graduate and undergraduate students. *Id.*, ¶ 41. Individual B's institution regularly applies for grants from numerous sources, including the federal government. *Id.*, ¶ 41. Individual B has, in the past, obtained non-HSI Program grants from federal agencies to fund Individual B's research. *Id.*, ¶ 41. Individual B would work with Individual B's institution to apply for grants earmarked for HSIs, if that institution were not ineligible based on the aggregated races of its students. *Id.*, ¶ 41. Individual B would seek to apply for research grants earmarked for HSIs to fund Individual B's research, were Individual B's institution not ineligible based on the aggregated races of its students. *Id.*, ¶ 41. Individual B is not Hispanic. *Id.*, ¶ 41.

Individual C is a member of FASORP. *Id.*, ¶ 42. Individual C is an enrolled undergraduate student at one of the Cited Schools. *Id.*, ¶ 42.

Individual D is a member of FASORP. *Id.*, ¶ 43. Individual D is an enrolled undergraduate student at one of the Cited Schools. *Id.*, ¶ 43.

The federal government's ongoing discrimination against non-HSI institutions pursuant to the challenged HSI Programs harms the student and faculty members of FASORP and the faculty members of NAS who are not at recognized HSI schools. They are denied professional and educational benefits afforded to those at institutions so recognized. In many cases, the *sole* basis for the federal government's denial of these benefits is the failure of their institutions to have a student body that is at least 25% Hispanic.

NAS's and FASORP's members at non-HSI schools will benefit from a judgment declaring the HSI Programs' discriminatory provisions unconstitutional. The federal government punishes these institutions (and, through them, these NAS and FASORP members affiliated with them) for their failure to engage in the level of race discrimination that would be necessary for them to become eligible for the HSI Programs. The Defendants' conduct discriminates on account of race, causing these harms, and must end.

## LEGAL STANDARD

Under Rule 24(a), a party is entitled to intervene as of right if it "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede

the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). This rule "should be 'broadly construed in favor of potential intervenors.'" *Stupak-Thrall v. Glickman*, 226 F.3d 467, 472 (6th Cir. 2000) (quoting *Purnell v. Akron*, 925 F.2d 941, 950 (6th Cir. 1991)).

To obtain intervention as of right, a party must establish four elements: "(1) timeliness of the application to intervene, (2) the applicant's substantial legal interest in the case, (3) impairment of the applicant's ability to protect that interest in the absence of intervention, and (4) inadequate representation of that interest by parties already before the court." *Id.* at 471 (quoting *Michigan State AFL–CIO v. Miller*, 103 F.3d 1240, 1245 (6th Cir. 1997)).

Under Rule 24(b), a party may permissively intervene if it "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). "[S]o long as the motion for intervention is timely and there is at least one common question of law or fact," permissive intervention may be granted. *Stupak-Thrall*, 226 F.3d at 472 (quotation marks omitted). The trial court's "balancing of undue delay, prejudice to the original parties, and any other relevant factors is reviewed for an abuse of discretion." *Id.*

## **ARGUMENT**

## I.  **The Applicants are entitled to intervene as of right.**

The Applicants are entitled to intervene in this action as of right under Fed. R. Civ. P. 24(a) because their application is timely, they have a substantial legal interest in the case, their ability to protect their interest may be impaired by the disposition

of this action, and their interests are not adequately represented by the existing parties. *Stupak-Thrall*, 226 F.3d at 471.

### A. The motion to intervene is timely.

Whether a motion to intervene is timely must be assessed based on the totality of the following circumstances: (1) how far the proceeding has progressed; (2) the purpose for which intervention is sought; (3) how long intervenors have or should have known of their interest in the case; (4) prejudice to the original parties from the failure to promptly intervene; and (5) the existence of unusual circumstances militating for or against intervention. *Id.* at 473.

This case has only just begun. The original complaint was filed on June 11, 2025. Dkt. 1. This Application is being filed on August 8, 2025, before the Defendants have answered the complaint. Counsel for the Applicants informed counsel for the Initial Plaintiffs on July 29, 2025 of their intent to intervene as plaintiffs in this case and received their positions that same day. Defendants' answer is not due until August 11, 2025. No party sought to intervene before July 24, 2025, when the Hispanic Association of Colleges and Universities moved to intervene as a *defendant*, and the Court has not yet ruled on that motion.

There is no material delay or possibility of prejudice to the other parties. The Applicants seek only to protect the rights of their members. And no unusual circumstances exist which would militate against allowing the Applicants to intervene. The five factors all point toward the same conclusion: the motion is timely.

13

**B.      The Applicants have a substantial legal interest in this case.**

The Sixth Circuit holds "a rather expansive notion of the interest sufficient to invoke intervention of right." *Miller*, 103 F.3d at 1245.  No "specific legal or equitable interest" is required. *Id.* Nor is Article III standing.  *Id.* ("[A]n intervenor need not have the same standing necessary to initiate a lawsuit."); *see also Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 307 (6th Cir. 2019) ("Under our caselaw, the substantial-legal-interest requirement under Fed. R. Civ. P. 24(a) is a lower threshold to meet than the injury-in-fact requirement of Article III standing.").   Nonetheless, the Applicants *have* both specific legal claims and Article III standing, *see* Intervenors' Complaint, ¶¶ 50-67 and ¶¶34-49, respectively, and thus easily satisfy the "substantial legal interest" test.

Here, the rights of FASORP's student members are among those at issue in this case.  The Court cannot resolve this litigation without impacting their rights.  Should the Court uphold the HSI Programs' discriminatory criteria, those criteria will necessarily continue to impair the rights of FASORP's student members.

NAS's and FASORP's faculty members also have significant interests at stake in this litigation.  This case will resolve the eligibility of their institutions to access significant federal funding through the HSI Programs, and thus those institutions' ability to continue to fund the faculty members' work.  It will confront directly the legality of the HSI Programs incentivizing the faculty members' employers and potential employers to racially discriminate against them in faculty hiring.  A ruling upholding the HSI Programs' discriminatory criteria would thus hinder the faculty

14

members' ability to fairly compete for federal funding and to access a nondiscriminatory academic job market.

Wherever an intervenor "would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." *Cascade Nat. Gas Corp. v. El Paso Nat. Gas Co.*, 386 U.S. 129, 134 n.3 (1967) (quoting 1966 Advisory Committee Note to Fed. R. Civ. P. 24(a)). That includes "public interest groups . . . whose members are affected by the law." *Northland Fam. Plan. Clinic, Inc. v. Cox*, 487 F.3d 323, 345 (6th Cir. 2007). Even if this were a close case—it is not—" close cases should be resolved in favor of recognizing an interest under Rule 24(a)." *Grutter v. Bollinger*, 188 F.3d 394, 399 (6th Cir. 1999).

### C. The Applicants' ability to protect their interests may be impaired absent intervention.

"To satisfy this element of the intervention test, a would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied. This burden is minimal." *Grutter*, 188 F.3d at 399 (quoting *Miller*, 103 F.3d at 1247). For at least two reasons, it is possible that the Applicants' ability to protect their interests could be impaired if intervention is denied.

First, were this Court to incorrectly uphold the HSI Programs, that adverse precedent could hinder the Applicants' ability to protect their interests. The Sixth Circuit "has already acknowledged that potential stare decisis effects can be a sufficient basis for finding an impairment of interest." *Miller*, 103 F.3d at 1247.

Second, where a party has a "substantial legal interest" in a case, there is ordinarily a risk that an adverse outcome in the case could impair the party's interest.

15

That is why the Sixth Circuit has treated second and third intervention factors as rising or falling together. *See Grutter*, 188 F.3d at 400 ("As we have now decided, the district court erred in determining that the proposed intervenors did not have a substantial interest in the subject matter of this case. Consequently, we must likewise conclude that the district court erred in its analysis of the impairment element as well."). Here too, the Applicants and their members will suffer if the Defendants are allowed to continue their discriminatory practices. *See id.*

### D. Representation of the Applicants' Interests May Otherwise Prove Inadequate.

The burden of showing "inadequate representation" is "is minimal because it is sufficient that the movant prove that representation *may* be inadequate." *Miller*, 103 F.3d at 1247 (alteration adopted; emphasis added); *see also Grutter*, 188 F.3d at 400 ("The proposed intervenors need show only that there is a *potential* for inadequate representation."). The presence of a state plaintiff has no bearing; the Sixth Circuit "has declined to endorse a higher standard for inadequacy when a government entity is involved." *Grutter*, 188 F.3d at 400. For at least four reasons, the existing plaintiffs may not adequately represent all of the Applicants' interests.

First, the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), highlights the potential for inadequate representation. Under *CASA*, an injunction must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 2562-63. Tennessee and SFFA clearly have standing to seek relief with respect to the non-HSI schools located in Tennessee. But only NAS and FASORP have identified a faculty member at a non-HSI school *outside*

16

of Tennessee. Intervenors' Complaint, ¶ 41. There is thus at least "a *potential*" for inadequate representation by the existing plaintiffs. *Grutter*, 188 F.3d at 400.

Second, only FASORP has identified specific *student* members at non-HSI schools in Tennessee. Intervenors' Complaint, ¶¶ 42-43. While SFFA has identified a specific faculty member, Complaint, Dkt. 1, ¶¶ 51-55, it has not identified any specific student members. Thus, there is "a *potential*" that the existing plaintiffs will not adequately represent FASORP's student members. *Grutter*, 188 F.3d at 400.

Third, both NAS and FASORP have a special emphasis on *faculty*—as their names reflect: the National Association of *Scholars* and *Faculty*, Alumni, and Students Opposed to Racial Preferences. While SFFA has at least one faculty member, Complaint, Dkt. 1, ¶ 53, its focus is on students. *See Harvard*, 600 U.S. at 201 (describing SFFA's student membership). To ensure that faculty interests are adequately represented, the Court should allow NAS and FASORP to intervene.

Fourth, inadequate representation may be shown where "the existing party who purports to seek the same outcome will not make all of the prospective intervenor's arguments." *Grutter*, 188 F.3d at 400. Here, the Applicants' proposed complaint highlights both other Education Department programs—the MSI Programs—and other agencies' adjacent programs which rely on the Education Department's current, discriminatory criteria to determine their own eligibility. Intervenors Complaint, ¶¶ 2, 5-8, 29, 31, 33, and 46. These are all programs that could be affected by the Court's ruling, which the original complaint does not address. That additional perspective is further reason to grant the motion to intervene.

17

While there is "a potential" for inadequate representation, the Applicants and the Initial Plaintiffs agree on the substantive constitutional issues in this case. In the interest of avoiding additional burden to the Court and existing parties, the Applicants would be willing to brief this case jointly with the Initial Plaintiffs.

## II.    Alternatively, the Court should grant permissive intervention.

Alternatively, the Applicants request permissive intervention under Rule 24(b)(1)(B), which allows intervention to anyone who "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). Permissive intervention may be granted when a "motion for intervention is timely and alleges at least one common question of law or fact." *United States v. Michigan*, 424 F.3d 438, 445 (6th Cir. 2005).

The Applicants meet the requirements for permissive intervention. The Applicants' motion is timely and presents no risk of delay or prejudice. And the Applicants' proposed complaint in intervention shares common questions of law and fact with the main action, including the legality of the HSI Programs. The judiciary's "[s]trong interest in judicial economy and desire to avoid multiplicity of litigation wherever and whenever possible therefore supports permissive intervention." *Buck v. Gordon*, 959 F.3d 219, 225-26 (6th Cir. 2020) (reversing district court for denying permissive intervention).

"In determining whether to allow permissive intervention, courts may consider whether such intervention will contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal

18

questions presented." *Students for Fair Admissions Inc. v. Univ. of N. Carolina*, 319 F.R.D. 490, 496 (M.D.N.C. 2017) (quotation marks omitted).  The Applicants and their counsel at the American Civil Rights Project have long worked to enforce the Constitution's guarantee of equal protection, including, specifically, on the structural problems of the MSI Programs.  Their participation in this case "may significantly contribute to a full development of the legal and factual issues and ensure that all competing legal arguments are presented." *Id.*

Given the low bar for permissive intervention, it is unsurprising that district courts regularly grant permissive intervention to nonprofit organizations seeking to join lawsuits challenging government policies, whether in support of or opposition to the challenged policy.  *See, e.g.*, *Washington v. U.S. Dep't of Transportation*, 2025 WL 2070906, at *1 (W.D. Wash. July 23, 2025); *Pub. Int. Legal Found., Inc. v. Winfrey*, 463 F. Supp. 3d 795, 797 (E.D. Mich. 2020); *Am. Farm Bureau Fed'n v. U.S. E.P.A.*, 278 F.R.D. 98, 102-04, 111 (M.D. Pa. 2011); *Johnson v. Mortham*, 915 F. Supp. 1529, 1538-39 (N.D. Fla. 1995).  This Court should do the same if it does not grant intervention as a matter of right for the reasons requested above.

## CONCLUSION

The Court should grant the Applicants' motion to intervene.


DATED: August 8, 2025          Respectfully submitted,

/s/ *Eric G. Osborne*
Eric G. Osborne (No. 29719)
Mark Alexander Carver (No. 36754)*
SHERRARD ROE VOIGT & HARBISON, PLC

19

1600 West End Avenue, Suite 1750
Nashville, TN 37203
Phone: (615) 742-4200
eosborne@srvhlaw.com
acarver@srvhlaw.com

Dan Morenoff (Texas Bar No. 24032760)*
Joseph A. Bingham (D.C. Bar No. 1015329)*
American Civil Rights Project
P.O. Box 12207
Dallas, TX 75225
(214) 504-1835
(919) 649-7403
dan@americancivilrightsproject.org
joe@americancivilrightsproject.org

**\*** *Pro hac vice* application pending

*Attorneys for Proposed Intervenors the National Association of Scholars and Faculty, Alumni, and Students Opposed to Racial Preferences*

## CERTIFICATE OF SERVICE

I hereby certify that I filed this document through the Court's CM/ECF system on August 8, 2025, which will automatically serve counsel for all parties.

DATED: August 8, 2025

/s/ *Eric G. Osborne*
Eric G. Osborne