IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| STATE OF TENNESSEE and STUDENTS FOR FAIR ADMISSIONS, INC.,<br><br>*Plaintiffs,*<br><br>and<br><br>THE NATIONAL ASSOCIATION OF SCHOLARS and FACULTY, ALUMNI, AND STUDENTS OPPOSED TO RACIAL PREFERENCES,<br><br>*Plaintiffs-Intervenors,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION and LINDA MCMAHON, in her official capacity of Secretary of Education,<br><br>*Defendants.* | No. 3:25-cv-270-KAC-DCP |

## **COMPLAINT IN INTERVENTION**

### I.    INTRODUCTION

1. Congress bars countless schools from competing for approximately a *billion dollars* in federal grants a year because of the races of those schools' students.

2. Congress does so through at least nine "Minority Serving Institution" programs, which condition schools' eligibility for federal money on the racial balances[1] they engineer for their student populations.[2]

---

[1] As used herein, the term "race" includes ethnicity.

[2] As used here, a Minority Serving Institution is one authorized to participate in any of nine parallel federal programs: (i) the Developing Hispanic Serving Institutions Program; (ii) the Hispanic-Serving Institutions—Science, Technology, Engineering, or Mathematics and Articulation Program; (iii) the Promoting Postbaccalaureate Opportunities for Hispanic Americans Program (programs (i)-(iii), together, , the "HSI Programs," with each an "HSI Program"); (iv) the Alaska Native-

1

3. Congress created the first of these programs for "Hispanic Serving Institutions" ("HSIs" or "HSI schools") to support "institutions of higher education, which have a student body that has traditionally had a significant portion of Hispanic students,"[3] but never incorporated any requirement of any such history into the statute.

4. Instead—from the jump—Congress made funding availability contingent on current enrollment *percentages*.

5. By so defining these programs, Congress bars institutions from an equal opportunity to access federal funding because too few of their students classify in specified racial groups, while too many identify with others. Under settled law, these programs unconstitutionally discriminate based on race.

6. These programs primarily flow through the U.S. Department of Education (the "Department"), which designates the qualifying institutions and awards dedicated grants solely to the schools so designated. Then a host of other federal agencies participate in their own parallel programs by piggybacking on the Department's designations of institutions having achieved its to-order racial results and awarding grants solely to those schools.

---

Serving Institutions Program; (v) the Native Hawaiian-Serving Institutions Program; (vi) the Asian American or Native American Pacific Islander-Serving Institutions Program; (vii) the Native American-Serving Nontribal Institutions Program; (viii) the Predominantly Black Institutions Program; and (ix) the Master's Degree Programs at Predominantly Black Institutions Program (programs (i)-(ix), together, the "Minority Serving Institutions Programs" or the "MSI Programs," with each an "MSI Program").

[3] Alexander M. Heideman, *Hispanic-Serving Institutions and Emerging Constitutional Issues*, 24 Federalist Soc'y Rev. 147, 152 (2023) (citing the Hispanic Serving Institutions of Higher Education Act of 1989, H.R. 1561, 101st Cong. (1989)).

7. These agencies, like the Department, limit access to federal funding streams to the schools the Department favors because of the racial balances of their students.

8. Through these programs, the federal government discriminates against students because of their races. Through these programs, the federal government discriminates against faculty and their schools because of the races of their students. Through these programs, the federal government incentivizes schools (including state public schools) to violate federal civil rights statutes (and public schools to violate the Fourteenth Amendment).

9. That's wrong. It's illegal. It must stop.

10. The largest of these bounties-for-race-balancing programs are the HSI Programs at issue in this case.

11. The Plaintiff-Intervenors (as defined below) deserve the chance for their members' institutions to fairly compete for education dollars, whatever their races or the races of their peers and students. Those members have the right not to be denied funding for their research, services, or education because of their races and the races of their students and classmates. The Court must stop the defendants from continuing to deny these rights.

## II. PARTIES

12. Plaintiff the State of Tennessee is a sovereign state.

13. Plaintiff Students for Fair Admissions (along with Tennessee, the "Initial Plaintiffs") is a voluntary membership organization representing individuals opposed to unlawful racial discrimination.

14. Plaintiff-Intervenor National Association of Scholars ("NAS") is a non-profit organization that seeks to reform higher education. Since 1987, NAS has upheld the standards of a liberal arts education that fosters intellectual freedom,

3

searches for the truth, and promotes virtuous citizenship. To accomplish this mission, NAS defends the academic freedom of faculty members, students, and others through individual advocacy; investigates issues affecting the academic freedom, integrity, and purpose of the university and publishes its findings as in-depth reports; and educates the public about policies and legislation that would preserve the liberal arts and protect academic freedom. These efforts create three pillars on which NAS's work stands: individual advocacy, research reports, and public advocacy. NAS has members around the nation affiliated with non-HSIs (including at least one who is a faculty member of a Tennessee public university and at least one who is a faculty member at a public university located outside Tennessee), who have taught undergraduates and who would assist their institutions in applying for HSI-Program grants (and/or would apply to other federal agencies for grants which limit eligibility solely to affiliates of institutions with MSI-status), if the federal government did not prohibit their institutions' participation (or require that they get any such application submitted primarily by faculty at an HSI).

15. Plaintiff-Intervenor Faculty, Alumni, and Students Opposed to Racial Preferences ("FASORP") is a voluntary, unincorporated, non-profit membership organization formed in 2018 for the purpose of restoring meritocracy in academia and fighting corrupt and illegal race and sex preferences that subordinate academic merit and educational excellence to so-called diversity considerations. FASORP has at least two members who are enrolled students at schools cited by the Initial Plaintiffs as excluded from participation in the HSI Programs because of their students' races.[4] FASORP also has members around the nation affiliated with non-HSIs (including at

---

[4] Those institutions are: Cleveland State Community College, East Tennessee State University, Jackson State Community College, the University of Memphis, Walters State Community College, University of Tennessee at Chattanooga, Dyersburg State Community College, and Middle Tennessee State University (together, the "Cited Schools"). Complaint, Dkt. 1, ¶ 36.

least one who is a faculty member of a Tennessee public university and at least one who is a faculty member at a public university located outside Tennessee), who have taught undergraduates and who would assist their institutions in applying for HSI-Program grants (and/or would apply to other federal agencies for grants which limit eligibility solely to affiliates of institutions with MSI-status), if the federal government did not prohibit their institutions' participation (or require that they get any such application submitted primarily by faculty at an HSI).

16. Defendant U.S. Department of Education is an executive agency of the federal government responsible for the enforcement and administration of the Higher Education Act and the HSI Programs.

17. Defendant Linda McMahon is the Secretary of the U.S. Department of Education. The Secretary is responsible for the administration and enforcement of the Higher Education Act and the HSI Programs. *See, e.g.*, 20 U.S.C. §§1003(17), 1067q(b)(1)(A), 1101(c), 1102a(a). She is sued in her official capacity.

18. Proposed Defendant-Intervenor Hispanic Association of Colleges and Universities ("HACU") is a membership organization representing the institutional beneficiaries of the HSI Programs' racial balancing bounties.

### III. JURISDICTION AND VENUE

19. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201 and 5 U.S.C. § 702, because this case presents a substantial question of federal law—specifically whether the HSI Programs, and Defendants' implementation thereof, violate the guarantees of the U.S. Constitution and 5 U.S.C. § 706.

20. This Court has authority to issue a declaratory judgment, to order injunctive relief, and to award attorneys' fees and costs and other relief that is necessary and proper pursuant to 28 U.S.C. § 2201, 2202, and 2412 and 5 U.S.C. §§ 705 and 706.

5

21. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and/or (e)(1).

## IV. FACTS

22. The Plaintiff-Intervenors incorporate by reference Paragraphs 1-50 of the Complaint of Plaintiffs Tennessee and Students for Fair Admissions. *See* Dkt. 1.

23. The federal government offers funds to public educational institutions, often in the form of grants, which are distributed through a large number of programs.

24. Among those programs are the HSI Programs.

25. These programs differ profoundly from other programs which neither the Initial Plaintiffs, nor the Plaintiff-Intervenors, challenge. For example, neither the Initial Plaintiffs, nor the Plaintiff-Intervenors challenge the propriety of the federal government supporting either Historically Black Colleges and Universities ("HBCUs") or Tribal Colleges and Universities ("TCUs"), which stand on a different and much stronger constitutional footing.

26. HBCUs' federal support *is not* conditioned (as the MSI Programs are) on their current, enrolled demography. Instead, HBCU status (and HBCU funding eligibility) is determined by the "H"—if an institution *historically* existed as a school for Black Americans and received federal funding before the passage of the Civil Rights Act of 1964, it retains that funding today, whatever its current makeup.

27. TCUs similarly lack the MSI Programs' shared conditioning of federal money on current racial balances. TCUs receive support from the federal government because (regardless of student body demographics), they are institutions of higher learning maintained by America's *sovereign* Tribes. The Tribes maintain TCUs as sovereign political entities, not as racial or ethnic groups. Those political units can and do institute rules for such institutions to assure that they serve the Tribes'

6

constituencies in exactly the same way that Georgia charges Georgia residents less for tuition at the University of Georgia than it charges Americans from elsewhere. Because Tribes are political institutions, this is a political distinction, not a racial or ethnic one, with the treatment turning on constituency-status, not on race.

28. Conversely, the HSI Programs challenged in this litigation share an unlawful discriminatory structure entirely different from HBCUs' and TCUs' race-neutrality.

29. Each of the MSI Programs, including the HSI Programs challenged here, run primarily through the Department. By statute, each of the MSI Programs conditions the eligibility of any school to participate in that MSI Program on such school annually certifying with the Department the racial balance of its student body. *See* Alexander M. Heideman, *Hispanic-Serving Institutions and Emerging Constitutional Issues*, 24 Federalist Soc'y Rev. 147, 149 & nn.19-22 (2023) (documenting the different racial thresholds that apply to each MSI Program).

30. No school may compete for the HSI Programs' funding or participate in the HSI Programs unless it annually certifies that at least 25% of its student population is Hispanic.

31. While the Department maintains the master lists of colleges and universities qualifying for participation in the various MSI Programs, additional federal agencies make the eligibility of colleges and universities to participate in some of those additional agencies' own programming contingent on the Department's determinations.[5]

---

[5]  At least the following agencies maintain such follow-on programs: the Department of Health & Human Services (through the Centers for Medicare & Medicaid Services (Minority Research Grant Program, https://www.cms.gov/priorities/health-equity/grants-awards/minority-research (last visited, July 20, 2025)); the Department of Defense (through the Department of the

7

32. The HSI Programs require their funds to be spent by recipient institutions specifically to benefit Hispanic students.[6] And the HSI Programs structurally prefer grant applications designed to confer benefits on Hispanic students.[7]

33. Multiple federal agencies, then, actively condition federal benefits on the racial enrollment of students at recipient institutions, in the process barring because of schools' enrolled students' races: (a) those schools from accessing those benefits for their students (including FASORP's student members), (b) students at such schools (including FASORP's student members) from receiving the benefits of these programs, and (c) faculty at those schools (including NAS and FASORP's faculty members) from accessing funding for their facilities, research, and services to

---

Navy (Department of Navy's HBCU/MI Program, https://www.onr.navy.mil/hbcu (last vistited, July 20, 2025)); the Department of Homeland Security (The Department of Homeland Security Notice of Funding Opportunity FY 2023 Scientific Leadership Awards for Minority Institutions and Other Minority Serving Institutions (MSI), https://apply07.grants.gov/apply/opportunities/instructions/PKG00277925-instructions.pdf (last visited, July 20, 2025)); and NASA (Research Infrastructure and Capacity Building: NASA's Minority University Research and Education Project, https://www.nasa.gov/murep-research-infrastructure-and-capacity-building/ (last visited, July 20, 2025)).

[6] 20 U.S.C. § 1101b(a) ("Grants awarded . . . shall be used . . . to assist the institutions to plan, develop, undertake, and carry out programs to improve and expand the institutions' capacity to serve Hispanic students and other low-income students.").

[7] *E.g.*, 34 C.F.R. § 606.12(a) (requiring HSI Program development grant applications to include "[t]he institution's comprehensive development plan"); *id.* § 606.8(b)(5) (requiring such "comprehensive development plans" to include an applicant's "five year plan to improve its services to Hispanic and other low-income students"); *id.* § 606.10(a) (requiring that development grant recipients "implement [their] comprehensive development plans" through activities that may "include . . . (13) Expanding the number of Hispanic and other underrepresented graduate and professional students that can be served by the institution by expanding courses and institutional resources.").

8

students.  *See* Heideman, *Hispanic-Serving Institutions*, 24 Federalist Soc'y Rev. at 156-58 (documenting these parallel programs).

34. FASORP's members include students enrolled at institutions across the state and the nation (like and including at least one of the Cited Schools), which are prohibited from participating in the HSI Programs because of their races and the races of their classmates.  For example, Individuals C and D are each members of FASORP who are enrolled undergraduate students at one of the Cited Schools.

35. These federal agencies' discriminatory requirements harm FASORP's student members in at least three ways.

36. *First*, so long as non-HSI schools do not achieve the prescribed racial balances the HSI Programs require, the HSI Programs deny those schools HSI funding.  This denial of funding increases the relative cost of the education of FASORP's student members enrolled at non-HSI institutions, denying them a federal benefit based on their races and those of their classmates.

37. *Second*, through their current, discriminatory requirements, the HSI Programs incentivize schools to violate the United States Constitution and federal statutes by discriminating as much as necessary to racially gerrymander their admitted and retained classes to produce qualifying racial balances.  Congress thus pays schools to engage in the same behavior that the Supreme Court confirmed is unlawful in *Students for Fair Admissions v. President & Fellows of Harvard University*.[8]  Congress entices schools to unlawfully discriminate against both: (a) applicants for admission and (b) enrolled students (including FASORP's student members), if they are of the wrong races in order to increase the percentage of their reportable Hispanic populations.

---

[8]     600 U.S. 181 (2023).

9

Case 3:25-cv-00270-KAC-DCP   Document 35   Filed 10/10/25   Page 9 of 19   PageID #: 220

38. *Third*, the HSI Programs harm many of FASORP's student members enrolled *at HSIs*, by both (a) expressly requiring their funds to be spent by recipients to specifically and specially benefit Hispanic students;[9] and (b) structurally preferring grant applications designed to confer benefits on Hispanic students.[10] The majority of American college students are not Hispanic.[11] The majority of American college students *at HSIs* are not Hispanic.[12] The HSI Programs require even those entities they allow to participate in the HSI Programs to spend the funds received in ways that deny the non-Hispanic majority of their students the benefits of or discriminate against the non-Hispanic majority of their students under the funded programming.

39. The Plaintiff-Intervenors' members include faculty at non-HSI institutions of higher education across the state and nation, including at least one

---

[9] 20 U.S.C. § 1011b(a) (requiring that HSI Program "grants awarded . . . be used . . . to plan, develop, undertake, and carry out programs to improve and expand the institutions' capacity to serve Hispanic students and other low income students").

[10] *E.g.*, 34 C.F.R. § 606.12(a) (requiring HSI Program development grant applications to include "[t]he institution's comprehensive development plan"); *id.* § 606.8(b)(5) (requiring such "comprehensive development plans" to include an applicant's "five year plan to improve its services to Hispanic and other low-income students"); *id.* § 606.10(a) (requiring that development grant recipients "implement [their] comprehensive development plans" through activities that may "include . . . (13) Expanding the number of Hispanic and other underrepresented graduate and professional students that can be served by the institution by expanding courses and institutional resources.").

[11] Postsecondary National Policy Institute, *Latino Students in Higher Education Fact Sheet*, https://pnpi.org/wp-content/uploads/2025/05/LatinoStudents_FactSheet_Apr25.pdf ("In fall 2022, Latino Students made up 20.3% of all postsecondary enrollment." (citing Digest of Education Statistics, National Center for Education Statistics, Apr. 2025)).

[12] Postsecondary National Policy Institute, *Hispanic Serving Institutions (HSIs) Fact Sheet*, https://pnpi.org/wp-content/uploads/2025/07/HSI_FactSheet_Jul25.pdf ("2,142,019 (45.8%) of the total enrollment at HSIs identified as Hispanic or Latino." (citing Integrated Postsecondary Education Data System. National Center for Education Statistics, Feb. 2024)).

member whose institution could otherwise qualify to participate in the HSI Programs but for the HSI Programs' discriminatory criteria.

40. Individual A is a member of NAS and FASORP. Individual A serves on the faculty of a public university in Tennessee. Individual A at times teaches courses to graduate and undergraduate students. Individual A's institution regularly applies for grants from numerous sources, including the federal government. Individual A would work with Individual A's institution to apply for grants earmarked for HSIs, if that institution were not ineligible based on the aggregated races of its students. Individual A is not Hispanic.

41. Individual B is a member of NAS and FASORP. Individual B serves on the faculty of a public university located outside of Tennessee. Individual B at times teaches courses to graduate and undergraduate students. Individual B's institution regularly applies for grants from numerous sources, including the federal government. Individual B has, in the past, obtained non-HSI Program grants from federal agencies to fund Individual B's research. Individual B would work with Individual B's institution to apply for grants earmarked for HSIs, if that institution were not ineligible based on the aggregated races of its students. Individual B would seek to apply for research grants earmarked for HSIs to fund Individual B's research, were Individual B's institution not ineligible based on the aggregated races of its students. Individual B is not Hispanic.

42. Individual C is a member of FASORP. Individual C is an enrolled undergraduate student at one of the Cited Schools.

43. Individual D is a member of FASORP. Individual D is an enrolled undergraduate student at one of the Cited Schools.

44. In order to attain a student body that is at least 25% Hispanic, colleges and universities are often counseled that they should show that they have a welcoming and supportive environment for Hispanic students (often referred to in the

11

literature as demonstrating "servingness"). While they could take many steps to make such prospective students (indeed, *all* students) comfortable, in practice, they are often told that they should obtain a faculty that reflects their targeted future demographics.[13] Schools regularly pursue racial matches of their faculties to their targeted future student demographics—openly—as part of their declared pursuit of HSI status.

45. This means that—practically speaking—the HSI Programs actively encourage institutions across the nation to pursue illegal employment discrimination against individuals like the Plaintiff-Intervenors' faculty members.

46. The HSI Programs (and the parallel grant programs of other federal agencies) discriminate against the Plaintiff-Intervenors' faculty members based on their affiliation with student populations of the wrong races. The HSI Programs exclude these faculty members' institutions from obtaining funding for their facilities, their work, and their services to their students because of their students' racial mix. The parallel versions of the HSI Programs maintained by other federal agencies expressly qualify and disqualify institutions from receiving funding for the Plaintiff-Intervenors' faculty members' work due to the races of their students. *See* Heideman, *Hispanic-Serving Institutions*, 24 Federalist Soc'y Rev. at 156-58 (documenting these parallel programs).

---

[13] *E.g.*, Gina Ann Garcia, *Defining "Servingness" at Hispanic-Serving Institutions (HSIs): Practical Implications for HIS Leaders*, American Council on Education, 2019, https://www.equityinhighered.org/wp-content/uploads/2019/12/Garcia-Essay-FINAL.pdf (last visited, Jul. 30, 2025) (including as an "indicator[ ] of servingness" "experiences that are validating and positively influence sense of belonging, such as interactions with same racial-ethnic peers and Spanish-speaking peers, faculty, and staff" and lauding a related "compositional diversity of faculty, staff, administrators, and graduate students[.]").

12

47. The HSI Programs' current, discriminatory criteria deny the Plaintiff-Intervenors' faculty members affiliated with non-HSI schools any opportunity to compete for streams of federal funding for their facilities, services, and research. Those same criteria, coupled with the HSI Programs' incentivization to demonstrate "servingness," incentivize invidious discrimination against the Plaintiff-Intervenors' faculty members as employees and employment applicants.

48. The Plaintiff-Intervenors' faculty members include those ready and able to assist their institutions in applying for HSI Program grant funding. The Plaintiff-Intervenors' faculty members include those who have assisted their institutions in pursuing grants from many sources, including federal agencies. The Plaintiff-Intervenors' faculty members include those who have obtained non-HSI Program grants from federal agencies in the past to fund their work. These faculty members stand ready to assist their institutions in obtaining HSI Program grants, if the HSI Programs' eligibility criteria did not exclude their institutions from participating based on the races of their students.

49. The Plaintiff-Intervenors' members have suffered and will continue to suffer irreparable harm from the HSI Programs' categorical denial to their schools of the opportunity to compete for federal funding on an equal footing (indeed, to compete for the HSI Programs' appropriated funding *at all*).

## V. CLAIMS FOR RELIEF

### COUNT 1 - DENIAL OF EQUAL PROTECTION

50. The foregoing allegations are hereby incorporated by reference.

51. Since the day on which the Supreme Court issued its opinions in *Brown v. Board of Education* and *Bolling v. Sharpe*,[14] it has been clear that the Constitution

---

[14] 347 U.S. 483 (1954) and 347 U.S. 497 (1954), respectively.

imposes the same constraints on the federal government that the Fourteenth Amendment's Equal Protection Clause imposes on the states.

52. Regardless of *where* this constraint is most properly found in the Constitution, the constraint's *existence* is by now a truth universally acknowledged. Coterminous with the Equal Protection Clause, it renders *all* federal racial discrimination odious, no matter the context.[15] It "demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities."[16] "That principle"—the core of equal protection—"cannot be overridden except in the most extraordinary case," where racial classification and disparate treatment satisfy strict scrutiny.[17]

53. The HSI Programs' current, discriminatory requirements expressly rely on racial classifications to categorically exclude institutions from participating. They must satisfy strict scrutiny to be valid. Strict scrutiny requires the defendants' utilization of these eligibility requirements to be "narrowly tailored" to "further compelling governmental interests."[18]

54. The HSI Programs' current, discriminatory requirements cannot satisfy either prong of this test.

55. The HSI Programs' current, discriminatory requirements serve no compelling interest. The Supreme Court recognizes only two interests as sufficiently compelling to justify race discrimination: "One is remediating specific, identified instances of recent past discrimination that violated the Constitution or a statute . . . . The second is avoiding imminent and serious risk to human safety in

---

[15] *Harvard*, 600 U.S. at 206-07.

[16] *Id.* at 220 (quotation marks omitted).

[17] *Id.* at 206-08.

[18] *Id.* at 206-07.

14

prisons, such as [during] a race riot."[19] Nothing about the HSI Programs' current, discriminatory requirements comes close.

56. Even if the HSI Programs' current, discriminatory requirements served one of the two available compelling interests or something even approximating their gravity, the HSI Programs would not be narrowly tailored to achieve it.

57. Instead, the HSI Programs plainly, nakedly dispense federal funds on the basis of "[o]utright racial balancing" for its own sake.[20] Refusing to "treat citizens as individuals[,]" they choose which schools to allocate federal dollars based on the reduction of American students to "simpl[e] components of a racial … class."[21] They specifically fund benefits that must be racially directed. *See* 20 U.S.C. § 1011b(a).

58. The HSI Programs unconstitutionally discriminate against the students (including FASORP's student members) and faculty (including NAS and FASORP's faculty members) at excluded institutions (including the Cited Schools and other schools in Tennessee and around the nation) on the basis of the racial mix of those institutions. The HSI Programs require their funding to be used to discriminate against most of the students (including FASORP's members) *even at included* institutions. *See* 20 U.S.C. § 1011b(a).

59. The HSI Programs' discriminatory requirements facially violate equal protection and should both be declared unlawful and enjoined.

### COUNT 2 - VIOLATION OF THE SPENDING CLAUSE

60. The foregoing allegations are hereby incorporated by reference.

61. Article I of the U.S. Constitution enumerates the powers of Congress.

62. The Taxing and Spending Clause (Article I, Section 8, Clause 1) empowers Congress to "lay and collect Taxes, Duties, Imposts and Excises, to pay the

---

[19] *Id.* at 207.

[20] *Id.* at 223.

[21] *Id.* (quotation marks omitted).

15

Debts and provide for the common Defence and general Welfare of the United States[.]"

63. The resulting spending power is exceptionally broad, but it has some limits. Prominently among those limits stands the "independent constitutional bar" doctrine. The independent constitutional bar doctrine:

> stands for the unexceptionable proposition that the power may not be used to induce the States to engage in activities that would themselves be unconstitutional. Thus, for example, *a grant of federal funds conditioned on invidiously discriminatory state action … would be an illegitimate exercise of the Congress' broad spending power*.[22]

64. The HSI Programs' current, discriminatory requirements condition federal funding on schools' annual re-certification that they have obtained or maintained the HSI Programs' required racial balances. Public colleges and universities are instrumentalities of their states subject to the Fourteenth Amendment's Equal Protection Clause, and they therefore cannot engage in racial discrimination even if necessary to access federal funds under the HSI Programs.

65. The HSI Programs' current, discriminatory requirements assure that the HSI Programs' funds go to *only* the public institutions that achieve the proscribed "[o]utright racial balancing,"[23] refusing to "treat citizens as individuals" rather than as "simpl[e] components of a racial . . . class."[24] "'[O]utright racial balancing' is 'patently unconstitutional'" under the Fourteenth Amendment's Equal Protection Clause.[25] The Supreme Court has confirmed racial discrimination in college admissions—including racial balancing—to be a form of invidious discrimination.

---

[22] *South Dakota v. Dole*, 483 U.S. 203, 210-211 (1987) (emphasis added).
[23] *Harvard*, 600 U.S. at 223.
[24] *Id.* (quotation marks omitted).
[25] *Id.*

16

Case 3:25-cv-00270-KAC-DCP    Document 35    Filed 10/10/25    Page 16 of 19
PageID #: 227

Yet the HSI Programs' current, discriminatory requirements nonetheless condition federal dollars on schools' obtaining and maintaining specific racial balances, so rewarding that intentional invidious discrimination.

66. The HSI Programs require even recipient institutions to use their funds to seek to achieve racially defined ends. The pursuit of such intentional racial ends (even if pursued through proxy discrimination) violates the Fourteenth Amendment's Equal Protection Clause as invidious discrimination, unless it can satisfy strict scrutiny. But no such recipient spending would or could satisfy either prong of strict scrutiny: it would serve no compelling interest and would not be narrowly tailored to such an interest.

67. For all these reasons, the HSI Programs' discriminatory requirements violate the independent constitutional bar doctrine. They exceed the power of Congress under the Spending Clause. The court should declare the HSI Programs' discriminatory requirements unlawful and enjoin their enforcement.

## VI. PRAYER

The Plaintiff-Intervenors pray for the following relief:

    (a) A declaratory judgment declaring that the HSI Programs violate the U.S. Constitution's Equal Protection constraints on the federal government;

    (b) A declaratory judgment that the HSI Programs violate the independent constitutional bar doctrine and so exceed Congress's Spending Clause powers;

    (c) Appropriate preliminary and permanent injunctive relief to the Plaintiff-Intervenors; and

    (d) Any and all other relief to which the Plaintiff-Intervenors are entitled, including attorneys' fees, litigation expenses, and costs.

17

DATED: October 10, 2025        Respectfully submitted,

/s/ *Mark Alexander Carver*
Eric G. Osborne (No. 29719)
Mark Alexander Carver (No. 36754)
SHERRARD ROE VOIGT & HARBISON, PLC
1600 West End Avenue, Suite 1750
Nashville, TN 37203
Phone: (615) 742-4200
eosborne@srvhlaw.com
acarver@srvhlaw.com

Dan Morenoff (Texas Bar No. 24032760)*
Joseph A. Bingham (D.C. Bar No. 1015329)*
American Civil Rights Project
P.O. Box 12207
Dallas, TX 75225
(214) 504-1835
(919) 649-7403
dan@americancivilrightsproject.org
joe@americancivilrightsproject.org

\* admitted *pro hac vice*

*Attorneys for Plaintiff-Intervenors the National Association of Scholars and Faculty, Alumni, and Students Opposed to Racial Preferences*

18

## **CERTIFICATE OF SERVICE**

I hereby certify that I filed this document through the Court's CM/ECF system on October 10, 2025, which will automatically serve counsel for all parties.

DATED: October 10, 2025

/s/ *Mark Alexander Carver*
Mark Alexander Carver