# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## KNOXVILLE DIVISION

STATE OF TENNESSEE; STUDENTS FOR FAIR
ADMISSIONS, INC.,

*Plaintiffs*,

THE NATIONAL ASSOCIATION OF SCHOLARS
and FACULTY, ALUMNI, AND STUDENTS
OPPOSED TO RACIAL PREFERENCES,

*Plaintiff–Intervenors*,

v.

UNITED STATES DEPARTMENT OF EDUCATION
and LINDA MCMAHON, in her official capacity
as Secretary of Education,

*Defendants,*

HISPANIC ASSOCIATION OF COLLEGES AND
UNIVERSITIES,

*Defendant-Intervenor.*

Case No. 3:25-cv-270

# DEFENDANT-INTERVENOR'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFF-INTERVENORS' COMPLAINT IN INTERVENTION

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.     Congress Establishes the Hispanic-Serving Institutions Program. ......................... 2

           A.    Developing Hispanic-Serving Institutions (Title V, Part A) ...................... 4

           B.    Promoting Postbaccalaureate Opportunities for Hispanic
                 Americans (Title V, Part B) ...................................................................... 4

           C.    Hispanic-Serving Institutions – Science, Technology, Engineering,
                 or Mathematics and Articulation (Title III, Part F) .................................... 5

    II.    Plaintiffs Challenge the Constitutionality of the Hispanic-Serving
          Institutions Program, but the U.S. Department of Education Declined to
          Defend the Program. .................................................................................... 5

    III.    The Department of Education Defunds Two of the Three Challenged HSIs
          Programs. ..................................................................................................... 7

LEGAL STANDARD ......................................................................................................... 7

ARGUMENT ...................................................................................................................... 8

    I.     Plaintiff-Intervenors NAS and FASORP Lack Article III Standing. ...................... 8

           A.    NAS and FASORP Fail to Identify a Member with a Concrete
                 Injury. ..................................................................................................... 10

           B.    NAS's and FASORP's Alleged Injuries Are Not Fairly Traceable
                 to Any Federal Law. ................................................................................ 12

           C.    Adjudication of NAS's and FASORP's Claims Would Require
                 Individual Member Participation. ............................................................. 16

    II.    Plaintiff-Intervenors' Claims Based on the Title V Programs Are Moot. ........... 18

           A.    DOE's Defunding of the Title V Programs Moots Plaintiff-
                 Intervenors' Claims. ............................................................................... 18

           B.    The Voluntary Cessation Exception to the Mootness Doctrine Does
                 Not Apply. ............................................................................................... 20

CONCLUSION ................................................................................................................. 23

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Ailor v. City of Maynardville,*
368 F.3d 587 (6th Cir. 2004) ...................................................................18, 20

*Allen v. Collins,*
529 F. App'x 576 (6th Cir. 2013) .........................................................18, 19, 20

*Allen v. Wright,*
468 U.S. 737 (1984) .................................................................................15

*Already, LLC v. Nike, Inc.,*
568 U.S. 85 (2013) ...................................................................................18

*Alvarez v. Smith,*
558 U.S. 87 (2009) ...................................................................................18

*Bano v. Union Carbide Corp.,*
361 F.3d 696 (2d Cir. 2004) ......................................................................17

*Bassett v. Nat'l Collegiate Athletic Ass'n,*
528 F.3d 426 (6th Cir. 2008) ......................................................................14

*Bench Billboard Co. v. City of Cincinnati,*
675 F.3d 974 (6th Cir. 2012) ......................................................................20

*Bond v. Utreras,*
585 F.3d 1061 (7th Cir. 2009) ......................................................................9

*Cartwright v. Garner,*
751 F.3d 752 (6th Cir. 2014) ........................................................................8

*Changizi v. Dep't of Health & Hum. Servs.,*
82 F.4th 492 (6th Cir. 2023), *cert. denied,* 144 S. Ct. 2716 (2024)........................13

*Chapman v. Tristar Prods., Inc.,*
No. 16-CV-1114, 2018 WL 4203533 (N.D. Ohio Sept. 4, 2018)............................9

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .................................................................................15

*County of Santa Clara v. Trump,*
250 F. Supp. 3d 497 (N.D. Cal. 2017) ..........................................................6

*Crawford v. U.S. Dep't of the Treasury,*
868 F.3d 438 (6th Cir. 2017) ......................................................................12

*Davis v. Colerain Township,*
51 F.4th 164 (6th Cir. 2022) ......................................................................21

*Davis v. FEC*,
    554 U.S. 724 (2008) ........................................................................................8

*DeFunis v. Odegaard*,
    416 U.S. 312 (1974) ........................................................................................8

*Democracy Forward Found. v. White House Off. of Am. Innovation*,
    356 F. Supp. 3d 61 (D.D.C. 2019) ................................................................7

*Doe v. Univ. of Mich.*,
    78 F.4th 929 (6th Cir. 2023) ........................................................................21

*Fair Elections Ohio v. Husted*,
    770 F.3d 456 (6th Cir. 2014) ........................................................................16

*FASORP v. Harv. L. Rev. Ass'n*,
    No. 18-12105, 2019 WL 3754023 (D. Mass. Aug. 8, 2019) .................................12

*FASORP v. N.Y.U. L. Rev.*,
    No. 18-cv-9184, 2020 WL 1529311 (S.D.N.Y. Mar. 31, 2020), *aff'd*, 11 F.4th
    68 (2d Cir. 2021) ............................................................................................11

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ......................................................................................21

*Gavitt v. Born*,
    835 F.3d 623 (6th Cir. 2016) ........................................................................14

*Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*,
    807 F.3d 806 (6th Cir. 2015) ....................................................................7, 8

*Gun Owners of Am., Inc. v. U.S. Dep't of Just.*,
    157 F.4th 834 (6th Cir. 2025) ......................................................................22

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ........................................................................9, 10, 16

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,
    477 U.S. 274 (1986) ......................................................................................17

*Jackson v. City of Columbus*,
    194 F.3d 737 (6th Cir. 1999) ..........................................................................6

*Jones v. City of Cincinnati*,
    521 F.3d 555 (6th Cir. 2008) ..........................................................................6

*Los Angeles County v. Davis*,
    440 U.S. 625 (1979) ......................................................................................20

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..................................................................................9, 11

*North Carolina v. Rice*,
    404 U.S. 244 (1971) ........................................................................................8

- iii -

*Ohio Stands Up! v. U.S. Dep't of Health & Hum. Servs.*,
   No. 21-3995, 2022 WL 1576929 (6th Cir. May 19, 2022) ................................. 13, 16

*Ohio v. U.S. Env't Prot. Agency*,
   969 F.3d 306 (6th Cir. 2020) ................................................................................. 8

*Resurrection School v. Hertel*,
   35 F.4th 524 (6th Cir. 2022) ................................................................................ 22

*Robinson v. Shelby Cnty. Bd. of Educ.*,
   566 F.3d 642 (6th Cir. 2009) .............................................................................. 14

*Simon v. E. Ky. Welfare Rts. Org.*,
   426 U.S. 26 (1976) .............................................................................................. 15

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ............................................................................................ 11

*Students for Fair Admissions v. Harvard*,
   600 U.S. 181 (2023) ............................................................................................ 21

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ............................................................................................ 11

*Thomas v. City of Memphis*,
   996 F.3d 318 (6th Cir. 2021) ................................................................... 20, 22, 23

*Thompson v. DeWine*,
   7 F.4th 521 (6th Cir. 2021) ................................................................................. 19

*Town of Chester v. Laroe Ests., Inc.*,
   581 U.S. 433 (2017) .............................................................................................. 9

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ............................................................................................ 11

*Turaani v. Wray*,
   988 F.3d 313 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 225 (2021) .............. 12, 13, 17

*Vapor Tech. Ass'n v. U.S. Food & Drug Admin.*,
   977 F.3d 496 (6th Cir. 2020) .............................................................................. 15

*W6 Rest. Grp., Ltd v. Loeffler*,
   140 F.4th 344 (6th Cir. 2025) ........................................................................... 7, 8

*Warth v. Seldin*,
   422 U.S. 490 (1975) ...................................................................................... 11, 16

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ............................................................................................ 21

**Statutes**

20 U.S.C. § 1067q .................................................................................................. 2, 3, 5

20 U.S.C. § 1101 ..................................................................................................... *passim*

20 U.S.C. § 1102 ..................................................................................................... *passim*

42 U.S.C. § 300u-6(g)(2) .......................................................................................2

**Other Authorities**

Gina Ann Garcia, *Defining "Servingness" at Hispanic-Serving Institutions
(HSIs): Practical Implications for HSI Leaders,* AM. COUNCIL ON EDUC.
(2019), https://www.equityinhighered.org/wp-
content/uploads/2019/12/Garcia-Essay-FINAL.pdf ............................................13, 14, 16, 17

Mark Hugo Lopez, Jens Manuel Krogstad & Jeffrey S. Passel, *Who Is Hispanic?*,
PEW RSCH. CTR. (Sept. 12, 2024), https://www.pewresearch.org/fact-
tank/2021/09/23/who-is-hispanic/.................................................................................2

**Regulations**

34 C.F.R. § 606.9.................................................................................................4

34 C.F.R. § 606.10...............................................................................................4

# INTRODUCTION

Geographic shifts in Latino populations tend to lead to surges of Latino student enrollment in local community colleges and other institutions of higher learning. When that enrollment reaches twenty-five percent or higher, an institution is eligible for a congressionally authorized designation as a Hispanic-Serving Institution ("HSI"). HSIs, which typically educate low-income, first-generation, multilingual, and adult learners and are markedly under-resourced, are eligible for competitive funding programs—that benefit *all* enrolled students—through Titles V and III-F of the Higher Education Act. Plaintiff-Intervenors National Association of Scholars ("NAS") and Faculty, Alumni, and Students Opposed to Racial Preferences ("FASORP")—who purportedly represent students, scholars, alumni, and faculty—challenge these funding streams as unconstitutional. But Plaintiff-Intervenors' claims present no justiciable controversy and should be dismissed. Their claims are built on abstractions and hypotheticals, not on any concrete injury—much less one fairly traceable to the challenged grant programs.

NAS is a nonprofit member organization that "seeks to reform higher education," and FASORP is a member organization formed for the purported "purpose of restoring meritocracy in academia" and fighting race- and sex-based "preferences that subordinate academic merit and educational excellence to . . . diversity considerations." Complaint in Intervention, Dkt. No. 35 ("Intervenor Compl."), ¶¶ 14–15. Their Complaint in Intervention fails to identify a single member of either organization who has suffered a particularized injury. It relies instead on generalized grievances and speculative chains of causation that hinge on the independent decisions of third-party colleges and universities, not the federal government Defendants. Because NAS and FASORP have failed to allege standing, this Court lacks subject matter jurisdiction over their claims and the Complaint in Intervention should be dismissed in its entirety.

Even if they did have standing—which they do not—most of Plaintiff-Intervenors' claims

1

are now moot.  Congress established the HSIs programs to address persistent disparities in higher education and to expand opportunities for Hispanic and low-income students.  Plaintiff-Intervenors claim they were unlawfully excluded from competing for funding.  But on September 10, 2025, the Department of Education reprogrammed discretionary funds away from two of the three HSIs grant programs.  Because Plaintiff-Intervenors cannot be harmed by their exclusion from these defunded grant programs, this Court cannot grant the declaratory or injunctive relief they seek in challenging those programs.  Plaintiff-Intervenors' claims as to the Title V discretionary grants thus no longer present a live controversy and should be dismissed as moot.

## BACKGROUND

### I.    Congress Establishes the Hispanic-Serving Institutions Program.

In 1998, Congress created the Hispanic-Serving Institutions Program in Titles III and V of the Higher Education Act to expand educational opportunities for students at colleges and universities across the country.  20 U.S.C. §§ 1067q(b)(2)(B), 1101(c), 1101a; *see also* Complaint, Dkt. No. 1 ("Initial Compl."), ¶ 13.[1]  Congress stated its purpose clearly:  (1) to "expand educational opportunities for, and improve the academic attainment of, Hispanic students" and (2) to "expand and enhance the academic offerings, program quality, and institutional stability of colleges and universities that are . . . helping large numbers of Hispanic students and other low-income individuals complete postsecondary degrees."  20 U.S.C. § 1101(b).[2]

---

[1] The Complaint in Intervention incorporates paragraphs 1–50 of the Initial Complaint.  Intervenor Compl. ¶ 22.  Accordingly, this Motion cites to those paragraphs in the Initial Complaint.

[2] The term "Hispanic" refers to individuals who originate from Spanish-speaking countries.  *See* 42 U.S.C. § 300u-6(g)(2).  "Latino" or the gender neutral "Latinx" refers to individuals whose origins are Latin America.  *See* Mark Hugo Lopez, Jens Manuel Krogstad & Jeffrey S. Passel, *Who Is Hispanic?*, Pew Rsch. Ctr. (Sept. 12, 2024), https://www.pewresearch.org/fact-tank/2021/09/23/who-is-hispanic/.  Defendant-Intervenor uses the terms interchangeably not because they mean the same thing but to cover the range of races

2

To effectuate these goals, Congress set requirements for institutions to qualify as HSIs. As a threshold, an institution must be eligible under the Higher Education Act, 20 U.S.C. § 1101a(a)(2)—which requires that the institution (i) enroll "needy students," (ii) have low "average educational and general expenditures," (iii) confer bachelor's degrees or be a junior or community college, (iv) satisfy national accreditation requirements, (v) meet any other requirements imposed by the Education Secretary, and (vi) be in a State. *Id.* An eligible institution becomes an HSI if it enrolls at least twenty-five percent Hispanic students in full-time undergraduate studies. *Id.* § 1101a(a)(5).

Congress based these criteria on several findings it codified in the Higher Education Act. 20 U.S.C. § 1101(a). Specifically, Congress found that (1) "Hispanic Americans are at high risk of not enrolling or graduating from institutions of higher education"; (2) there are increasing "[d]isparities between the enrollment of non-Hispanic white students and Hispanic students in postsecondary education"; (3) "Hispanic-serving institutions provide a significant proportion of postsecondary opportunities for Hispanic students"; (4) these institutions "are underfunded" and "receive significantly less in State and local funding" than their peers; (5) despite this gap, HSIs are successful in educating Hispanic students; and (6) correcting these "disparities" is within the "national interest." *Id.* § 1101(a). To address these findings, Congress established three sub-programs: Developing Hispanic-Serving Institutions (Title V, Part A), Promoting Postbaccalaureate Opportunities for Hispanic Americans (Title V, Part B) (together, the "Title V Programs"), and Hispanic-Serving Institutions – Science, Technology, Engineering, or Mathematics and Articulation (Title III, Part F). 20 U.S.C. §§ 1067q, 1101, 1102; *see also* Initial

---

and ethnicities within the Latino umbrella, including Afro-Latinos and Indigenous people who self-identify as Latino.

3

Compl. ¶ 14.

### A. Developing Hispanic-Serving Institutions (Title V, Part A)

The Developing Hispanic-Serving Institutions program "provide[s] grants and related assistance to Hispanic-serving institutions to improve and expand their capacity to serve Hispanic students and other low-income individuals." 20 U.S.C. § 1101. Under this program, the Secretary of Education can award three types of grants: (1) planning grants, (2) individual development grants, and (3) cooperative arrangement development grants. 34 C.F.R. § 606.9. Planning grants provide grantees funding for up to a year to formulate a development plan and apply for a development grant. *Id.* § 606.10(a). Development grants last up to five years and empower grantees to "carry out activities that . . . hold promise for strengthening the[ir] institution." *Id.* § 606.10(b). Acceptable activities include investing in scientific and laboratory equipment, constructing and renovating instructional facilities, purchasing educational materials, developing tutoring and counseling programs, establishing community outreach programs, and supporting faculty development. 20 U.S.C. § 1101b; *see also* 34 C.F.R. § 606.10(b).

### B. Promoting Postbaccalaureate Opportunities for Hispanic Americans (Title V, Part B)

The Promoting Postbaccalaureate Opportunities for Hispanic Americans program authorizes the Secretary of Education to award grants for institutions "to improve postbaccalaureate education opportunities for Hispanic and low-income students." 20 U.S.C. § 1102c(a). Congress enacted this program with the express purpose of "expand[ing] postbaccalaureate educational opportunities" and "enhanc[ing] the program quality in the institutions of higher education" to help "large numbers of Hispanic and low-income students." *Id.* § 1102. Grants awarded under the Promoting Postbaccalaureate Opportunities program can be used for procuring scientific and laboratory equipment, constructing and improving instructional

4

facilities, purchasing educational materials, and supporting low-income students. *Id.* § 1102b. These grants can support HSIs for up to five years. *Id.* § 1102c(b).

### C. Hispanic-Serving Institutions – Science, Technology, Engineering, or Mathematics and Articulation (Title III, Part F)

The Science, Technology, Engineering, or Mathematics and Articulation program states that $100 million "shall be available" to HSIs for activities further delineated in the Act with priority given to activities that increase participation in STEM programs or that develop transfer and articulation programs. 20 U.S.C. §§ 1067q(a)(2), (b). Unlike the first two programs of the HSIs program, the Secretary lacks discretion whether to fund this program. *Compare* 20 U.S.C. § 1067q(b)(2)(B) (stating funds "shall be available"), *with* 20 U.S.C. §§ 1101(c), 1102(a) (conferring discretion on the Secretary to award grants).

### II. Plaintiffs Challenge the Constitutionality of the Hispanic-Serving Institutions Program, but the U.S. Department of Education Declined to Defend the Program.

On June 11, 2025, Plaintiffs State of Tennessee and Students for Fair Admissions, Inc. filed this action against the United States Department of Education ("DOE") and Secretary of Education Linda McMahon in her official capacity. Initial Compl. ¶¶ 11–12. Plaintiffs allege that various Tennessee colleges and universities are harmed because they do not meet the criteria Congress established for HSIs grants. *Id.* ¶¶ 39–40. They challenge the three HSIs programs discussed above: Developing Hispanic-Serving Institutions (Title V, Part A), Promoting Postbaccalaureate Opportunities for Hispanic Americans (Title V, Part B), and Hispanic-Serving Institutions – Science, Technology, Engineering, or Mathematics and Articulation (Title III, Part F). *Id.* ¶ 14.

Defendants declined to defend the HSIs programs. On July 25, Solicitor General John Sauer sent a letter to the Speaker of the House informing him that DOE and Secretary McMahon "ha[d] decided not to defend the constitutionality of certain provisions of the Higher Education Act" establishing the three HSIs programs at issue in this lawsuit. Letter of Hon. D. John Sauer,

U.S. Solic. Gen., to Hon. Mike Johnson, Speaker, U.S. House of Representatives (July 25, 2025), Dkt. No. 32 ("Sauer Letter"), ¶ 1.[3]

On July 24, the Hispanic Association of Colleges and Universities ("HACU") moved to intervene. Proposed Defendant-Intervenor's Motion to Intervene, Dkt. No. 16. HACU is an organization that "champion[s] Hispanic students' success in higher education . . . by improving access to and the quality of post-secondary educational opportunities for Hispanic students." *Id.* Ex. A, ¶¶ 5, 7.

On August 8, NAS and FASORP moved to intervene as plaintiffs (together, "Plaintiff-Intervenors"). NAS alleges it includes "members around the nation affiliated with non-HSIs," including "at least one . . . faculty member of a Tennessee public university" and "at least one . . . faculty member at a public university located outside Tennessee." Intervenor Compl. ¶ 14. NAS claims these members have "taught undergraduates" and "would assist their institution[] in applying for HSI-Program grants" if their institutions were eligible. *Id.* But Plaintiff-Intervenors do not state that these alleged faculty members' institutions would in fact apply for a grant if they were eligible or that those institutions would even be eligible but for the allegedly unconstitutional criterion. *See id.* FASORP also alleges that its membership includes "at least two" students who "are enrolled students at schools . . . excluded from participation in the HSI Programs because of their students' races." *Id.* ¶ 15. Additionally, FASORP alleges that the HSIs Programs "harm" its

---

[3] The Court can take judicial notice of the Solicitor General's letter because it is a "public record[]." *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999) (explaining that courts may "consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies") (abrogated on other grounds); *see also Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) ("A court may consider public records without converting a [motion to dismiss] into a [summary judgment] motion."); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 510 n.2 (N.D. Cal. 2017) (taking judicial notice of a letter from an Assistant Attorney General to a House Subcommittee chair because "courts may judicially notice information and official documents contained on official government websites").

"student members enrolled *at HSIs*," but fails to identify any such members in the Complaint in Intervention.  *Id.* ¶ 38.

The Court granted HACU, NAS, and FASORP's motions to intervene on October 10.  *See* Order, Dkt. 34.

## III.    The Department of Education Defunds Two of the Three Challenged HSIs Programs.

On September 10, DOE announced it was reprogramming funds away from the Title V programs:  the Developing Hispanic-Serving Institutions and the Promoting Postbaccalaureate Opportunities for Hispanic Americans programs in a press release.  *See* Press Release, Dep't of Educ., U.S. Department of Education Ends Funding to Racially Discriminatory Discretionary Grant Programs at Minority-Serving Institutions (Sep. 10, 2025); Declaration of Francisca Fajana ("Fajana Decl.") Ex. A ("DOE Press Release").[4]  DOE stated that this "discretionary program funding" would be "reprogrammed to support other priorities."  *Id.*  "The discretionary grant programs" that DOE "cease[d] to fund . . . include both 2025 new awards and non-competing continuations."  *Id.*  However, DOE stated that it would continue funding "mandatory funds . . . that cannot be reprogrammed on a statutory basis," which include the Developing HSI Science, Technology, Engineering or Mathematics and Articulation Programs.  *Id.*

### LEGAL STANDARD

To survive a Rule 12(b)(1) motion for lack of subject-matter jurisdiction, the plaintiff bears the burden of proving that jurisdiction exists.  *See Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015).  "A Rule 12(b)(1) motion to dismiss for lack

---

[4] This Court may take judicial notice of DOE's press release "as it is a government document available from a reliable source."  *Democracy Forward Found. v. White House Off. of Am. Innovation*, 356 F. Supp. 3d 61, 68 n.4 (D.D.C. 2019) (taking judicial notice of a White House press release).

of subject-matter jurisdiction can raise facial or factual attacks." *W6 Rest. Grp., Ltd v. Loeffler*, 140 F.4th 344, 349 (6th Cir. 2025). "A facial attack goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction." *Id.* (quoting *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014)). When presented with a facial attack, a court "treats the facts alleged in the complaint as true" in a similar manner to the approach to motions under Rule 12(b)(6). *Id.*; *see also Glob. Tech.*, 807 F.3d at 810.

"[C]ourts are without power to decide questions that cannot affect the rights of litigants in the case before them." *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)). "Thus, when a case at first presents a question concretely affecting the rights of the parties, but—as a result of events during the pendency of the litigation— the court's decision would lack any practical effect, the case is moot." *Ohio v. U.S. Env't Prot. Agency*, 969 F.3d 306, 308 (6th Cir. 2020). A court "may address jurisdictional issues of standing and mootness in whichever order" it chooses. *W6 Rest Grp.*, 140 F.4th at 349.

## ARGUMENT

The Court should dismiss Plaintiff-Intervenors' Complaint in its entirety for lack of subject matter jurisdiction because NAS and FASORP do not have Article III standing. Alternatively, the Court should dismiss as moot all claims based on the Title V grants because those programs have been defunded.

## I. Plaintiff-Intervenors NAS and FASORP Lack Article III Standing.

Intervenors seeking relief must establish standing in their own right. "Standing is not dispensed in gross," and each "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citation modified). That requirement holds for intervenors: "For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of

8

right." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439–41 (2017); *see Bond v. Utreras*, 585 F.3d 1061, 1072 (7th Cir. 2009) (requiring permissive intervenors to "meet the standing requirements of Article III in addition to Rule 24(b)'s requirements"); *Chapman v. Tristar Prods., Inc.*, No. 16-CV-1114, 2018 WL 4203533, at *6 (N.D. Ohio Sept. 4, 2018) ("[*Town of Chester*'s] reasoning applies with equal force whether a party seeks intervention as of right or permissively."). Here, Plaintiff-Intervenors ask the Court to issue "preliminary and permanent injunctive relief to the Plaintiff-Intervenors," Intervenor Compl. at 17, and thus must establish Article III standing for their claims and requested remedies.

Standing requires a concrete, particularized injury that is actual or imminent, fairly traceable to the defendant, and likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). When alleged harms depend on third parties not before the court, establishing traceability and redressability is "substantially more difficult." *Id.* at 562.

Here, NAS and FASORP seek to assert claims on behalf of their members and thus must satisfy the requirements for associational standing. Under the associational standing doctrine, an organization can sue on behalf of its members only when it shows (1) that at least one member would have standing in his or her own right, (2) that the interests asserted are germane to the organization's purpose, and (3) that neither the claim nor the relief requires individual member participation. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977).

Plaintiff-Intervenors cannot meet the first and third requirements of the *Hunt* test. Their purported injuries are caused by discretionary choices by universities, students, and other grant programs—not by any command from DOE, the Secretary, or any federal law. And the relief Plaintiff-Intervenors seek would not predictably alter those third-party decisions. NAS and FASORP accordingly fail to identify at least one member who would have standing to sue in his

9

or her own right. *Id.* Their claims also impermissibly "require[] the participation of individual members" to resolve, so they cannot rely on associational standing. *Id.* at 343.

### A. NAS and FASORP Fail to Identify a Member with a Concrete Injury.

Plaintiff-Intervenors fail to establish that their members would have standing to sue and thus cannot meet *Hunt*'s first requirement. 432 U.S. at 343. They allege only generalized, institution-level grievances and conjecture—not a concrete, imminent injury to any identified member.

Namely, FASORP alleges that some student-members attend institutions ineligible for HSIs programs because of "their races and races of their classmates"; that denying those schools eligibility for the HSIs programs "increases the relative cost of the education of FASORP's student members" by "denying them a federal benefit based on their races and those of their classmates"; that the HSIs programs "entice[]" and "incentivize schools to . . . racially gerrymander" admissions; that grant funds at HSIs are "expressly" directed "to specifically and specially benefit Hispanic students"; and that, to demonstrate "servingness," schools are "often told" to hire "a faculty that reflects their targeted future demographics." Intervenor Compl. ¶¶ 34, 36–38, 44–45.

NAS likewise alleges that its faculty members at non-HSIs "would work with [their] institution[s] to apply for grants earmarked for HSIs," if those institutions "were not ineligible based on" campus racial demographics; that the HSIs programs and "parallel" agency programs "exclude these faculty members' institutions from obtaining funding for their facilities, their work, and their services to their students because of their students' racial mix"; that the HSIs programs "deny . . . any opportunity to compete" for these streams of funding; that faculty "stand ready to assist their institutions" with HSI applications "if the HSI Programs' eligibility criteria did not exclude their institutions." Intervenor Compl. ¶¶ 39–41, 44–48.

These allegations do not identify a member with a concrete, particularized, and imminent

10

injury.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009) (reiterating that to have standing, an organization must "make specific allegations establishing that at least one identified member had suffered or would suffer harm"); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021) ("Under Article III, federal courts do not adjudicate hypothetical or abstract disputes."). Generalized assertions about "relative cost" or diffuse resource differences, Intervenor Compl. ¶¶ 36, 38, are abstract claims of institutional resource allocation, not "concrete and particularized" "invasion[s] of [any particular member's] legally protected interests." *Spokeo*, *Inc. v. Robins*, 578 U.S. 330, 339–42 (2016) (citation and internal quotation marks omitted).  *See Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("[A] plaintiff must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.").  Nor do allegations that faculty "stand ready" to compete for grants if eligibility changes—or that students would enjoy reduced tuition or expanded campus programming if their institutions were to apply for grants, prevail, and then allocate any award to those purposes—establish imminent injury.  Intervenor Compl. ¶¶ 34–38, 48.  Such "some day" intentions and probabilistic chains of events do not satisfy Article III.  *Lujan*, 504 U.S. at 564.

Indeed, two courts have already dismissed analogous suits by FASORP for its failure to allege that faculty members faced any imminent injuries stemming from law review membership policies.  *See FASORP v. N.Y.U. L. Rev.*, No. 18-cv-9184, 2020 WL 1529311, at *5–7 (S.D.N.Y. Mar. 31, 2020) (dismissing for lack of associational standing where FASORP failed to identify a member who suffered "a concrete and particularized injury" from the "Law Review's membership and articles selection process" and reasoning that members of FASORP lacked a "legally protected interest" in race- and sex-blind editorial selection), *aff'd*, 11 F.4th 68, 71–74 (2d Cir. 2021); *FASORP v. Harv. L. Rev. Ass'n*, No. 18-12105, 2019 WL 3754023, at *2–4 (D. Mass. Aug. 8,

2019) (concluding that FASORP failed to establish associational standing because none of its members suffered an actual or imminent injury and reasoning that the complaint failed to allege a FASORP member "had an article rejected in the past . . . or is preparing to submit an article in the reasonably foreseeable future"). Their Complaint in Intervention here suffers from the same fatal flaw: FASORP and NAS rely on conjecture about institutional practices and hypothetical member harms—such as "relative cost" increases, bald assertions of program benefits "expressly" directed to Hispanic students, alleged admissions practices, and faculty who only "stand ready" to pursue grants if eligibility changes—rather than any actual or imminent denial of opportunity to a particular student or professor.

### B. NAS's and FASORP's Alleged Injuries Are Not Fairly Traceable to Any Federal Law.

Even if a member-level injury could be inferred, the claimed harms are not fairly traceable to federal HSIs eligibility criteria because they turn on discretionary choices by colleges, universities, and other third parties. The Sixth Circuit requires a plaintiff to show that the government's conduct had a "determinative or coercive effect" on the third party. *Crawford v. U.S. Dep't of the Treasury*, 868 F.3d 438, 455–57 (6th Cir. 2017) (citation omitted). An "injury that results from the third party's *voluntary and independent actions* does not establish traceability." *Turaani v. Wray*, 988 F.3d 313, 316–18 (6th Cir. 2021) (citation and internal quotation marks omitted), *cert. denied*, 142 S. Ct. 225 (2021).

That rule forecloses Plaintiff-Intervenors' standing theories. Whether a non-HSI institution experiences "fewer resources"—or an HSI allegedly allocates funds in ways that affect particular non-Hispanic students or faculty—depends on whether that institution chooses to apply for grants (including non-HSI grants), how it designs proposals, and how it allocates and administers awarded funds. Those are voluntary choices by independent institutions—they are not

12

actions "compelled or coerced by the federal government." *Changizi v. Dep't of Health & Hum. Servs.*, 82 F.4th 492, 497–99 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 2716 (2024).  DOE's federal eligibility criteria neither compel applications nor dictate campus-level allocations in a manner that determines member-level outcomes.  To the extent the individual members of FASORP and NAS claim their experiences as students and faculty members at their institutions could be better, "they describe injuries committed by third parties who are not before the court." *Ohio Stands Up! v. U.S. Dep't of Health & Hum. Servs.*, No. 21-3995, 2022 WL 1576929, at *2 (6th Cir. May 19, 2022).

Nor can traceability be inferred from generalized "encouragement" absent predictable, evidence-backed effects.  *See* Intervenor Compl. ¶ 45.  Indirect theories of traceability—like the ones Plaintiff-Intervenors attempt to allege here—"require[] that the government cajole, coerce, command," not merely encourage or incentivize.  *Turaani*, 988 F.3d at 316.  Yet Plaintiff-Intervenors' theory that "servingness" purportedly leads to racially discriminatory faculty hiring decisions rests on noncoercive higher education guidance and subsequent university-specific hiring judgments.  *See* Intervenor Compl. ¶ 47.  In support of their theory, Plaintiff-Intervenors reference literature that discusses what servingness "requires" and claim that institutions "are often told that they should obtain a faculty that reflects their targeted future demographics."  Intervenor Compl. ¶ 44.  But their sole support for that claim is one report by the American Council on Education—not a government institution—that speaks to how Hispanic-Serving Institutions can best develop infrastructure to better serve the students they already enroll.  *See id.* ¶ 44 n.13; Gina Ann Garcia, *Defining "Servingness" at Hispanic-Serving Institutions (HSIs): Practical Implications for HSI Leaders,* AMERICAN COUNCIL ON EDUCATION (2019), https://www.equityinhighered.org/wp-content/uploads/2019/12/Garcia-Essay-FINAL.pdf

13

("Garcia Report"); Fajana Decl. Ex. B.[5] But Plaintiff-Intervenors ignore that, while the statute enumerates the requirements HSIs must meet to be defined as such, the central premise of the Garcia Report was that there is "*no federal requirement* for having a commensurate institutional infrastructure for serving [Hispanic and low-income] students." Garcia Report at 1 (emphasis added).

Moreover, this report makes clear that the government takes a markedly hands-off approach to how HSIs funding is spent. For instance, it notes that "grant programs allow HSIs to define servingness on their own terms, which gives institutions autonomy . . . ." *Id.* at 2. It continues, "the allowable activities outlined in federal grant programs do not require institutions to utilize these funds specifically to meet the needs of Latinx students." *Id.* The report on which Plaintiff-Intervenors rely is thus not only inadequate to support their point; it also substantiates that the actions Plaintiff-Intervenors fault are those taken *voluntarily* by universities—not pursuant to a federal command to hire by race or shape student experience based on students' race.[6]

Supreme Court precedent has long foreclosed the standing theory advanced by Plaintiff-Intervenors. The mere alleged "encouragement" of racially discriminatory hiring—to the extent any exists at HSIs, which has not been established—cannot establish Article III causation. *See Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 42–43 (1976) (deeming insufficient a complaint

_____

[5] Plaintiff-Intervenors expressly cite and quote the Garcia Report as their only example of a purported "literature" supporting their "servingness" theory. Intervenor Compl. ¶ 44 & n.2. The Court may consider that report on this motion to dismiss because it is incorporated by reference— i.e., it is "referred to in the Complaint" and "central to [the plaintiff's] claim." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *see also Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) ("[A] court may consider exhibits attached to the complaint, public records, items appearing in the record of the case . . . .").

[6] Indeed, the Sixth Circuit has rejected judicially imposed faculty race matching as unlawful, which makes it implausible to assume that universities will pursue hiring practices that binding precedent has long condemned. *See Robinson v. Shelby Cnty. Bd. of Educ.*, 566 F.3d 642, 654 (6th Cir. 2009).

that merely alleged federal agencies "encouraged" a policy outcome where it was "purely speculative whether" that outcome "fairly can be traced to [the agencies'] 'encouragement'"). The Supreme Court has also long mandated dismissal where independent private choices broke the causal chain—a mandate the Sixth Circuit has applied rigorously. *See, e.g.*, *Allen v. Wright*, 468 U.S. 737, 759 (1984) ("The chain of causation is even weaker in this case. It involves numerous third parties . . . whose independent decisions may not collectively have a significant effect . . . ."); *Vapor Tech. Ass'n v. U.S. Food & Drug Admin.*, 977 F.3d 496, 502 (6th Cir. 2020) (holding that a plaintiff "cannot sue" a federal agency to "attack" some "independent third party that is not part of the present suit").

For similar reasons, Plaintiff-Intervenors cannot show that a court order enjoining or altering HSIs eligibility criteria would likely redress their alleged harms. For members not currently at HSIs, relief would not compel any institution to apply for grants, prevail in competitive processes, or reallocate funds toward services affecting a particular member. And for those at HSIs, relief would not dictate how universities design or allocate programs, let alone guarantee benefits to any non-Hispanic student or faculty member. The proposed relief would operate only through a "highly attenuated chain of possibilities," dependent on discretionary decisions by nonparties, namely university administrators, individual professors, and even students. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). And just as "encouragement" cannot support causation, the possibility that "a grant of [intervenors'] requested relief . . . would '*discourage*'" HSIs from making certain administrative decisions—whether in faculty hiring or student services—is too speculative to establish redressability. *Simon*, 426 U.S. at 42 (emphasis added). "[I]t is neither obvious nor even likely that such an injunction would necessarily prevent the independent third parties from taking or continuing the actions that caused the claimed injuries."

*Ohio Stands Up!*, 2022 WL 1576929, at *2.

### C. Adjudication of NAS's and FASORP's Claims Would Require Individual Member Participation.

Plaintiff-Intervenors also fail to establish associational standing because, under *Hunt*'s third prong, adjudication of their claims would require individualized proof concerning specific members at specific campuses. *See* 432 U.S. at 343. Determining whether any particular student or faculty member suffered a cognizable injury would require evidence about whether the member's institution applied for HSI-related grants, the content of those applications, whether the institution won awards, how the institution allocated funds it received from HSIs or non-HSI programs, and whether the member was personally denied equal treatment in a particular program. Without such individualized proof, Plaintiff-Intervenors cannot demonstrate that their members would be afforded "some relief other than the satisfaction of making the government comply with the law" as they interpret it. *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014). The necessity of these member-by-member and campus-specific inquiries defeats associational standing for this program-level challenge. *See Warth*, 422 U.S. at 515–16 (recognizing that when an "injury is peculiar to the individual member concerned," associational suits are ill-suited because member participation becomes necessary).

The need for individual FASORP and NAS member participation is even more pronounced as to their claims concerning HSIs. As discussed above, the sole support for their argument that HSIs pursue "servingness" by engaging in purportedly racially discriminatory allocations of faculty spots and student services is a non-governmental organization's report that makes clear any such decisions are voluntary and variable across HSIs. That report even highlights that the HSI grant applicants differ in whether they address race *at all* in their applications. *See* Garcia Report at 2 (describing "research show[ing] that some HSI grant seekers do not explicitly address

16

race and Latinx students in their grant proposals").

Consequently, any adjudication of whether FASORP and NAS members suffer from racially discriminatory administrative decisions on their campus would require individualized proof: Are the members' institutions ones that use HSIs funding to set up race-based campus programs, to hire faculty reflective of student demographics, or both? Or *neither*? *Compare Bano v. Union Carbide Corp.*, 361 F.3d 696, 714–15 (2d Cir. 2004) (no associational standing where "the fact and extent" of organizational plaintiff's members' bodily injuries and property damages would require individualized proof), *with Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 288–90 (1986) (allowing associational standing where a union challenged a uniform Department of Labor eligibility interpretation that applied *identically* to *all* members, and resolution turned on a pure question of law, not member-specific facts). Plaintiff-Intervenors' claimed injuries are impossible to evaluate without individualized evidence concerning the distinct administrative decisions, student experiences, faculty composition, and research funding trends their members have allegedly encountered.

\*   \*   \*

At bottom, Plaintiff-Intervenors seek to litigate hypothetical harms that vary by institution, member, and circumstance. Their allegations would require the Court to investigate individualized factual experiences at dozens of campuses, not to resolve a uniform legal question about an identically applied federal policy. Plaintiff-Intervenors' true "quarrel" is with their campuses and university leadership—not the Department of Education. *Turaani*, 988 F.3d at 316. Article III does not permit the kind of abstract, program-level challenge they assert here, and the associational-standing doctrine cannot transform speculation about third parties' discretionary choices into a justiciable controversy. Plaintiff-Intervenors' claims should thus be dismissed for lack of standing under Rule 12(b)(1).

17

## II.    Plaintiff-Intervenors' Claims Based on the Title V Programs Are Moot.

Even if Plaintiff-Intervenors had standing to bring their claims—which they do not—their claims challenging the Title V programs are moot because DOE defunded those grant programs. *See* Intervenor Compl. ¶¶ 50–67 (alleging the "HSI Programs" collectively violate equal protection and the Spending Clause).  No exception to mootness applies here because DOE defunded the Title V grants in a genuine policy change based on its professed understanding of new binding precedent—not to gain a tactical advantage in this litigation or to manipulate this Court's authority.  There is no relief that this Court could order to remedy Plaintiff-Intervenors' alleged harms related to exclusion from the entirely defunded Title V grant programs.  Accordingly, those claims are moot and should be dismissed.

### A.    DOE's Defunding of the Title V Programs Moots Plaintiff-Intervenors' Claims.

Article III requires that an "actual controversy" exist "not only 'at the time the complaint is filed,' but through 'all stages' of the litigation."  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (quoting *Alvarez v. Smith*, 558 U.S. 87, 92 (2009)).  A claim is moot "if events that occur subsequent to the filing of a lawsuit . . . deprive the court of the ability to give meaningful relief." *Ailor v. City of Maynardville*, 368 F.3d 587, 596 (6th Cir. 2004).  When there is no longer an actual controversy, the case is moot, regardless of "how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit."  *Already, LLC*, 568 U.S. at 91.

Moreover, the mootness doctrine applies with equal force to claims for both injunctive and declaratory relief.  The Sixth Circuit considers a claim for injunctive relief moot "when either the issues presented are no longer live or the parties lack a legally cognizable interest (personal stake) in the outcome." *Allen v. Collins*, 529 F. App'x 576, 579 (6th Cir. 2013) (citation modified).  And when presented with a claim for declaratory relief, the court considers "whether the facts alleged,

18

under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Thompson v. DeWine*, 7 F.4th 521, 524 (6th Cir. 2021).

Plaintiff-Intervenors' claims for injunctive and declaratory relief with respect to both Title V HSIs programs do not present a live controversy under this standard. On September 10, 2025, DOE announced it was defunding both Title V programs—the Developing Hispanic-Serving Institutions and the Promoting Postbaccalaureate Opportunities programs. *See id.* In no uncertain terms, DOE announced that funds from these programs "will be reprogrammed into [other] programs . . . that advance Administration priorities." *Id.* This reprogramming is not temporary: The press release made clear that the policy change applies to "both 2025 new awards and non-competing continuations." *Id.*

Plaintiff-Intervenors' request for injunctive relief as to the Title V programs is now moot because these grant programs have been defunded. *See* DOE Press Release. Because DOE defunded the Title V grants, *nobody* can compete for Title V grants. It is thus impossible for Plaintiff-Intervenors to be "exclude[d] . . . from obtaining funding for their facilities, their work, and their services." Intervenor Compl. ¶ 46. Faculty members and students cannot claim to be "den[ied] the . . . opportunity to compete for streams of federal funding," *id*. ¶ 47, when those streams run dry. *See Allen*, 529 F. App'x at 579 (finding a claim for declaratory judgment moot when the allegedly unconstitutional parole guidelines had been rescinded).

Similarly, Plaintiff-Intervenors' request for declaratory relief is moot as to the Title V programs because there is no longer a "substantial controversy" for this Court to resolve. *Thompson*, 7 F.4th at 524. DOE has ceased funding all grants under these two programs, so there is no immediate or real controversy "to warrant the issuance of declaratory judgment." *Id.* As in

*Allen*, the program that Plaintiff-Intervenors take issue with has ceased to affect anyone, because existing grants were frozen and no new applications were accepted, so exclusion from the programs "cannot affect [their] legal interest." 529 F. App'x at 579. Without any cognizable basis for injunctive or declaratory relief, this Court no longer has "the ability to give meaningful relief," so Plaintiff-Intervenors' claims as to the Title V programs are moot. *Ailor*, 368 F.3d at 596.

### B. The Voluntary Cessation Exception to the Mootness Doctrine Does Not Apply.

The voluntary cessation exception to the mootness doctrine does not save Plaintiff-Intervenors' claims challenging the Title V programs. The Sixth Circuit applies the established two-part framework from *Los Angeles County v. Davis,* 440 U.S. 625, 631 (1979), to determine whether a defendant's voluntary cessation of challenged conduct moots a claim. *See Thomas v. City of Memphis*, 996 F.3d 318, 324 (6th Cir. 2021) (applying *Davis*). A party arguing mootness must show "(1) there is no reasonable expectation that the alleged violation will recur; and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* (citation modified). HACU bears a light burden here because "cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties." *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981 (6th Cir. 2012). Courts presume good faith in government actors and therefore "place greater stock in their acts of self-correction." *Id.* at 982.

***No Reasonable Expectation That the Alleged Violation Will Recur.*** HACU satisfies the first prong of the *Davis* framework because there is no reasonable expectation that HSIs grants under Title V will resume for two primary reasons.

*First*, DOE stopped funding the Title V programs based on its professed understanding of the U.S. Supreme Court's decision in *Students for Fair Admissions v. Harvard*, 600 U.S. 181

(2023).[7] *See* DOE Press Release (referring to the Solicitor General's conclusion that the programs violate *Students for Fair Admissions*). When the government "makes a change to comply with binding precedent (even if it has done so in an ad hoc manner)," the Sixth Circuit applies a presumption of mootness to claims based on the policy prior to the change. *Doe v. Univ. of Mich.*, 78 F.4th 929, 947 (6th Cir. 2023) (finding district court lacked jurisdiction to issue a declaratory judgment after the University of Michigan changed its policy to comply with new Sixth Circuit precedent); *see also Davis v. Colerain Township*, 51 F.4th 164 (6th Cir. 2022) ("We concluded that Colerain Township had changed its policy in light of an external factor—recent and controlling Sixth Circuit precedent—rather than with the intent to moot and thereby thwart the plaintiff's lawsuit."). Further, the Sixth Circuit directs courts to give governments solicitude when it makes policy changes in response to new authority because in those cases, "it is 'absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Doe*, 78 F.4th at 947 (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc*., 528 U.S. 167, 189 (2000)). Accordingly, here, because the Department stopped funding the Title V programs based on its understanding of new legal precedent, Plaintiff-Intervenors' challenge is presumptively moot.

*Second*, all evidence indicates DOE's policy change is genuine—and not gamesmanship. A critical factor in assessing the authenticity of a government's policy change is whether the government continues to defend the legality of the previous policy. *Cf. West Virginia v. EPA*, 597 U.S. 697, 720 (2022) (declining to find mootness when "the Government nowhere suggests that if this litigation is resolved in its favor it will not reimpose emissions limits" but rather "vigorously

---

[7] HACU disputes DOE's interpretation of the Supreme Court's decision in *Students for Fair Admissions v. Harvard*, and reserves all rights to contest the merits of that interpretation. However, as explained *infra* at p. 22, for purposes of evaluating mootness, the only relevant inquiry is whether DOE's policy change based on this decision is genuine.

21

defends the legality of such an approach"). Here, both the Solicitor General and DOE have expressly disavowed the constitutionality of the Title V grants. *See* DOE Press Release; Sauer Letter. This disavowal makes it "exceedingly unlikely that the agency will suddenly turn around" and fund the Title V programs if this lawsuit disappears. *Gun Owners of Am., Inc. v. U.S. Dep't of Just.*, 157 F.4th 834, 838 (6th Cir. 2025).

Further, there is a notable "lack of gamesmanship" here because DOE changed its policies in response to its professed interpretation of new authority, not in a strategic move to avoid this litigation. *See Resurrection School v. Hertel*, 35 F.4th 524, 530 (6th Cir. 2022) (en banc) (citing "the lack of gamesmanship on the State's part" as a factor finding the case "palpably" moot). The fact that DOE disavowed this program and defunded the Title V grants after this litigation began is immaterial. *See Thomas*, 996 F.3d at 326 (finding that a new media policy enacted thirteen days after the plaintiff filed suit mooted the case); *Gun Owners of Am., Inc.,* 157 F.4th at 841 (finding mootness even though the Bureau of Alcohol, Tobacco, & Firearms revoked the challenged policy years into litigation). Just as in *Gun Owners of America*, DOE changed its policy with respect to the Title V grants after litigation began—not because of it—based on its independent decision that it "no longer believed that the [previous] policy complied with the law." *Id*. at 839. Nothing supports "the impression that [the agency] was engaged in a tactical change in position," in changing its policy, *id.* at 838, especially because DOE simultaneously disavowed several other minority-serving institutions grant programs in addition to the Title V grants at issue here. There is nothing to suggest that DOE "will snap back to" funding the Title V grants "once freed from this litigation." *Id.*

**DOE's Defunding Eradicated the Effects of the Alleged Violation.** HACU also satisfies the second prong of the *Davis* framework because DOE's defunding of the Title V programs has

22

"completely and irrevocably eradicated" the purported effects of "the alleged violation" stemming from the Title V programs on NAS and FASORP. *Thomas*, 996 F.3d at 329. Plaintiff-Intervenors' primary alleged harm is that their members lose out on "the opportunity to compete for federal funding on an equal footing." Intervenor Compl. ¶ 49. But on September 10, 2025, DOE announced an immediate reprogramming of funds away from the Title V grants. *See* DOE Press Release. Now that nobody can compete for Title V funding, this Court cannot issue any relief that would remedy Plaintiff-Intervenors' alleged lost "opportunity to compete for" the Title V grants. Intervenor Compl. ¶ 49.

## CONCLUSION

For the reasons stated above, this Court should dismiss the Complaint in Intervention in its entirety for lack of standing. In the alternative, this Court should dismiss Plaintiff-Intervenors' claims related to the Title V programs as moot.

Dated this 2nd day of December, 2025.

Respectfully Submitted,

*/s/ Francisca D. Fajana*
Francisca D. Fajana*
Namratha Somayajula**
LatinoJustice PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 219-3360
FFajana@latinojustice.org
Nsomayajula@latinojustice.org

Stella Yarbrough (BPR No. 033637)
Zee Scout (BPR No. 042637)
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
(615) 320-7142

23

SYarbrough@aclu-tn.org
ZScout@aclu-tn.org

Grace E. Hart**
Suzana Kondic**
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-6372
GHart@gibsondunn.com
SKondic@gibsondunn.com

*Attorneys for Defendant-Intervenor, Hispanic
Association of Colleges and Universities*

* Admitted pro hac vice

** Pro hac vice application forthcoming