**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

| | |
|---|---|
| STATE OF TENNESSEE and STUDENTS FOR FAIR ADMISSIONS, INC., *Plaintiffs*,<br><br>NATIONAL ASSOCIATION OF SCHOLARS and FACULTY, ALUMNI, AND STUDENTS OPPOSED TO RACIAL PREFERENCES, *Plaintiff-Intervenors*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION and LINDA MCMAHON, in her official capacity as Secretary of Education, *Defendants*,<br><br>HISPANIC ASSOCIATION OF COLLEGES AND UNIVERSITIES, *Defendant-Intervenor*. | No. 3:25-cv-270 |

**PLAINTIFFS' & PLAINTIFF-INTERVENORS' JOINT MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Authorities .......... iii

Introduction .......... 1

Background .......... 2

- A. The federal government reserves lucrative opportunities for "Hispanic Serving Institutions," a designation that turns on ethnicity. .......... 2
- B. This ethnic discrimination harms States, schools, faculty, staff, and students. .......... 9
- C. Plaintiffs and Plaintiff-Intervenors bring this constitutional challenge. .......... 12

Legal Standard .......... 13

Argument .......... 14

- I. Plaintiffs have standing. .......... 14
  - A. Tennessee .......... 14
  - B. Associations .......... 18
- II. The HSI program is unconstitutional. .......... 20
  - A. The HSI program intentionally discriminates based on ethnicity. .......... 21
  - B. The program's ethnic discrimination serves no compelling interest. .......... 24
  - C. The program's ethnic discrimination is not narrowly tailored. .......... 25
- III. This Court should declare that the HSI program is unconstitutional. .......... 27

Conclusion .......... 29

Certificate of Service .......... 31

## TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors v. Peña*,
515 U.S. 200 (1995) .......... 20, 21

*Alfred L. Snapp & Son v. P.R. ex rel. Barez*,
458 U.S. 592 (1982) .......... 17

*Allen v. Milligan*,
146 S. Ct. 1377 (2026) .......... 20

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) .......... 21, 22

*Associated Gen. Contractors of Ohio v. Drabik*,
214 F.3d 730 (6th Cir. 2000) .......... 21, 24, 26

*Barry v. Lyon*,
834 F.3d 706 (6th Cir. 2016) .......... 18

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......... 14

*Chattanooga v. Walker Cnty. Gen. Water & Sewerage Auth.*,
2025 WL 542309 (E.D. Tenn. Feb. 18) .......... 14

*Chicago v. Barr*,
961 F.3d 882 (7th Cir. 2020) .......... 28

*Colville v. Becerra*,
2023 WL 2668513 (S.D. Miss. Mar. 28) .......... 17

*Contractors Ass'n of E. Pa. v. Philadelphia*,
6 F.3d 990 (3d Cir. 1993) .......... 15

*Coria v. Sport Pontoons*,
2024 WL 2703131 (E.D. Tenn. Mar. 15) .......... 14

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... 16

*Diamond Alternative Energy v. EPA*,
606 U.S. 100 (2025) .......... 18

*Doran v. Salem Inn, Inc.*,
422 U.S. 922 (1975) .......... 28

*Fisher v. Univ. of Texas*,
579 U.S. 365 (2016) .......... 23

*Friends of the Earth v. Laidlaw*,
528 U.S. 167 (2000) .......... 28

*Grand Trunk W. R. Co. v. Consol. Rail Corp.*,
746 F.2d 323 (6th Cir. 1984) .......... 28

*Hile v. Michigan*,
86 F.4th 269 (6th Cir. 2023) ........................................................................................ 15

*Hunt v. Cromartie*,
526 U.S. 541 (1999) .................................................................................................. 21

*Hunter v. Underwood*,
471 U.S. 222 (1985) .................................................................................................. 23

*Inclusive La. v. St. James Par.*,
134 F.4th 297 (5th Cir. 2025) ....................................................................................... 20

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977) .................................................................................................. 15

*Kentucky v. Biden*,
23 F.4th 585 (6th Cir. 2022) ........................................................................................ 17

*Kentucky v. FHA*,
728 F. Supp. 3d 501 (W.D. Ky. 2024) ........................................................................... 27

*Killion v. KeHE Distributors, LLC*,
761 F.3d 574 (6th Cir. 2014) ........................................................................................ 25

*Lac Vieux Desert Band v. Michigan Gaming Control Bd.*,
172 F.3d 397 (6th Cir. 1999) ............................................................................ 15, 16, 18

*Landor v. La. DCPS*,
146 S. Ct. 1931 (2026) ............................................................................................... 20

*Little Sisters of the Poor v. Pennsylvania*,
591 U.S. 657 (2020) .................................................................................................. 14

*Louisiana v. Callais*,
146 S. Ct. 1131 (2026) ................................................................................... 20, 21, 23

*Main Line Paving Co. v. Bd. of Educ.*,
725 F. Supp. 1349 (E.D. Pa. 1989) ................................................................................ 28

*Mich. Rd. Builders Ass'n v. Milliken*,
834 F.2d 583 (6th Cir. 1987), *aff'd*, 489 U.S. 1061 (1989) ................................................. 24

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) .................................................................................................. 19

*Moore v. Detroit Sch. Reform Bd.*,
293 F.3d 352 (6th Cir. 2002) ................................................................................ 21, 22

*Nathan v. Alamo Heights Indep. Sch. Dist.*,
173 F.4th 576 (5th Cir. 2026) (en banc) ........................................................................ 25

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*,
508 U.S. 656 (1993) ........................................................................................... 14, 15

*New Hampshire v. Maine*,
532 U.S. 742 (2001) .................................................................................................. 16

*Nuziard v. MBDA*,
721 F. Supp. 3d 431 (N.D. Tex. 2024) ........................................................................................15

*Parsons v. DOJ*,
801 F.3d 701 (6th Cir. 2015) ..........................................................................................................20

*Powell v. McCormack*,
395 U.S. 486 (1969)........................................................................................................................28

*Rabiebna v. Higher Educ. Aids Bd.*,
36 N.W.3d 611 (Wis. 2026) ...........................................................................................................24

*Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989)........................................................................................................................25

*Robinson v. Purkey*,
326 F.R.D. 105 (M.D. Tenn. 2018) ................................................................................................27

*Rumsfeld v. FAIR*,
547 U.S. 47 (2006)..........................................................................................................................14

*Saginaw Cnty. v. STAT EMS*,
946 F.3d 951 (6th Cir. 2020) ..........................................................................................................17

*Savel v. MetroHealth Sys.*,
96 F.4th 932 (6th Cir. 2024) ...........................................................................................................19

*Sessions v. Morales-Santana*,
582 U.S. 47 (2017)..........................................................................................................................27

*SFFA v. Harvard*,
600 U.S. 181 (2023)..................................................................................1, 18, 24, 25, 26, 27

*Smith v. Cleveland Heights*,
760 F.2d 720 (6th Cir. 1985) ..........................................................................................................20

*South Dakota v. Dole*,
483 U.S. 203 (1987)........................................................................................................................20

*Tennessee v. Cardona*,
737 F. Supp. 3d 510 (E.D. Ky. 2024)..............................................................................................17

*Tennessee v. Dep't of Educ.*,
104 F.4th 577 (6th Cir. 2024) ................................................................................................. 14, 17

*Tennessee v. Dep't of Educ.*,
615 F. Supp. 3d 807 (E.D. Tenn. 2022) ..........................................................................................16

*Trump v. CASA*,
606 U.S. 831 (2025)................................................................................................................. 28, 29

*Tyler v. Hennepin County*,
598 U.S. 631 (2023)........................................................................................................................20

*United States v. Green*,
532 F.3d 538 (6th Cir. 2008) ..........................................................................................................25

*United States v. Mazumder*,
800 F. App'x 392 (6th Cir. 2020)....25

*United States v. Vaello Madero,*
596 U.S. 159 (2022)....20

*Universal Life Church Monastery Storehouse v. Nabors*,
35 F.4th 1021 (6th Cir. 2022)....18

*Vitolo v. Guzman*,
999 F.3d 353 (6th Cir. 2021)....15, 21, 22, 24, 25, 26

*W. States Paving Co. v. Wash. State Dep't of Transp.*,
407 F.3d 983 (9th Cir. 2005)....26

*Zillow, Inc. v. Miller*,
126 F.4th 445 (6th Cir. 2025)....27

**Statutes**

10 U.S.C. §2200a....7

10 U.S.C. §2200c....7

12 U.S.C. §5452....7

14 U.S.C. §2131....7

15 U.S.C. §2229....6

15 U.S.C. §3704....6

15 U.S.C. §9451....6

15 U.S.C. §9543....6

15 U.S.C. §9551....6

15 U.S.C. §9552....6

20 U.S.C. §1033....5

20 U.S.C. §1033a....5

20 U.S.C. §1067q....2, 3, 5, 11, 22

20 U.S.C. §1101....2, 3, 22, 23, 24, 26

20 U.S.C. §1101a....2, 5, 15, 21, 23, 25, 27

20 U.S.C. §1101b....3, 11

20 U.S.C. §1101c....5

20 U.S.C. §1102....2, 3, 22

20 U.S.C. §1102a....2, 5

20 U.S.C. §1102c....5

20 U.S.C. §1103a....2, 15, 23

20 U.S.C. §4704....7

28 U.S.C. §2202 .......... 28
29 U.S.C. §718 .......... 5
42 U.S.C. §1862o-12 .......... 5
42 U.S.C. §19183 .......... 5
42 U.S.C. §19184 .......... 5
42 U.S.C. §19302 .......... 6
42 U.S.C. §7381c-1 .......... 6
47 U.S.C. §1306 .......... 6
51 U.S.C. §30304 .......... 7
6 U.S.C. §353 .......... 7
6 U.S.C. §475a .......... 7
7 U.S.C. §2206a .......... 6
7 U.S.C. §3103 .......... 6
7 U.S.C. §3243 .......... 6
7 U.S.C. §5843 .......... 6
Tenn. Code Ann. §4-21-1101 .......... 10, 17
Tenn. Code Ann. §49-8-101 .......... 14
Tenn. Code Ann. §49-8-203 .......... 16
Tenn. Code Ann. §49-9-208 .......... 16

**Rules and Regulations**

34 C.F.R. §606.1 .......... 3
34 C.F.R. §606.12 .......... 4
34 C.F.R. §606.2 .......... 2, 15, 23
34 C.F.R. §606.23 .......... 4, 17
34 C.F.R. §606.3 .......... 2, 15, 23
34 C.F.R. §606.4 .......... 2, 15, 23
34 C.F.R. §606.8 .......... 4, 17
7 C.F.R. §3434.3 .......... 6
72 Fed. Reg. 59266 (Oct. 19, 2007) .......... 3
76 Fed. Reg. 16747 (March 25, 2011) .......... 4
81 Fed. Reg. 11532 (March 4, 2016) .......... 3
86 Fed. Reg. 22947 (Apr. 30, 2021) .......... 5, 22
88 Fed. Reg. 34840 (May 31, 2023) .......... 5

89 Fed. Reg. 18607 (March 14, 2024) .... 22
90 Fed. Reg. 11408 (Mar. 6, 2025) .... 9, 15
90 Fed. Reg. 23520 (June 3, 2025) .... 2, 4, 22, 26
91 Fed. Reg. 14003 (Mar. 24, 2026) .... 9
Fed. R. Civ. P. 56(a) .... 13

**Constitutional Provisions**

Tenn. Const. art. XI, §12 .... 17

**Other Authorities**

138 Cong. Rec. H1736, 1992 WL 57307 (Mar. 25, 1992) .... 3
144 Cong. Rec. H2510, 1998 WL 207029 (Apr. 29, 1998) .... 3
*2026 USDA E. Kika De La Garza Fellowship Program Applications Open*, HACU (Feb. 26, 2026), perma.cc/M3ZJ-8SBG .... 8
154 Cong. Rec. H645, 2008 WL 340145 (Feb. 7, 2008) .... 24
*Acquisition Professional Career Program*, DHS, perma.cc/5WNK-3ZCT .... 7
*Assistance to Firefighters Grants*, FEMA, perma.cc/KK2G-VG6Z .... 6
*Augustus F. Hawkins Centers of Excellence (Hawkins) Program*, U.S. Dep't of Educ., perma.cc/7JHQ-TFYC .... 5
*College Student Pre-Commissioning Initiative (CSPI) Program*, Coast Guard, perma.cc/C8DD-DHM8 .... 7
*Computer and Information Science and Engineering Research Expansion Program*, NSF, perma.cc/UB6Y-HYE4 .... 6
*Connecting Minority Communities Pilot Program*, Nat'l Telecomm'ns & Info. Admin., perma.cc/C7DL-BVFV .... 6
*Constitutionality of Race-Based Department of Education Programs*, 2025 WL 4055305 (O.L.C. Dec. 2, 2025) .... 3, 21, 22, 25, 26
*DHS Mentor-Protégé Program Relaunches*, DHS, perma.cc/Q5H9-LB4A .... 7
*E. Kika De La Garza Fellowship Program*, USDA, perma.cc/SN98-YZFX .... 8
*EnergyTech University Prize: 2025 Program Key Information*, Department of Energy, perma.cc/S84U-B4YS .... 6
*ExpandAI*, NSF, perma.cc/5S69-378Z .... 5
Final Judgment, *SFFA v. Harvard*, Doc.754, No. 1:14-cv-14176-ADB (D. Mass. Jan. 9, 2024) .... 28
H.R. Conf. Rep. 110-803, 2008 WL 2970927 (June 30, 2008) .... 3, 24
H.R. Rep. 105-481 (Apr. 17, 1998) .... 3
H.R. Rep. 110-500, 2007 WL 4556528 (Dec. 19, 2007) .... 3, 22

*Hispanic-Serving Agricultural Colleges and Universities (HSACU)*, USDA, perma.cc/58GU-DS3R ........ 6

*Hispanic-Serving Institutions Education Grants (HSI) Program*, USDA, perma.cc/N9TA-7QYF ........ 6

*Hispanic-Serving Institutions: Enriching Learning, Programs, and Student Experiences*, U.S. National Science Foundation, perma.cc/2R72-ANMH ........ 5

Judgment, *SFFA v. U.S. Coast Guard*, Doc.25, No. 5:25-cv-00284 (N.D. Fla. May 28, 2026) ........ 12, 19

*MBDA Parren J. Mitchell Entrepreneurship Program: FY 2026 Notice of Funding Opportunity*, U.S. Department of Commerce, perma.cc/EG7U-K37T ........ 6

*MBDA Rural Business Center Program: FY 2026 Notice of Funding Opportunity*, U.S. Dep't of Com., perma.cc/832A-ZRF5 ........ 6

*Minority Research Grant Program Flyer*, CMS.gov, perma.cc/9NXB-REFN ........ 6

*Minority Research Grant Program*, CMS.gov, perma.cc/YHF3-WGWH ........ 6

*MUREP*, NASA, perma.cc/4QPS-VDK3 ........ 6

*National Genetic Resources Advisory Council*, USDA, perma.cc/WXS3-TRNR ........ 6

*Press Release: 2026 Goldwater Scholarship Awards*, GoldwaterScholarship.gov, perma.cc/U4YT-ZC32 ........ 7

S. Rep. 102-204, 1991 WL 254644 (Nov. 12, 1991) ........ 3, 22, 24

*Welcome to the Department of War Cyber Service Academy*, DoD Cyber Exchange, perma.cc/JH7L-DMCE ........ 7

## INTRODUCTION

After *Brown* declared "'the fundamental principle that racial discrimination in public education is unconstitutional,'" the "time for making distinctions based on race" or ethnicity "passed." *SFFA v. Harvard*, 600 U.S. 181, 204 (2023). Yet in 2026, the federal government continues to award millions of dollars per year using a blatant ethnic quota. Under the HSI program, the government asks whether colleges enroll at least "25% Hispanic students" and, if they do, designates them "Hispanic-Serving Institutions" that can get lucrative grants and other benefits. The 25% cutoff is facially discriminatory and, like all quotas, arbitrary: It would fund a 10-student school that serves 3 Hispanics, but not a 100,000-student school that serves 24,999 Hispanics—no matter how well the latter school serves its students, and no matter how much those students need the money. This system is so plainly illegal under equal-protection principles that the Department of Justice doesn't think it can be defended.

The existing HSIs, through their association HACU, intervened to defend the program; but even HACU seems to think it cannot survive strict scrutiny. It hopes to elide that question by attacking Plaintiffs' standing, even though one of the Plaintiffs is a State whose schools want this funding but are excluded—and even though HACU thinks *it* has standing to prevent its members from having to compete with more schools for this funding. On the merits, HACU plans to defend the program not under strict scrutiny, but rational-basis review—insisting that the program somehow does not classify anyone based on ethnicity. That argument is wrong under binding precedent. And its logic has no stopping point. HACU's position would equally insulate a program for "White Serving Institutions," or a program that *withheld* funding from schools whose students were at least 25% Hispanic.

Federal funding for those in need should go to those in need, irrespective of irrelevant factors like race. Because our colorblind Constitution requires as much, this Court should declare the HSI program unconstitutional and grant summary judgment to Plaintiffs and Plaintiff-Intervenors.

## BACKGROUND

### A. The federal government reserves lucrative opportunities for "Hispanic Serving Institutions," a designation that turns on ethnicity.

The Department of Education makes federal funding and other opportunities available to colleges and universities that qualify as "Hispanic Serving Institutions." HSI is defined in 20 U.S.C. §1101a(a)(5) of the Higher Education Act. *See also* 34 C.F.R. §606.2(a)(1). If a school qualifies, it becomes eligible for grants under three subprograms. Two fall under Title V: Developing HSIs, 20 U.S.C. §1101; and Promoting Postbaccalaureate Opportunities for Hispanic Americans, §1102. And the third falls under Title III: HSIs Science, Technology, Engineering or Math and Articulation, §1067q(b)(2)(B). All three subprograms are limited to HSIs, meaning schools qualify only if they satisfy the definition of HSI in §1101a(a)(5). *See* §1101a(a)(5)(B); §1102a(b)(1); §1067q(b)(2)(B).

**1.** The definition of HSI turns on ethnicity. The definition was enacted in 1992 and slightly modified in 1998. *See* App.2250-51. It defines HSI as an otherwise "eligible" school that "has an enrollment of undergraduate full-time equivalent students that is *at least 25 percent Hispanic students* at the end of the award year immediately preceding the date of application." 20 U.S.C. §1101a(a)(5) (emphasis added). To be otherwise "eligible," a school must enroll a substantial number of needy students and spend less money per student than average. *See* §1101a(a)(2), (b). These neediness and expenditure requirements can be waived. 20 U.S.C. §1103a(a)(5), §1103a(b)(1); 34 C.F.R. §606.4(c), 34 C.F.R. §606.3(b); *see* App.1990. The 25% Hispanic quota cannot. *See* 90 Fed. Reg. 23520, 23522 (June 3, 2025); App.1995. The 25% number has not been revisited since 1992. Fewer than 200 schools qualified as HSIs then; but today, due to increases in America's Hispanic population, the number of HSIs is greater than 600. App.2542. HSIs now include campuses of some of the wealthiest universities in the country, including Texas A&M (more than $19 billion endowment); the University of Arizona ($1.4 billion endowment); and many of the schools within the University of Texas and University of California Systems (more than $67 billion and $29 billion endowments, respectively). App.868-966, *especially* App.945, 952; App.2009, App.2129-30, App.2721-22.

Per the word "Hispanic" in the title and the "Hispanic" quota in the definition, the HSI program was enacted for the express "purpose" of benefiting "Hispanic" students. 20 U.S.C. §1101(b)(1)-(2); 34 C.F.R. §606.1; 20 U.S.C. §1101b(a); §1102; §1067q(b)(2)(B); *see Constitutionality of Race-Based Department of Education Programs*, 2025 WL 4055305, at *12-13 (O.L.C. Dec. 2, 2025) ("*OLC*"). Congress cited educational "disparities" between "non-Hispanic white students and Hispanic students in postsecondary education" based on data from 1973 to 1994. 20 U.S.C. §1101(a)(1)-(2). Statements that the program is designed to benefit Hispanics also appear throughout the legislative history. *See, e.g.*, 138 Cong. Rec. H1736, H1751, 1992 WL 57307 (Mar. 25, 1992) (Rep. Richardson: "increase Hispanic educational achievements," "ensure that Hispanic-Americans are as well trained and educated as possible," "support and expand the number of Hispanics attending college and … graduating," "the benefits it would provide to Hispanic students and the Hispanic community"); S. Rep. 102-204, 1991 WL 254644, at 19-20 (Nov. 12, 1991) (Senate committee report: "to increase Hispanic participation in postsecondary education"); H.R. Rep. 105-481, 150 (Apr. 17, 1998) (House committee report: "for Hispanic … students"); 144 Cong. Rec. H2510, H2522, 1998 WL 207029 (Apr. 29, 1998) (Rep. Hinojosa: "expanding opportunities for Hispanic students"); H.R. Conf. Rep. 110-803, at 571, 2008 WL 2970927 (June 30, 2008) (House conference report: "increasing the number of Hispanics earning graduate degrees"); H.R. Rep. 110-500, 2007 WL 4556528 (Dec. 19, 2007) (House committee report: "boost graduate opportunities for Hispanics").

Implementing this congressional purpose, the executive branch administers the HSI program based on ethnicity. The Department of Education defines "Hispanic" as an "ethnicity." 72 Fed. Reg. 59266, 59267 (Oct. 19, 2007). Its guidance agrees that the "purpose" of HSI funding is to "increas[e] the number of Hispanics and low-income students with degrees." App.1917. The Department reiterates that purpose when it calls for funding applications from HSIs. *See, e.g.*, 81 Fed. Reg. 11532, 11532 (March 4, 2016) ("Purpose" is "to increase the number of Hispanic and low-income students

attaining degrees"); 76 Fed. Reg. 16747, 16748 (March 25, 2011) ("Purpose" is to help "serve Hispanic and other low-income students."). The Department also sets funding priorities under the program that give a preference to proposals that are intended to benefit Hispanics. For example, the Department "gives priority" to applicants that address the "dropout rates of Hispanic students," the "academic achievement of Hispanic students," or "the rates at which Hispanic high school graduates enroll in higher education." 34 C.F.R. §606.23(e). And the Department scores applications based on how well the applicant "will improve its services to Hispanic and other low-income students." 90 Fed. Reg. at 23524. Applicants also must provide a "comprehensive development plan," 34 C.F.R. §606.12(a), that "must include" a "five year plan to improve its services to Hispanic and other low-income students," §606.8(b)(5).

Many proposals that the Department chooses to fund are, in fact, exclusively for or designed to benefit Hispanic students. Under the Developing HSIs subprogram, for example, the Department recently funded a "Summer Bridge Program for Hispanic/Latinx students," an "Intentionally designed First Year Plus experience for first-time college Hispanic/Latinx students," and a "program to reduce Imposter Syndrome among Hispanic students." App.1553, App.1575. Under the Promoting Postbacc Opportunities subprogram, the Department recently funded a program "for Latinx and other Underrepresented Demographics" and a program to recruit "Hispanic-Latino registered nurses." App.1612, App.1627. And under the HSI STEM subprogram, the Department recently funded programs designed to "enhanc[e] the educational and racial/ethnic experiences of our Hispanic students" and "to support Chicanx/Latinx student success." App.1649, App.1654. Similar examples abound. *See, e.g.*, App.1709 ("Target Population: 100 Hispanic STEM majors/yr."); App.1743 ("Project is designed … for Hispanic students"); App.1684 ("a Latinx in STEM program"); App.1534 ("STEM Success program" designed to "[i]ncrease collegiate enrollment of Hispanic high school students," "[i]ncrease the percentage of Hispanic college students engaged in paid undergraduate

research and internships," "improve Hispanic student retention," and "improve … graduation rates for Hispanic students.").

**2.** For the schools that qualify as HSIs, that status unlocks many benefits. The most obvious is access to grants under the three HSI subprograms. *See* 20 U.S.C. §1101a(a)(5)(B); §1102a(b)(1); §1067q(b)(2)(B). Congress has appropriated $100 million per year for the STEM subprogram. 20 U.S.C. §1067q(b)(2)(A)(i). And until it reprogrammed the funds in response to this lawsuit, the Department spent over $250 million per year on the other two HSI subprograms. App.1813. These lucrative grants are highly coveted: Each competition year, fewer than half (and sometimes much less) of the HSIs that apply get a grant. App.1249, App.1421. Once awarded, though, the grants can be doled out over five years. 20 U.S.C. §1101c(a), §1102c(b); 86 Fed. Reg. 22947, 22950 (Apr. 30, 2021) ("Project Period: Up to 60 months.").

Satisfying the Department's definition of HSI in 20 U.S.C. §1101a(a)(5) also unlocks "grants funded by entities such as the National Science Foundation, the Department of Agriculture, the National Institutes of Health, the Department of Housing and Urban Development, and the National Endowment for the Humanities." App.2135. Nearly all of these programs are rooted in a federal statute, and nearly all remain operational today.

Only HSIs (and sometimes other "minority serving institutions") can apply for at least the following grants:

- The Department of Education's Hawkins Centers of Excellence Program. *Augustus F. Hawkins Centers of Excellence (Hawkins) Program*, U.S. Dep't of Educ., perma.cc/7JHQ-TFYC; *see* 20 U.S.C. §1033a; §1033(1)(A)(ii).
- The Department of Education's Underserved Populations program. 29 U.S.C. §718(b)(2)(A)-(B), (b)(5)(B); *see* 88 Fed. Reg. 34840 (May 31, 2023).
- The National Science Foundation's HSIs STEM program. *Hispanic-Serving Institutions: Enriching Learning, Programs, and Student Experiences*, U.S. National Science Foundation, perma.cc/2R72-ANMH; *see* 42 U.S.C. §1862o-12.
- Many other NSF programs. *E.g.*, 42 U.S.C. §19183(a)(1) ("to build institutional research capacity"); §19183(b)(1)(C); §19184(3); *ExpandAI*, NSF, perma.cc/5S69-378Z (artificial

intelligence); *Computer and Information Science and Engineering Research Expansion Program*, NSF, perma.cc/UB6Y-HYE4 (computer science); 15 U.S.C. §9451(e)(2)(A)(iii)(I) (artificial intelligence).

- The Department of Agriculture's HSI grant program. *See Hispanic-Serving Institutions Education Grants (HSI) Program*, USDA, perma.cc/N9TA-7QYF; *Hispanic-Serving Agricultural Colleges and Universities (HSACU)*, USDA, perma.cc/58GU-DS3R; 7 U.S.C. §3243(e)(1); §3103(10)-(11); 7 C.F.R. §3434.3. This agency also has advisory councils that are required to appoint members "from among individuals representing … Hispanic-serving institutions." 7 U.S.C. §5843(c)(4)(C); *National Genetic Resources Advisory Council*, USDA, perma.cc/WXS3-TRNR.

- The Department of Commerce's Parren J. Mitchell Entrepreneurship Education grants. 15 U.S.C. §9543(b); *MBDA Parren J. Mitchell Entrepreneurship Program: FY 2026 Notice of Funding Opportunity*, U.S. Department of Commerce, perma.cc/EG7U-K37T.

- The Department of Commerce's Rural Business Center program. *MBDA Rural Business Center Program: FY 2026 Notice of Funding Opportunity*, U.S. Dep't of Com., perma.cc/832A-ZRF5; *see* 15 U.S.C. §9552(b); §9551(2), (5).

- The Department of Commerce's "Minority Serving Institution Digital and Wireless Technology Opportunity Program." 15 U.S.C. §3704(c)(1), (c)(8)(B)(ii), (c)(8)(B)(ix).

- The Department of Commerce's "Connecting Minority Communities Pilot Program." 47 U.S.C. §1306(c)(1)(A), (a)(10)(C); *Connecting Minority Communities Pilot Program*, Nat'l Telecomm'ns & Info. Admin., perma.cc/C7DL-BVFV.

- The Centers for Medicare & Medicaid Services' Minority Research Grant Program. *See Minority Research Grant Program*, CMS.gov, perma.cc/YHF3-WGWH; *see also Minority Research Grant Program Flyer*, CMS.gov, perma.cc/9NXB-REFN ("Health equity researchers at the following types of institutions are eligible to apply ... Hispanic-Serving Institutions.").

- NASA's Minority University Research and Education Project. *See MUREP*, NASA, perma.cc/4QPS-VDK3.

HSIs also get preferential treatment in the award of many other grants and benefits. Again, the following is a nonexhaustive list:

- FEMA's Assistance to Firefighters grants program. *Assistance to Firefighters Grants*, FEMA, perma.cc/KK2G-VG6Z; *see* 15 U.S.C. §2229(j)(4)(A)(ii).

- The Department of Energy's Clean Energy Technology University Prize competition. 42 U.S.C. §19302(d); §19302(a)(2); *EnergyTech University Prize: 2025 Program Key Information*, Department of Energy, perma.cc/S84U-B4YS.

- The Department of Agriculture can convey its "excess … personal property … with or without monetary compensation to … any Hispanic-serving institution." 7 U.S.C. §2206a(1)(B).

- The Department of Energy must give HSIs exclusive opportunities to participate in the research of National Laboratories. 42 U.S.C. §7381c-1.

- NASA must "annually establish a goal of at least 8 percent of" contracts and subcontracts for "organizations owned or controlled by socially and economically disadvantaged individuals … including … Hispanic-serving institutions." 51 U.S.C. §30304.

- The Department of Homeland Security runs a "Mentor-Protégé Program" for larger firms to mentor small businesses as well as minority-serving institutions, including HSIs. *DHS Mentor-Protégé Program Relaunches*, DHS, perma.cc/Q5H9-LB4A; 6 U.S.C. §475a(f)(1)(H), (h)(3).

Students and faculty at HSIs get unique benefits as well. Several scholarships awarded by the federal government are available only to students who attend HSIs (and sometimes other "minority-serving institutions"). *See, e.g.*, 20 U.S.C. §4704(a)(2) and *Press Release: 2026 Goldwater Scholarship Awards*, GoldwaterScholarship.gov, perma.cc/U4YT-ZC32 (Barry Goldwater scholarship); 10 U.S.C. §2200a & §2200c(b)(1) and *Welcome to the Department of War Cyber Service Academy*, DoD Cyber Exchange, perma.cc/JH7L-DMCE (Department of War's Cyber Service Academy). Federal statutes often require recruitment at, or set-asides for, HSIs. For example, federal financial agencies must "take affirmative steps to seek diversity in the workforce of the agency at all levels of the agency … [by] recruiting at … Hispanic-serving institutions." 12 U.S.C. §5452(f)(1). The Department of Homeland Security's Acquisition Professional Career Program must "[c]arry out recruitment efforts to attract candidates … from … Hispanic-serving institutions." 6 U.S.C. §353(c)(3)(A); *see Acquisition Professional Career Program*, DHS, perma.cc/5WNK-3ZCT.

Two such programs warrant particular mention. The Coast Guard runs the College Student Pre-Commissioning Initiative (CSPI), a program that lets undergraduates "enlist and receive a guaranteed commission as an officer in the Coast Guard" while getting their college completely paid for. 14 U.S.C. §2131(a); *College Student Pre-Commissioning Initiative (CSPI) Program*, Coast Guard, perma.cc/C8DD-DHM8. When this lawsuit was filed, the CSPI program was limited to students at HSIs (and other minority-serving institutions). 14 U.S.C. §2131(b)(6). Still today, the Department of Agriculture runs an HSI Fellowship Program, an exclusive program for "faculty, staff, and administrators from Hispanic-Serving Institutions" to "meet directly with USDA agencies." *E. Kika*

*De La Garza Fellowship Program*, USDA, perma.cc/SN98-YZFX ("*Garza Fellowship*"); *2026 USDA E. Kika De La Garza Fellowship Program Applications Open*, HACU (Feb. 26, 2026), perma.cc/M3ZJ-8SBG.

**3.** Given all these benefits, schools work hard to become HSIs. HSI status is a "coveted designation" that "unlocks federal grants." App.2420. "Many colleges are striving to obtain this designation—and the greater access to federal grants and the reputational boost that can come with it." App.2421; *accord* App.2397-98; App.2256-58. Schools make achieving HSI status—including by a specific date—their official policy. *E.g.*, App.2036 (Texas State); App.2060 (UCLA); App.2105-07 (University of Oregon); App.2020-27 (UC San Diego); App.2142 (WSU Tech). HACU keeps a list of Emerging HSIs—schools that enroll 10-24% Hispanics—and lets these Emerging HSIs join HACU as associate members. *See* App.2435-45, App.2447. The Emerging HSI category exists precisely because schools want to obtain HSI status and to "track" their progress toward hitting that goal. App.2457; *e.g.*, App.2138-39 (Weber State); App.2032-33 (Marquette); App.2048-49 (UNC Greensboro); App.2003-05 (American International); App.2043-46 (Wichita State). To become an HSI, schools must hit the 25% ethnic threshold; so to get there, schools adopt measures with the intent of admitting more Hispanics. *See, e.g.*, App.2415 ("Berkeley is … working to increase its Hispanic enrollment and become eligible."); App.2064 ("UCLA can reach and maintain HSI status … [by] directing efforts and resources toward improving admission, yield and retention rates for Latinx students"); App.2094 (Oregon: "We recommend … an intermediary goal of reaching 20 percent Latinx enrollment."); App.2432 ("Metro State has publicly stated its ambition of becoming an HSI by 2015. It created a task force in 2007, when its percentage of Latino students was 13 percent, to recommend how the college could reach out and appeal to Hispanics in the area."). Common measures to get HSI status include adopting discriminatory admissions strategies; adopting discriminatory financial-aid policies; and using discriminatory hiring and promotional policies for faculty and staff. App.2187-88, App.2203.

When schools reach the coveted 25% threshold, they quickly seek designation as HSIs and apply for grants. The Department uses an eligibility matrix to determine which schools are eligible for funding under Titles III and V generally. *See* 90 Fed. Reg. 11408, 11409 (Mar. 6, 2025); *accord* 91 Fed. Reg. 14003, 14003 (Mar. 24, 2026). Schools can become eligible either automatically based on the Department's data, by submitting an application proving their eligibility, or by requesting a waiver. 90 Fed. Reg. at 11409; *accord* 91 Fed. Reg. at 14004. These matrices, combined with records of past applications and other available data, reveal that nearly all HSIs apply for funding under the HSI program at least once. In 2020, for example, 266 schools were eligible to apply under an HSI subprogram (excluding schools already receiving grants), and 249 schools did apply. *Compare* App.1377 ("249 applications"), *with* App.56-266 (266 eligible schools); *see also* App.2516 ("Over the past 20 years ... over half [of HSIs] have received at least one grant from the Developing HSIs program."). A document produced by HACU in discovery states that "most" schools that become HSIs apply for funding at least once. App.2534 (produced as HACU 123). And a study estimated that, from 2010 to 2017, about 70% of HSIs applied for the Title V subprograms each year. App.2340. Notably, HACU is here representing the HSIs; and when Plaintiffs asked HACU in discovery to identify an HSI that had never applied for funding, HACU refused. App.2561-62, App.2598-600.

**B. This ethnic discrimination harms States, schools, faculty, staff, and students.**

Because of the 25% ethnic quota, many States are excluded from the HSI program entirely. As of 2025, around 20 States had no colleges and universities that qualified as HSIs. Ex.18. None of Tennessee's public colleges or universities have ever met the 25% Hispanic quota. Ex.11-12, Ex.14, Ex.16, Ex.18. Tennessee's non-HSIs serve and educate many students of all ethnicities, including Hispanics. App.2630. And during the course of this lawsuit, 19 of these Tennessee public schools have been deemed eligible or received a waiver under the nonethnic criteria because they serve many needy students and have lower than average expenditures. *See* Ex.17, Ex.19-20. But these public

schools are barred from being HSIs and thus from competing for any of the benefits that come from that designation.

If Tennessee's otherwise eligible public schools could apply for HSI funding, at least one would do so. As the Chancellor of UT-Chattanooga explains in her declaration, her school "will seek to obtain that funding" if the school "meets the published eligibility criteria" in the future. Bruce-Decl. ¶9. Likewise, the Chancellor of the Tennessee Board of Regents testifies that HSI funding "would help improve the educational opportunities and the education" for the "many low-income students" served by the Tennessee schools she oversees. Tydings-Decl. ¶5. If those funds were available, she "would encourage Tennessee's public community colleges to apply." ¶6. And as chancellor, she is the CEO in charge of the State University and Community College System. *See* App.2122.

Tennessee also enforces many laws that ban ethnic discrimination by private and public schools. *E.g.*, Tenn. Code Ann. §4-21-1101. Per the director of the Tennessee attorney general's civil-rights enforcement division, these laws "prohibit colleges and universities from considering ethnicity in granting or denying admission, scholarships, or other educational opportunities." Griffin-Decl. ¶7. Schools in Tennessee violate state law when they "make decisions related to admissions or financial aid with the intent to increase the number of admitted or enrolled students of a particular race [or] ethnicity" or implement programs that "give preference to … any … ethnic group." ¶¶8-9. By "t[ying] federal funding" to an ethnic quota and "prioritiz[ing] and fund[ing] projects that give preference to Hispanics," the HSI program "incentivizes" schools to "violate Tennessee law." ¶11.

The HSI program also excludes many administrators, faculty, students, and prospective students. Within Tennessee, the State represents these individuals too. And both within Tennessee and nationwide, these individuals are members of SFFA, NAS, and FASORP. These membership associations have identified seven specific standing members in this case, whose true identities have been revealed to HACU under the protective order. *See* Doc.69.

SFFA's Member A is a tenured faculty member at a public university in Tennessee. Member-A-Decl. ¶2. He is prolific at drafting grant applications and securing federal funding. ¶5, ¶¶12-15. Member A is currently seeking funding for a statistical research center and a leadership training program, so far without success. ¶¶8-9. He wants to apply for an HSI grant because these grants go to a broad range of programming, including his planned projects, while other federal grants are too restrictive and specific. *See* 20 U.S.C. §1101b(b)(2)-(3); 20 U.S.C. §1067q(b)(2)(B). His university can satisfy all the nonethnic criteria for the HSI program. *See, e.g.*, Ex.17. Unfortunately, Member A cannot apply because, like all of Tennessee's public universities, Member A's school does not hit the 25% Hispanic quota. If HSI funding becomes available, Member A "would draft and submit a grant application at the next available opportunity." Member-A-Decl. ¶21. His university "will endorse [his] applications for HSI funding in its name," as it has always done with his previous federal grant applications. ¶21, *see* ¶17.

Individual B, a member of NAS and FASORP, is another faculty member at a non-HSI. Individual-B-Decl. ¶2. Individual B is likewise prolific at applying for and receiving grants. ¶¶10-11. And she likewise has a planned but unfunded grant proposal—one that would assist her scholarship, support faculty-supervised undergraduate research, fund new research equipment, and implement the findings of her research to promote student welfare on campus. ¶14. These activities fall within the parameters of HSI grants. *See* 20 U.S.C. §1101b(b)(1)-(3); §1067q(b)(2)(B). They are also similar to activities that other federal agencies fund through grants made available only to affiliates of institutions that the Department of Education recognizes as HSIs. Individual-B-Decl. ¶18. But because her school is not an HSI, Individual B cannot apply. If the court enters adequate relief, Individual B will "work with [her school] to apply for HSI grants in the institution's name to fund [her] research, facilities, and services to [her] students" and will "apply for research grants earmarked for HSIs to fund [her] own research." Individual-B-Decl. ¶24. Her school "will endorse [her] HSI funding applications in its name,

as it has done with [her] prior federal grant applications." ¶24. In fact, her university has "strived for years" to become an HSI so its faculty can access these opportunities. ¶12.

FASORP's Individual E is an administrator at a non-HSI who wants to apply for the USDA's HSI Fellowship. *Garza Fellowship*. Individual-E-Decl. ¶2, ¶9, ¶11. The only requirement he does not satisfy is that his school is not an HSI because it does not meet the 25% Hispanic quota. ¶10, ¶13. Individual E is otherwise ready and able to submit the relatively simple application, including a statement of interest and a résumé. ¶14. Individual E has participated in similar fellowships in the past and is eager to spend a week in D.C. for this fellowship. ¶¶15-17. If a court grants adequate relief, Individual E "will apply for the ... Fellowship Program in the next available application cycle." ¶18.

The remaining standing members—SFFA's Members B-D and FASORP's Individual C—are undergraduate students who currently attend non-HSIs. All are harmed by the program's ethnic classification. Blum-Decl. ¶7, ¶¶9-10; Individual-C-Decl. ¶¶8-10. And all are harmed in other ways too. When this suit was filed, Member D had to decline his school of choice and attend an HSI instead so he could apply for the Coast Guard's CSPI program. Blum-Decl. ¶10. SFFA filed a lawsuit and successfully argued that by incorporating the Department of Education's definition of HSI (and similar racial designations), the CSPI program drew an ethnic classification and could not satisfy strict scrutiny. *SFFA v. U.S. Coast Guard*, Doc.25, No. 5:25-cv-00284 (N.D. Fla. May 28, 2026). Member D has now transferred to his non-HSI school of choice and is actively applying for CSPI. Blum-Decl. ¶10. Members B-C likewise attend a non-HSI. ¶9. Their school could otherwise qualify for HSI funding, frequently applies for federal funding, and has cited the recent end of federal funding as a reason why it is increasing their tuition and fees next year. ¶9.

### C. Plaintiffs and Plaintiff-Intervenors bring this constitutional challenge.

In June 2025, Tennessee and SFFA filed their original complaint against the Department of Education and related defendants. Doc.1. In response to and specifically referencing this lawsuit, the Department of Justice notified Congress that it would not defend the constitutionality of the HSI

program. *See* Doc.32 ¶1. Two membership associations, NAS and FASORP, intervened as plaintiffs. Docs.22 & 35. And HACU, a membership association of all existing HSIs, intervened as a defendant. Docs.17 & 34. When it sought to intervene, HACU said the relief sought in this litigation "would harm HACU's members by ending a key source of federal funding" and would "harm HACU's student members and students attending HSIs, many of whom have been able to access higher education due to scholarship funds and support services built under the auspices of HSIs grants." Doc.17 at 18.

In September 2025, and again in response to this lawsuit, the Department of Education announced that it was reprogramming funding from the HSI subprograms under Title V. Doc.45-1 Ex.A. Because Title V funding is "discretionary," the Department said it could "reprogram" the approximately $350 million that Congress appropriated to these subprograms for FY2025 elsewhere. *Id.* But the Department would continue funding the HSI subprogram in Title III, since those "approximately $132 million in mandatory funds appropriated by Congress … cannot be reprogrammed on a statutory basis." *Id.* at 3.

In December 2025, HACU filed a motion to dismiss and motion for judgment on the pleadings, arguing that the complaints failed to plead standing on their face and that some of the requested relief was moot. Docs.45 & 57. Those motions remain pending.

The parties have now completed nine months of fact and expert discovery. They exchanged many requests for production and interrogatories. And HACU disclosed two experts: Dr. Patrick Valdez and Dr. Marcel Roman. As all participating parties anticipated in the scheduling order, this case should now be resolved on cross-motions for summary judgment. Doc.41 at 1.

## LEGAL STANDARD

Summary judgment "shall" be entered when there is "no genuine dispute as to any material fact" and judgment can be entered "as a matter of law." Fed. R. Civ. P. 56(a). On "'cross-motions for summary judgment,'" the Court "'evaluate[s] each motion on its own merits and view[s] all facts and inferences in the light most favorable to the nonmoving party.'" *Coria v. Sport Pontoons*, 2024 WL

2703131, at *2 (E.D. Tenn. Mar. 15). But that rule has little relevance here: "[T]he crux of this dispute is not based in fact. It is based in law." *Chattanooga v. Walker Cnty. Gen. Water & Sewerage Auth.*, 2025 WL 542309, at *4 (E.D. Tenn. Feb. 18). Hence why Plaintiffs, Plaintiff-Intervenors, and HACU all "'agree that this case can be resolved on cross-motions for summary judgment.'" Doc.41 at 1.

## ARGUMENT

Plaintiffs and Plaintiff-Intervenors plausibly alleged standing and now, after discovery and with the benefit of declarations and other evidence, have proved it with evidence. On the merits, the definition of HSI and discriminatory policies riddling the entire HSI program are ethnic classifications that must survive strict scrutiny but cannot. Accordingly, this Court should enter a declaratory judgment.

### I. Plaintiffs have standing.

Discovery proved what Plaintiffs and Plaintiff-Intervenors alleged in their complaints: Each has Article III standing. Because only "one" Plaintiff needs standing, *Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006), this Court can start and stop with perhaps the easiest plaintiff: Tennessee, *see Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020) (faulting a court for considering the standing of other parties when one was sufficient). But for completeness, the associational Plaintiffs and Plaintiff-Intervenors also have standing to represent the members they have specifically identified.

#### A. Tennessee

Tennessee is injured foremost because, due to the 25% Hispanic quota, its public colleges and universities are unable to compete for grants. Tennessee can sue over injuries to these schools. *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 588 (6th Cir. 2024); *Biden v. Nebraska*, 600 U.S. 477, 492 (2023); *see* Tenn. Code Ann. §49-8-101(a)(1) ("establish[ing] a state university and community college system"). And the inability to equally compete for opportunities due to ethnicity is a well-recognized Article III injury. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 657 (1993). "The government's use of racial preferences causes that injury. And that injury is redressable by a decision ordering the government not to grant priority consideration based on the race of

applicants." *Vitolo v. Guzman*, 999 F.3d 353, 358-59 (6th Cir. 2021). Because the injury is unequal competition, Tennessee does not need to prove that its schools would *get* any grants. *Id.* And because the 25% Hispanic quota makes it futile for Tennessee's schools to apply, Tennessee does not need to prove that its schools have applied in the past. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977). What matters is that Tennessee has at least one school that is "able and ready" to apply for grants, once a court removes the allegedly illegal ethnic criteria. *Jacksonville*, 508 U.S. at 666.

Tennessee has schools that are "able" to apply because, absent the illegal ethnic criteria, they satisfy the minimum objective requirements for HSI status. *See Hile v. Michigan*, 86 F.4th 269, 274-75 (6th Cir. 2023); *Contractors Ass'n of E. Pa. v. Philadelphia*, 6 F.3d 990, 995-96 (3d Cir. 1993). When this suit was filed, the Department's eligibility matrix said 15 Tennessee schools can apply for Title III and V grants: ten by data, three by application, and two by exemption or waiver. Ex.19. The most recent matrix says 17 Tennessee schools are eligible: seven by data, three by application, and seven by exemption or waiver. Ex.20. In other words, these schools are accredited undergraduate institutions that have an enrollment of needy students, 20 U.S.C. §1101a(a)(2)(A)(i); 34 C.F.R. §606.3(a), and have low per-student spending as compared to schools that offer similar instruction, 20 U.S.C. §1101a(a)(2)(A)(ii); 34 C.F.R. §§606.2(a)(4), 606.4(a)—or that got waivers from those requirements, *see* 20 U.S.C. §1103a(a), §1103a(b)(1); 34 C.F.R. §606.3(b), §606.4(c), 90 Fed. Reg. at 11410. These "criteria vary," but the "racial barrier does not." *Nuziard v. MBDA*, 721 F. Supp. 3d 431, 463 (N.D. Tex. 2024). The only criterion that these Tennessee public schools cannot satisfy is the one that cannot be waived: the illegal 25% Hispanic quota. Ex.18.

Tennessee's schools are also "ready" to apply because, once a court removes the illegal ethnic criteria, they would apply in the reasonably foreseeable future. *See Hile*, 86 F.4th at 275; *Lac Vieux Desert Band v. Michigan Gaming Control Bd.*, 172 F.3d 397, 405-06 (6th Cir. 1999). Tennessee submitted declarations from officials who represent 14 of the otherwise-eligible institutions listed above,

including the University of Tennessee at Chattanooga and Tennessee's 13 community colleges. UTC's chancellor testifies that, if the school met the criteria, it "will seek" the funding that is currently limited to HSIs. Bruce-Decl. ¶¶8-9. The CEO in charge of Tennessee's community colleges likewise testified that, if the 13 schools she oversees are made eligible for the funding that is currently limited to HSIs, she will encourage them all to apply. Tydings-Decl. ¶6.

Though this testimony is "sufficient," *Lac Vieux Desert Band*, 172 F.3d at 406, it was never necessary. It is entirely "predictable" that, once the program is made ethnicity neutral, schools that could apply for this new reservoir of federal funding will do so. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). These schools already get federal funding, *see Tennessee v. Dep't of Educ.*, 615 F. Supp. 3d 807, 829 (E.D. Tenn. 2022), and they must report to boards, donors, state legislatures, and other stakeholders on their budgets, *see, e.g.*, Tenn. Code Ann. §49-8-203(i), §49-9-208; it would be incredibly odd if they forswore an additional stream of federal funding, *see* Member-A-Decl. ¶5, ¶¶12-13. Tennessee's one HSI, a private school, applied for and even received funding under the HSI program. *See* App.1534.[1] And HACU's members are the HSIs. In discovery, HACU produced evidence that at least "most" HSIs have applied for funding, App.2534 (produced as HACU 123), and it refused to identify even one HSI that has never applied, App.2561-62, App.2598-600. In fact, HACU claims that its members will be injured by an adverse decision in this case precisely because, "without the Hispanic-enrollment requirement, the pool of institutions eligible to compete for limited HSI funding could expand." App.2582. HACU cannot base its standing off a prediction that more schools will apply, while also calling that same prediction speculative. *Cf. New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

[1] Though the published version of the abstract identifies this as a "TX" rather than a "TN" school, that is a typo. *See* App. 1503. *See also, e.g.*, App. 729, App. 941.

Apart from these competitive injuries, Tennessee has other injuries as well. States can assert sovereign and quasi-sovereign injuries against the federal government—both under binding precedent, *see Tennessee*, 104 F.4th at 592; *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 553 (E.D. Ky. 2024), and because the federal defendants here waived any argument to the contrary, *see* Doc.64 at 11-12. In fact, "States' claims of injury deserve 'special solicitude' in [the] standing analysis." *Saginaw Cnty. v. STAT EMS*, 946 F.3d 951, 957 (6th Cir. 2020) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007)). Their burdens on immediacy, causation, and redressability are all relaxed. *Colville v. Becerra*, 2023 WL 2668513, at *14-15 (S.D. Miss. Mar. 28).

The HSI program "interfere[s] with the enforcement of [Tennessee's] anti-discrimination laws, demonstrating a concrete harm to [Tennessee's] sovereign interest in [its] laws." *Id.* at *15. As explained in the declaration from the Tennessee Attorney General's Office, Tennessee's laws strictly "prohibi[t] colleges and universities from considering ethnicity in granting or denying admission, scholarships, or other educational opportunities." Griffin-Decl. ¶7 (citing, *e.g.*, Tenn. Code Ann. §4-21-1101). The HSI program incentivizes violations of those laws by subsidizing schools based on the number of Hispanics on campus, and by encouraging recipients to create programs that are designed to benefit one ethnicity. *Colville*, 2023 WL 2668513, at *17; *see* Griffin-Decl. ¶11; 34 C.F.R. §606.23(e); §606.8(b)(5); *supra* at 8. The program's ethnic discrimination thus infringes Tennessee's "sovereign" interest in "regulating education within [its] borders," *Tennessee*, 104 F.4th at 592, and "defending [its] own educational laws and regulations" from "the federal government's intrusions," *Tennessee*, 737 F. Supp. 3d at 553 (cleaned up); *see* Tenn. Const. art. XI, §12. For the same reasons, it infringes Tennessee's sovereign "interest in securing residents from the harmful effects of discrimination." *Alfred L. Snapp & Son v. P.R. ex rel. Barez*, 458 U.S. 592, 609 (1982); *accord Kentucky v. Biden*, 23 F.4th 585, 599 (6th Cir. 2022). At a minimum, Tennessee is "trapped between choosing to enforce state

laws or receiving federal funds," a dilemma that itself is a quasi-sovereign injury. *Tennessee*, 104 F.4th at 591.

### B. Associations

Plaintiff SFFA and Plaintiff-Intervenors, NAS and FASORP, are associations representing their members, including specific employees and students at non-HSIs. The associations have standing if these members could sue on their own, this suit is germane to the associations' purposes, and this case does not require the members' excessive individual participation. *Harvard*, 600 U.S. at 199. The germaneness requirement is easily met. *See* Blum-Decl. ¶13; Wood-Decl. ¶3; Follmer-Decl. ¶3. And the associations' facial challenges and requests for forward-looking relief do not require their members' participation. *Barry v. Lyon*, 834 F.3d 706, 716 (6th Cir. 2016). The only question is whether the associations have at least "one" member who would have standing to sue on his or her own. *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1036 (6th Cir. 2022). They do.

Faculty at non-HSIs—including Member A of SFFA and Individual B of NAS and FASORP—have standing based on their inability to compete for grants. *Lac Vieux*, 172 F.3d at 404-06. These tenured professors work at schools that could satisfy the nonethnic criteria for HSI status. Member-A-Decl. ¶2; Individual-B-Decl. ¶2; Ex.15, Ex.17, Ex.19-20. Though the federal funding that is contingent on HSI status is allocated to schools, faculty can and do take the lead in drafting the proposals and spending the money. *See* App.1738-42; Member-A-Decl. ¶16; Individual-B-Decl. ¶19. Member A and Individual B each have an impressive track record of getting federal grants, and they have specific proposals that need funding and fall under the HSI program's parameters. Member-A-Decl. ¶5, ¶¶8-9, ¶11, ¶¶12-15; Individual-B-Decl. ¶¶10-11, ¶¶14-17. If their schools qualified, these professors would submit their grant proposals at the earliest available cycle. Member-A-Decl. ¶21; Individual-B-Decl. ¶24. Given their track records, and the "economic realities" of university funding, it is "predictable" that the professors' schools would support them. *Diamond Alternative Energy v. EPA*, 606 U.S. 100, 116 (2025); *see* Member-A-Decl. ¶21; Individual-B-Decl. ¶24. Even in the "remarkable"

and "shocking" scenario where their schools did not support them, Member-A-Decl. ¶17; Individual-B-Decl. ¶20, their proposals could be supported in a future cycle, and the professors would still get professional benefits for trying, Member-A-Decl. ¶¶20-21; Individual-B-Decl. ¶¶23-24.

Students, faculty, and administrators at non-HSIs—like Member D of SFFA and Individual E of FASORP—also have standing based on their inability to apply for specific programs. Individual E, for example, is able and ready to apply for the Department of Agriculture's HSI Education Fellowship. Individual-E-Decl. ¶¶18-19. As a university administrator, he satisfies the objective minimum criteria and would do everything required to submit a timely application. Individual-E-Decl. ¶¶12-14. But because his university is not an HSI, his application is currently futile. Individual-E-Decl. ¶¶9-10; *see* Ex.18-19. The fellowship relies on the Department of Education to determine which schools are HSIs, *Garza Fellowship*; so once a court enters relief here, Individual E can and will apply. Individual-E-Decl. ¶¶18-19. As for Member D, when this suit was filed, he was forced to turn down his college of choice and enroll at an HSI so he could apply for the Coast Guard's CSPI program. Blum-Decl. ¶10; *see Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 154-55 (2010) (explaining that costly "measures to minimize the likelihood" of harm are themselves injuries); *Savel v. MetroHealth Sys.*, 96 F.4th 932, 940 (6th Cir. 2024) (similar). He now attends a non-HSI because SFFA won in another court that the HSI requirement is an illegal ethnic classification that cannot satisfy strict scrutiny. *Coast Guard*, Doc.25, No. 5:25-cv-00284 (N.D. Fla.). If this Court holds otherwise, it could jeopardize Member D's pending application to the CSPI at his current school. Blum-Decl. ¶10.

Finally, the HSI program injures students whose schools are excluded based on ethnicity—including Members B and C of SFFA and Individual C of FASORP. All three students currently attend non-HSIs that could satisfy all the nonethnic criteria except for the 25% ethnic quota. Blum-Decl. ¶9; Follmer-Decl. ¶9; Individual-C-Decl. ¶2, ¶8; *see* Ex.19-20. By counting up these students (and their classmates) to determine whether their schools meet the 25% threshold, the HSI program ethnically

classifies and inflicts a stigmatic injury on them. *Smith v. Cleveland Heights*, 760 F.2d 720, 721-22 (6th Cir. 1985); *see Inclusive La. v. St. James Par.*, 134 F.4th 297, 312 (5th Cir. 2025) (stigmatic injury when government disfavored an area associated with one race). It also deprives them of the educational resources and opportunities that HSI status is designed to unlock. *See Parsons v. DOJ*, 801 F.3d 701, 713 (6th Cir. 2015) ("[T]he fact that an injury is indirect does not destroy standing."). Even more direct, Members B-C attend a school that frequently seeks federal funding, just had its most recent federal funding dry up, and is citing that lack of federal funding as a reason it is increasing their tuition and fees next year. Blum-Decl. ¶9; Ex.71. These students have a "classic pocketbook injury" from the illegal consideration of ethnicity in the HSI program. *Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023).

## II. The HSI program is unconstitutional.

"[O]ur colorblind Constitution" states a strong "constitutional rule": Race and ethnicity cannot "play any part in government decisionmaking." *Allen v. Milligan*, 146 S. Ct. 1377, 1380 (2026); *Louisiana v. Callais*, 146 S. Ct. 1131, 1143 (2026). That equal-protection principle binds the federal government no less than the States. *Adarand Constructors v. Peña*, 515 U.S. 200, 223-24 (1995) (locating the ban on federal discrimination in the Fifth Amendment); *see also United States v. Vaello Madero,* 596 U.S. 159, 171-72 (2022) (Thomas, J., concurring) (locating the ban in the Fourteenth Amendment's Citizenship Clause). "[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227. This colorblindness rule binds Congress as well. Under the Spending Clause, Congress can make federal-funding recipients meet certain requirements; but those conditions on federal spending must not conflict with "other constitutional provisions." *South Dakota v. Dole*, 483 U.S. 203, 208 (1987). "A spending agreement that violates" these other constitutional provisions "is invalid, just like 'an illegal contract' at common law is invalid, even if freely assented to." *Landor v. La. DCPS*, 146 S. Ct. 1931, 1942 n.3 (2026). Chief among those constitutional provisions are the Fifth and Fourteenth Amendments' bans on ethnic discrimination. *See Dole*, 483 U.S. at 210-11.

The HSI program violates the Fifth and Fourteenth Amendments' bans on ethnic discrimination and, by extension, exceeds Congress's power under the Spending Clause. It intentionally discriminates based on ethnicity. And it cannot satisfy strict scrutiny.

### A. The HSI program intentionally discriminates based on ethnicity.

Under equal-protection principles, a federal law receives strict scrutiny if it intentionally discriminates based on ethnicity. *Adarand*, 515 U.S. at 227. Intentional discrimination includes not only the intent to harm, but also the intent to "prefe[r]" a particular ethnicity. *Associated Gen. Contractors of Ohio v. Drabik*, 214 F.3d 730, 734 (6th Cir. 2000); *accord Vitolo*, 999 F.3d at 360. A law can intentionally discriminate either on its face or in its purpose and effect, either one of which triggers strict scrutiny. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-68 (1977); *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999); *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 369 (6th Cir. 2002); *see also Callais*, 146 S. Ct. at 1147 ("*any* use of race in government decisionmaking generally triggers strict scrutiny"). The HSI program does both.

The HSI program draws an ethnic classification on its face. The statutory text could not be clearer: "The term 'Hispanic-serving institution' means an institution of higher education that … has an enrollment of undergraduate full-time equivalent students that is *at least 25 percent Hispanic students*." 20 U.S.C. §1101a(a)(5) (emphasis added). In other words, schools are eligible or ineligible for grants based on whether they "serv[e]" "Hispanic[s]"—a criterion that is defined solely in terms of whether schools enroll a high enough percentage of "Hispanic students." By incorporating this definition, every HSI subprogram "is subject to strict scrutiny because each distributes government benefits based on race by distinguishing between educational institutions based on the racial composition of their student bodies." *OLC*, 2025 WL 4055305, at *13. "If that conclusion were not obvious from Congress's mere designation of 'Hispanic-serving institutions,' it becomes inescapable considering the quota-based definition of HSIs that Congress provided." *Id.*

Though the definition of HSI withholds money from *schools* based on the ethnicity of their *students*, that fact does not make the definition facially neutral. Equal-protection principles "are no less violated when the government uses race to distinguish between organizations (as in *Croson* and *Adarand*) than when it uses race to distinguish between individuals." *OLC*, 2025 WL 4055305, at *4. For example, restaurants have no race; but a funding statute that gives restaurants a preference based on the race of a majority of the owners draws a racial classification. *Id.*; *see Vitolo*, 999 F.3d at 357, 360. Restaurants, businesses, schools, and other organizations are made up of individuals, after all. Denying the organization resources because of the race of the individuals that comprise it *is* denying those individuals resources based on race. If it weren't, Congress could just as easily pass a statute that *denies* funding to any school that has "too many" Hispanic students on campus.

Even if the definition of HSI were facially neutral based on ethnicity, the HSI program still intentionally discriminates in its purpose and effect. The "circumstantial and direct evidence of intent" here is abundant. *Arlington Heights*, 429 U.S. at 266. In the text itself, Congress said its "purpose" was to expand opportunities "for … Hispanic students." 20 U.S.C. §1101(b)(1); *accord* §1102(a) (same); §1067q(b)(2)(B) ("increase the number of Hispanic … students attaining degrees"). Similar statements abound in the "legislative [and] administrative history." *Arlington Heights*, 429 U.S. at 268; *see, e.g.*, S. Rep. 102-204, 1991 WL 254644, at 20 (Nov. 12, 1991) ("increase Hispanic participation"); H.R. Rep. 110-500, 2007 WL 4556528 (Dec. 19, 2007) (similar); 90 Fed. Reg. 23520, 23520 (June 3, 2025) ("Purpose of Program ... to expand educational opportunities for, and improve the academic attainment of, Hispanic students"); 89 Fed. Reg. 18607, 18608 (March 14, 2024) (similar); 86 Fed. Reg. 22947, 22948 (Apr. 30, 2021) (similar).

Consistent with this admitted purpose, the "impact of the [program] on particular racial groups" is disproportionate. *Moore*, 293 F.3d at 369. Per HACU, the 25% ethnic quota means that HSIs enroll 68.2% of all Hispanic undergraduates in the country. App.2454. The States with the

highest Hispanic populations (California, Texas, New York, Illinois, Florida, New Mexico, and New Jersey), plus Puerto Rico, are home to 80% of the HSIs, while around 20 States with lower Hispanic populations have zero HSIs. App.2454. Further, and as explained above, the Department of Education both encourages and funds grant proposals that are designed to benefit Hispanics. *See supra* at 3-5. And in practice, HSIs frequently get funding under the HSI subprograms for activities that exclude non-Hispanics or that are designed with the intent to benefit Hispanics in particular. *E.g.*, *supra* at 4-5; App.1640 ("Target Population. 310 Hispanic … students"), App.1649 ("to support Chicanx/Latinx student success."), App.1557 ("campus Chicanx/Latinx Resources Center"); App.1559 ("serve Hispanic … students through … a speaker of color series"); App.1611 ("program that serves 150 URM engineering students"); App.1612 ("recruitment of qualified Hispanic-Latino registered nurses").

Though Congress sometimes describes its purpose as benefiting "Hispanic students *and other low-income individuals*," 20 U.S.C. §1101(b)(2) (emphasis added), that supposed "additional purpose" does not make the program ethnically neutral, *Hunter v. Underwood*, 471 U.S. 222, 232 (1985). Outside of redistricting, the government gets strict scrutiny when ethnicity plays even one "role." *Callais*, 146 S. Ct. at 1146. And ethnicity plays the *main* role in the HSI program. As explained, the statutory criteria that consider students' need are flexible and can be waived; yet the requirement that schools enroll a fixed minimum percentage of Hispanic students is an inflexible, unwaivable quota. 20 U.S.C. §1101a, §1103a(a)(5), §1103a(b)(1); 34 C.F.R. §606.2, §606.3(b), §606.4(c). In fact, ethnicity is an acceptable *reason* for waiving the neediness requirement—if, for example, "the Secretary determines that the waiver will substantially increase higher education opportunities appropriate to the needs of Hispanic Americans." 20 U.S.C. §1103a(a)(5); *accord* 34 C.F.R. §606.3(b). But the degree to which ethnicity is considered is irrelevant: Even if ethnicity were only "a factor of a factor of a factor," the program would still need to satisfy strict scrutiny. *Fisher v. Univ. of Texas*, 579 U.S. 365, 375 (2016).

### B. The program's ethnic discrimination serves no compelling interest.

Under strict scrutiny, there are "only two compelling interests that permit resort to race-based government action." *Harvard*, 600 U.S. at 207; *accord Rabiebna v. Higher Educ. Aids Bd.*, 36 N.W.3d 611, 624 (Wis. 2026). The first is "remediating specific, identified instances of past discrimination that violated the Constitution or a statute." *Harvard*, 600 U.S. at 207. "The second is avoiding imminent and serious risks to human safety in prisons, such as a race riot." *Id.* The second interest has no relevance here, and the HSI program cannot be justified under the first.

The HSI program does not "remediat[e] specific, identified instances of past discrimination that violated the Constitution or a statute." *Id.* The relevant inquiry for assessment of the HSI program would focus on the presence or absence of a history of discrimination by the discriminating actor, not by its downstream beneficiaries. Here, that actor is the federal government. Congress—in passing the relevant portions of the Higher Education Act—made no findings of any kind concerning past unconstitutional discrimination by any component of the federal government. Congress could not have sought to remediate the federal government's own past history of specific, identified discrimination without even referencing such an incident.

Congress instead justified the statute based only on "disparities" in funding and educational outcomes for Hispanics. 20 U.S.C. §1101(a); *accord* §1067 ("underrepresentation"); S. Rep. 102-204, at 19, 1991 WL 254644 (Nov. 12, 1991) ("disparity"); H.R. Conf. Rep. 110-803, at 571, 2008 WL 2970927 (June 30, 2008) ("under-represented"); 154 Cong. Rec. H645, H654, 2008 WL 340145 (Feb. 7, 2008) ("under-representation"). But under strict scrutiny, "[s]tatistical disparities don't cut it." *Vitolo*, 999 F.3d at 361. Disparities do not prove the kind of specific intentional discrimination that violates a specific federal law. *Drabik*, 214 F.3d at 735; *Vitolo*, 999 F.3d at 361; *Mich. Rd. Builders Ass'n v. Milliken*, 834 F.2d 583, 594 n.14 (6th Cir. 1987), *aff'd*, 489 U.S. 1061 (1989). Congress did not find, or even suggest, that they did. Even its findings concerning "disparities" and "underrepresentation" are badly outdated—reflecting the state of Hispanic education "[b]etween 1973 and 1994." 20 U.S.C.

§1101(a)(2). And these findings betray a focus on "proportional representation," which is not a compelling interest but is a "patently unconstitutional" one. *Harvard*, 600 U.S. at 223.

HACU cannot remedy this defect in 2026, including with experts. The existence of a compelling "government interes[t] is a legal conclusion," not a question of fact. *United States v. Green*, 532 F.3d 538, 546 (6th Cir. 2008). So the Court must decide this question for itself, with no deference to any experts. *See Nathan v. Alamo Heights Indep. Sch. Dist.*, 173 F.4th 576, 607 (5th Cir. 2026) (en banc); *Killion v. KeHE Distributors, LLC*, 761 F.3d 574, 593 (6th Cir. 2014); *United States v. Mazumder*, 800 F. App'x 392, 395 (6th Cir. 2020). If the Court defers to anyone, it should defer to *the United States*, which has the best data and most experience on whether the HSI program serves the nation's interests. According to the United States, the program serves no compelling governmental interest—not when it was passed in 1992, and not today in 2026. *OLC*, 2025 WL 4055305, at *13.

**C. The program's ethnic discrimination is not narrowly tailored.**

Even if the government had an interest that qualified as compelling, the HSI program would flunk narrow tailoring. *Vitolo*, 999 F.3d at 360. Narrow tailoring "is a very demanding standard, which few programs will survive." *Id.* The HSI program, with its rigid quota and heavy-handed focus on ethnicity, comes nowhere close. Consider just a few of the obvious problems.

The definition of HSI uses a hard, numerical quota. Schools must enroll at least 25% Hispanic students—no exceptions. 20 U.S.C. §1101a(a)(5). For example, the Homestead Schools (33.8% Hispanic) can apply for funding, even though it educates only around 40 Hispanics. App.903, App.2489. But UCLA (24.3% Hispanic) cannot apply for funding, even though it educates more than 8,000 Hispanics. App.2464. Under decades of precedent, "rigid numerical" cutoffs are anathema to narrow tailoring. *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 508 (1989); *see Harvard*, 600 U.S. at 211 (explaining that, even under *Grutter* and *Bakke*, the government "could not establish quotas" or "desire some specified percentage of a particular group" (cleaned up)). These strict and arbitrary numbers do not possibly relate to any "remedial purpose." *Vitolo*, 999 F.3d at 363.

The HSI program is also fatally "overbroad and underinclusive." *Id.* It's overbroad because schools that hit the 25% threshold can apply for funding, regardless of how well (or poorly) they are educating Hispanics and regardless of whether they suffered (or inflicted) any ethnic discrimination. *Drabik*, 214 F.3d at 737. And it's underinclusive because "Hispanic students not enrolled at an HSI receive no benefits from the program whatsoever." *OLC*, 2025 WL 4055305, at *14; *see Vitolo*, 999 F.3d at 363. Those students are left out in the cold *even if* they experienced discrimination and *even if* their schools desperately need funding. *Drabik*, 214 F.3d at 737.

Nor did Congress consider and reasonably reject "workable race-neutral alternatives." *Vitolo*, 999 F.3d at 362. To improve academic outcomes, Congress could give funding to schools that have particularly good (or bad) academic outcomes. *Id.* at 363. To remedy discrimination, Congress could have tied the funding to a showing of past discrimination. *See W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 998 (9th Cir. 2005). And to "hel[p] … low-income individuals," 20 U.S.C. §1101(b)(2), Congress could have designed a program that assists schools with high numbers of low-income individuals, no matter their ethnicity. It did none of those things. It reached for a fixed ethnic quota, with no findings or analysis of why alternatives would not work.

The HSI program also violates every narrow-tailoring rule from *Harvard*. Because the grants are a competitive, zero-sum process, *see* 90 Fed. Reg. at 23523, the program uses ethnicity as a "negative" by treating it as a positive only for some applicants, *Harvard*, 600 U.S. at 218. The program also has no "logical" or "durational" end; Congress has continued it for decades with no sign of stopping, and its professed purpose of remedying disparities and achieving proportional representation has no stopping point. *Id.* at 221-22, 228. And the use of the category "Hispanic" promotes stereotyping and is too incoherent to satisfy narrow tailoring. As the Supreme Court majority explained in *Harvard*, "racial categories, such as 'Hispanic,' are arbitrary or undefined." *Id.* at 216 (citing Lopez et al., *Who is Hispanic?*, Pew Res. Ctr. (Sept. 15, 2022), perma.cc/9799-3DZV). Citing

Justice Gorsuch's concurrence, the majority also agreed that these categories "further" "'irrational stereotypes.'" *Id.*; *see id.* at 292 (Gorsuch, J., concurring) ("[T]he 'Hispanic' category covers those whose ancestral language is Spanish, Basque, or Catalan—but it also covers individuals of Mayan, Mixtec, or Zapotec descent who do not speak any of those languages and whose ancestry does not trace to the Iberian Peninsula but bears deep ties to the Americas."). Among other stereotypes, the HSI program assumes that a school "serves" "Hispanics" based on nothing more than the fact that 25% of its students self-report that they belong to that arbitrary category. Hardly the stuff of strict scrutiny. *See id.* at 216-17 (majority).

## III. This Court should declare that the HSI program is unconstitutional.

This Court should declare that the entire HSI program, as currently constituted, is unconstitutional—not just the definition of HSI in 20 U.S.C. §1101a(a)(5)(B). That relief is needed to match the scope of the constitutional problem because the HSI program is unconstitutional on its face: Ethnic discrimination is the program's illegal purpose and effect, and ethnic discrimination pervades the statutory text, its regulations, and its implementation. *See Zillow, Inc. v. Miller*, 126 F.4th 445, 457 (6th Cir. 2025) ("statute is 'wholly invalid' because the statute has … an impermissible purpose"). In equal-protection cases, the constitutional defect can be remedied either by leveling up (making everyone eligible for the benefit, regardless of ethnicity) or leveling down (ending the benefit entirely). *Sessions v. Morales-Santana*, 582 U.S. 47, 72-73 (2017). So in response to this Court's "declaratory relief," the government would have "flexibility" to choose a solution, including a solution that leveled up by giving schools access to these funds without all the ethnic criteria and preferences. *Robinson v. Purkey*, 326 F.R.D. 105, 137 (M.D. Tenn. 2018); *Kentucky v. FHA*, 728 F. Supp. 3d 501, 526 (W.D. Ky. 2024).

Though Plaintiffs initially sought both injunctive and declaratory relief, they now believe a declaratory judgment would be sufficient. In addition to giving the government flexibility in remedying the constitutional defect, declaratory relief is appropriate given the government's partial voluntary

cessation, which does not moot the case, *see* Doc.64 at 18-24, but does suggest that "stronger injunctive medicine" is not currently needed, *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975); *see Friends of the Earth v. Laidlaw,* 528 U.S. 167, 189 (2000). At the same time, a declaratory remedy "would settle the controversy" by "clarifying the legal relations in issue." *Grand Trunk W. R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984); *e.g.*, *Main Line Paving Co. v. Bd. of Educ.*, 725 F. Supp. 1349, 1365 (E.D. Pa. 1989) (awarding declaratory relief that a racial set-aside program violated the Constitution). If the government adopts an insufficient remedy or if declaratory relief proves insufficient, Plaintiffs can return to this Court and seek injunctive relief at that time. *See* 28 U.S.C. §2202; *Powell v. McCormack*, 395 U.S. 486, 499 (1969).

Finally, declaratory relief normally must be limited to the plaintiffs—here, Tennessee and its schools, as well as SFFA, NAS, FASORP, their members, and those members' schools—but this case is the rare one where the "injuries" make it "impossible for courts to craft relief that is complete and benefits only the named plaintiffs." *Trump v. CASA*, 606 U.S. 831, 852 n.12 (2025) (cleaned up). A declaration that the government cannot consider ethnicity only with respect to Plaintiffs and their schools does not provide these plaintiffs "complete relief." *Id.* at 851-52. Grants are a zero-sum competition; so if the government cannot consider ethnicity with respect to Plaintiffs and Plaintiff-Intervenors but can consider ethnicity with respect to all *other* applicants, Plaintiffs and Plaintiff-Intervenors would still be denied the ability to compete on an ethnically level playing field. *See Chicago v. Barr*, 961 F.3d 882, 928 (7th Cir. 2020); *e.g.*, *SFFA v. Harvard*, Doc.754, No. 1:14-cv-14176-ADB (D. Mass. Jan. 9, 2024) (ordering Harvard to stop using race as to all applicants). On the flipside, if only Plaintiffs' schools could apply for grants without satisfying the ethnicity-based rules for HSIs, then all other schools would be unable to compete on a level playing field. "To afford [Plaintiffs and Plaintiff-Intervenors] complete relief, the court has only one feasible option: order [the Department] to [stop

using ethnicity to determine funding eligibility]" for *everyone*, even though that relief "incidentally" helps nonparties. *CASA*, 606 U.S. at 851.

## CONCLUSION

The Court should grant this motion and enter a declaratory judgment that the HSI program, as currently constituted, is unconstitutional.

Dated: August 31, 2026

Respectfully submitted,

/s/ Cameron T. Norris

JONATHAN SKRMETTI
*Attorney General of Tennessee*

MADELINE CLARK
*Solicitor General of Tennessee*

JOSHUA DANIEL MINCHIN
*Assistant Solicitor General*

AARON L. BERNARD
*Assistant Solicitor General**

*Counsel for Plaintiff Tennessee*

Thomas R. McCarthy*
Cameron T. Norris
Tyler A. Dobbs
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22201
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
tdobbs@consovoymccarthy.com

Adam K. Mortara
Lawfair LLC
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

*Counsel for Plaintiff SFFA*

* *pro hac vice*

Eric G. Osborne
Mark Alexander Carver
SHERRARD ROE VOIGHT & HARBISON, PLC
1600 West End Avenue, Suite 1750
Nashville, TN 37203
eosborne@srvhlaw.com
acarver@srvhlaw.com
(615) 742-4200

Dan Morenoff*
Joseph A. Bingham*
AMERICAN CIVIL RIGHTS PROJECT
P.O. Box 12207
Dallas, TX 75225
dan@americancivilrightsproject.org
joe@americancivilrightsproject.org
(214) 504-1835

* *pro hac vice*

*Counsel for Plaintiff-Intervenors FASORP and NAS*

## CERTIFICATE OF SERVICE

I hereby certify that I filed this document through the Court's CM/ECF system on August 31, 2026, which automatically served counsel for all parties.

Dated: August 31, 2026 *<u>/s/Cameron T. Norris</u>*