UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| STATE OF TENNESSEE; STUDENTS FOR FAIR ADMISSIONS, INC.,<br><br>*Plaintiffs*,<br><br>THE NATIONAL ASSOCIATION OF SCHOLARS and FACULTY, ALUMNI, AND STUDENTS OPPOSED TO RACIAL PREFERENCES,<br><br>*Plaintiff-Intervenors*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION and LINDA MCMAHON, in her official capacity as Secretary of Education,<br><br>*Defendants,*<br><br>HISPANIC ASSOCIATION OF COLLEGES AND UNIVERSITIES,<br><br>*Defendant-Intervenor.* | Case No. 3:25-cv-270 |

**DEFENDANT-INTERVENOR'S COMBINED MEMORANDUM OF LAW IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' AND PLAINTIFF-INTERVENORS' JOINT MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page


INTRODUCTION ..... 1

BACKGROUND ..... 2

I. The HSI Program Provides Critical Funding that Benefits All Students ..... 2

II. The HSI Program's 25% Threshold Reflects Decades of Congressional Deliberation ..... 4

III. HSI Eligibility Tracks Organic Demographic Growth. ..... 6

IV. Procedural Background ..... 7

A. Tennessee and Students for Fair Admissions File Suit ..... 7

B. HACU, NAS, and FASORP Intervene in This Action. ..... 7

C. The HSI Program Is Reprogrammed. ..... 8

D. HACU Moves for Dismissal and Judgment on the Pleadings. ..... 9

LEGAL STANDARD ..... 9

ARGUMENT ..... 9

I. Plaintiffs Lack Article III Standing ..... 10

A. Tennessee Lacks Standing. ..... 10

B. SFFA, NAS, and FASORP Have Not Established Standing. ..... 12

II. Plaintiffs' Challenge Is Moot. ..... 16

III. The HSI Program Complies with the Constitution. ..... 18

A. The HSI Program Does Not Contain a "Racial Classification" Because It Does Not Treat Individuals Differently Because of Their Race. ..... 19

B. The HSI Program Permissibly Incorporates Demographic Data. ..... 21

C. The HSI Program Does Not Discriminate in Its Purpose or Effect. ..... 23

D. The HSI Program Readily Satisfies Rational Basis Review ..... 26

IV. Even If Strict Scrutiny Applies, the HSI Program Meets That Standard ..... 27

A. The Enrollment Threshold Serves Multiple Compelling Interests. ..... 27

B. The Enrollment Threshold Is Narrowly Tailored. ..... 30

V. The Enrollment Threshold Is Severable From the Remainder of the HSI Program. ..... 33

CONCLUSION ..... 35

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Adarand Constructors, Inc. v. Peña*,
515 U.S. 200 (1995)....21, 27, 29

*Alaska Airlines, Inc. v. Brock*,
480 U.S. 678 (1987)....34

*Allen v. Wright*,
468 U.S. 737 (1984)....14

*Alpert v. U.S.*,
481 F.3d 404 (6th Cir. 2007)....12

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013)....17

*Associated Gen. Contractors of Ohio, Inc. v. Drabik*,
214 F.3d 730 (6th Cir. 2000)....24, 28

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
591 U.S. 610 (2020)....34, 35

*Bench Billboard Co. v. City of Cincinnati*,
675 F.3d 974 (6th Cir. 2012)....16

*Biden v. Nebraska*,
600 U.S. 477 (2023)....10

*Brintley v. Aeroquip Credit Union*,
936 F.3d 489 (6th Cir. 2019)....12

*Brown v. Bd. of Educ.*,
347 U.S. 483 (1954)....30

*Cam I, Inc. v. Louisville/Jefferson Cnty. Metro Gov't*,
460 F.3d 717 (6th Cir. 2006)....34

*Campaign for Accountability v. U.S. Dep't of Just.*,
155 F.4th 724 (D.C. Cir. 2025)....20

*Cisneros v. Corpus Christi Indep. Sch. Dist.*,
467 F.2d 142 (5th Cir. 1972)....28

*City of Chicago v. Barr*,
961 F.3d 882 (7th Cir. 2020)....35

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)....16



Case 3:25-cv-00270-KAC-DCP Document 87 Filed 09/29/26 Page 3 of 44 PageID #: 3810

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989)....................20, 33

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....................15

*Cmty. First Bank v. Nat'l Credit Union Admin.*,
41 F.3d 1050 (6th Cir. 1994)....................11

*Crawford v. Bd. of Educ. of City of Los Angeles*,
458 U.S. 527 (1982)....................19

*Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*,
648 F.3d 365 (6th Cir. 2011)....................18

*Cutter v. Wilkinson*,
423 F.3d 579 (6th Cir. 2005)....................18

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025)....................15

*Doe v. Knox Cnty. Bd. of Educ.*,
2024 WL 5111942 (E.D. Tenn. Dec. 13, 2024)....................24

*Fisher v. Univ. of Tex.*,
579 U.S. 365 (2016)....................31

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010)....................34

*Green Genie, Inc. v. City of Detroit*,
63 F.4th 521 (6th Cir. 2023)....................26

*Haaland v. Brackeen*,
599 U.S. 255 (2023)....................11

*Hayden v. Cnty. of Nassau*,
180 F.3d 42 (2d Cir. 1999)....................20

*Hollingsworth v. Perry*,
570 U.S. 693 (2013)....................14

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)....................12

*Hunter v. Underwood*,
471 U.S. 222 (1985)....................25

*Kentucky v. Biden*,
23 F.4th 585 (6th Cir. 2022)....................11

*Keyes v. Sch. Dist. No. 1*,
413 U.S. 189 (1973)....................28

*Killion v. KeHE Distributors, LLC*,
761 F.3d 574 (6th Cir. 2014) ....................28

*Lewis v. Ascension Par. Sch. Bd.*,
806 F.3d 344 (5th Cir. 2015) ....................20, 25

*Lindenbaum v. Realgy, LLC*,
13 F.4th 524 (6th Cir. 2021) ....................35

*Louisiana v. Callais*,
146 S. Ct. 1131 (2026) ....................24

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................10, 12, 13, 15, 16

*LULAC v. Bredesen*,
500 F.3d 523 (6th Cir. 2007) ....................26

*Mangum v. Repp*,
674 F. App'x 531 (6th Cir. 2017) ....................9

*McKay v. Federspiel*,
823 F.3d 862 (6th Cir. 2016) ....................9

*Mendiola-Martinez v. Arpaio*,
836 F.3d 1239 (9th Cir. 2016) ....................25

*Midkiff v. Adams Cnty. Reg'l Water Dist.*,
409 F.3d 758 (6th Cir. 2005) ....................18

*Moore v. Detroit Sch. Reform Bd.*,
293 F.3d 352 (6th Cir. 2002) ....................25

*Nathan v. Alamo Heights Indep. Sch. Dist.*,
173 F.4th 576 (5th Cir. 2026) ....................28

*NetChoice, LLC v. Yost*,
180 F.4th 268 (6th Cir. 2026) ....................27

*Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*,
508 U.S. 656 (1993) ....................11

*Ondo v. City of Cleveland*,
795 F.3d 597 (6th Cir. 2015) ....................13

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007) ....................19, 21, 22, 23, 27

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) ....................23, 24

*Rice v. Vill. of Johnstown, Ohio*,
30 F.4th 584 (6th Cir. 2022) ....................10

*Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.*,
946 F.3d 951 (6th Cir. 2020) ....................12

*Schuette v. Coal. to Defend Affirmative Action*,
572 U.S. 291 (2014)....................19

*Sessions v. Morales-Santana*,
582 U.S. 47 (2017)....................35

*Shelby Cnty. v. Holder*,
570 U.S. 529 (2013)....................31

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966)....................11

*Spurlock v. Fox*,
716 F.3d 383 (6th Cir. 2013) ....................1, 19, 21, 22, 23, 24, 26, 27

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
600 U.S. 181 (2023)....................8, 11, 19, 28, 30, 32, 33

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009)....................15

*Tennessee v. Dep't of Educ.*,
104 F.4th 577 (6th Cir. 2024) ....................10, 11

*Tennessee v. Lane*,
541 U.S. 509 (2004)....................29

*Tex. Dep't of Hous. & Cmty. Aff. v. Inclusive Cmtys. Project, Inc.*,
576 U.S. 519 (2015)....................24

*Thompson v. DeWine*,
7 F.4th 521 (6th Cir. 2021) ....................17, 18

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................16, 18

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)....................35

*U.S. v. Arthrex*,
594 U.S. 1 (2021)....................34

*U.S. v. Benson*,
179 F.4th 470 (6th Cir. 2026) ....................20

*U.S. v. Mazumder*,
800 F. App'x 392 (6th Cir. 2020) ....................28

*U.S. v. Myrie*,
167 F.4th 876 (6th Cir. 2026) ....................18, 23, 24

*U.S. v. Skrmetti*,
605 U.S. 495 (2025)....................18

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982)....................16

*Vapor Tech. Ass'n v. FDA*,
977 F.3d 496 (6th Cir. 2020)....................16

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)....................23, 24, 25

*Vitolo v. Guzman*,
999 F.3d 353 (6th Cir. 2021)....................11, 20, 21, 24, 27, 28, 30, 31, 32

*W. States Paving Co. v. Wash. State Dep't of Transp.*,
407 F.3d 983 (9th Cir. 2005)....................32, 33

*Walls v. Sanders*,
2026 WL 2256862 (E.D. Ark. Aug. 5, 2026)....................25

*Woods v. Cloyd W. Miller Co.*,
333 U.S. 138 (1948)....................29

**Statutes**

20 U.S.C. § 1067 *et seq*....................22

20 U.S.C. § 1067k(3)....................23

20 U.S.C. § 1067q(b)(2)....................2, 4

20 U.S.C. § 1101-1101d....................2

20 U.S.C. § 1101....................2, 3, 18, 29, 30, 33, 34

20 U.S.C. § 1101a....................3, 5, 13, 19, 30, 31, 33, 34

20 U.S.C. § 1101b....................3, 4, 30

20 U.S.C. § 1101c(a)....................4

20 U.S.C. § 1102....................2

20 U.S.C. § 1102b....................3, 4

20 U.S.C. § 1102c....................2

20 U.S.C. § 1103(a)....................31

Pub. L. No. 89-329, §§ 301(a), 302, 79 Stat. 1219, 1229....................4

## Other Authorities

Charles A. Wright *et al.*, Fed. Prac. & Proc. § 3531.9.5 (3d ed.) ....................13

*Constitutionality of Race-Based Dep't of Educ. Programs*, 2025 WL 4055305 (O.L.C. Dec. 2, 2025) ....................8, 20

Stephanie Aguilar-Smith, *Serving Many in Many Ways: Hispanic-Serving Institutions as Drivers of Opportunity and Socioeconomic Mobility*, Third Way (May 22, 2024), available at https://perma.cc/A2ZM-G6ZL ....................6

UNITED STATES CENSUS, *About the Hispanic Population*, https://perma.cc/V3UA-MADG ....................2

U.S. Comm'n on Civil Rts., Toward Quality Education for Mexican Americans 50 (1974) ....................28

U.S. Gov't Accountability Off., GAO-24-106162, Higher Education: Hispanic-Serving Institutions Reported Extensive Facility and Digital Infrastructure Needs (2024) ....................6

## Rules

Fed. R. Civ. P. 56 ....................9, 13

## Regulations

2 C.F.R. § 200.308(g)(2) ....................17

2 C.F.R. § 200.344(c) ....................17

## Constitutional Provisions

U.S. Const., amend. XIV, § 5 ....................29

## INTRODUCTION

The Constitution's prohibition of racial classifications "does not demand demographic ignorance during the policymaking process." *Spurlock v. Fox*, 716 F.3d 383, 395 (6th Cir. 2013). For over 30 years, Congress has allocated institutional, capacity-building grants to under-resourced colleges and universities that serve a significant share of low-income and Hispanic students. The Hispanic-Serving Institutions ("HSI") Program awards grants to schools that satisfy need-based eligibility criteria and whose full-time undergraduate enrollment is at least 25% Hispanic. These grants benefit students regardless of race by funding laboratories, new courses, student services, and more. The HSI Program has expanded hundreds of institutions' educational capacity and has historically enjoyed bipartisan support. Plaintiffs and Plaintiff-Intervenors (collectively, "Plaintiffs") claim that the HSI Program's 25% enrollment threshold violates the equal protection component of the Fifth Amendment.

The Court should not exercise jurisdiction over Plaintiffs' meritless challenge to the HSI Program because no Plaintiff has standing, and this case is moot. The associational Plaintiffs' theories of injury to their individual members amount to generalized grievances and conjecture, and they fundamentally ignore that the HSI Program operates at an institutional level. Tennessee's theories of injury are unsupported by evidence of economic harm or unlawful discrimination by its universities. And all Plaintiffs fail to show causation and redressability because their alleged injuries hinge on the discretionary actions of parties not before the Court. Nor can Plaintiffs show a live case or controversy because the HSI Program is now defunct.

If the Court reaches the merits, it should uphold the HSI Program. The 25% enrollment threshold, which Plaintiffs mischaracterize as a "racial classification," does not require schools to treat any student differently based on race. Plaintiffs have offered no evidence that, despite being facially neutral, the threshold intentionally inflicts a disproportionate harm on any identifiable

group and was motivated by discriminatory animus. Applying strict scrutiny on this record would dramatically expand equal protection doctrine. It would also conflict with binding precedent holding that race-conscious measures like the threshold are distinct from prohibited individual racial classifications. The Court should therefore uphold the enrollment threshold under rational basis review. But even if strict scrutiny applies, the threshold meets that standard because it is narrowly tailored to serve multiple compelling interests. Finally, if the Court deems the enrollment threshold invalid, the Court should sever it from the remainder of the statute, making grants available to HSIs and non-HSIs alike.

Accordingly, the Court should grant Defendant-Intervenor's cross motion for summary judgment and deny Plaintiffs' joint motion for summary judgment.

## BACKGROUND

### I. The HSI Program Provides Critical Funding that Benefits All Students.

The HSI Program is a federal grant program administered by the U.S. Department of Education (the "Department") under Titles III and V of the Higher Education Act ("HEA"). *See* 20 U.S.C. §§ 1067q(b)(2)(B), 1101–1101d, 1102–1102c. The HSI Program aims to "expand educational opportunities for, and improve the academic attainment of, Hispanic students," and to "enhance the academic offerings, program quality, and institutional stability of" the institutions that educate large numbers of Hispanic[1] students and low-income individuals. 20 U.S.C. § 1101(b). In enacting the HSI Program, Congress found that (i) Hispanic Americans are at high risk of not enrolling in, or graduating from, institutions of higher education; (ii) the enrollment

[1] Hispanic refers to ethnicity, which is distinct from race. Both concepts "generally reflect a social definition of race and ethnicity recognized in this country, and they do not conform to any biological, anthropological or genetic criteria." UNITED STATES CENSUS, *About the Hispanic Population*, https://perma.cc/V3UA-MADG. "Persons who report themselves as Hispanic can be of any race." *Id.* Hispanic, which is often used interchangeably with Latino, includes Afro-Latinos and Indigenous Peoples who self-identify as such. *See* Dkt. 17 at 2 n.4.

disparities between Hispanic students and non-Hispanic white students are increasing; (iii) HSIs provide a significant proportion of the postsecondary opportunities available to Hispanic students yet remain underfunded, receiving significantly less state and local funding than comparable institutions; and (iv) correcting these disparities is in the national interest. *Id.* § 1101(a).

The requirements for institutions to qualify as HSIs reflect these findings. As a threshold, an institution must be eligible under the HEA, which requires that it (i) enroll "needy students," (ii) have low "average educational and general expenditures," (iii) confer bachelor's degrees or be a junior or community college, (iv) satisfy national accreditation requirements, (v) meet any other requirements imposed by the Secretary of Education, and (vi) be in a State. *Id.* § 1101a(a)(2). An institution becomes an HSI if, in addition to meeting these requirements, its population of full-time undergraduate students is "at least 25 percent Hispanic . . . at the end of the award year immediately preceding the date of [its grant] application." *Id.* § 1101a(a)(5).

Three sub-programs make up the HSI Program. The first, Developing Hispanic-Serving Institutions (administered under HEA Title V, Part A), authorizes discretionary grants for purposes including scientific equipment, the construction and renovation of campus facilities, curriculum development, educational materials, alumni programs, and financial literacy. *Id.* §§ 1101, 1101b. The second, Promoting Postbaccalaureate Opportunities for Hispanic Americans (administered under HEA Title V, Part B), authorizes discretionary grants for similar activities, along with support for low-income postbaccalaureate students and collaborations to expand postbaccalaureate degree offerings. *Id.* § 1102b. The third, the HSI STEM (Science, Technology, Engineering, or Mathematics) and Articulation program (administered under HEA Title III, Part F), authorizes approximately $100 million in mandatory funding that the Secretary of Education must award for activities that increase participation in the sciences, technology, engineering, and mathematics or

that develop transfer and articulation programs. *Id.* § 1067q(b)(2).

HSI grants are institutional awards—issued for periods of up to five years—rather than disbursements to individual students or faculty. *Id.* § 1101c(a); *see id.* § 1101b(b). These grants need not be spent to benefit only Hispanic students. *See, e.g.*, Hands-Decl. ¶¶ 7–8; Mulcaire-Decl. ¶ 5. Instead, authorized activities for grants include projects that benefit the entire student body of a recipient institution, such as spending on new laboratory equipment, renovated buildings, expanded course offerings, and strengthened student services. *See* 20 U.S.C. § 1101b(b).

## II. The HSI Program's 25% Threshold Reflects Decades of Congressional Deliberation.

The HSI Program grew out of Title III of the HEA, "Strengthening Developing Institutions," which directs federal funds to colleges that, "for financial and other reasons[,] are struggling for survival and are isolated from the main currents of academic life." Ex. A, Expert Report of Dr. Patrick Valdez ("Valdez Rep.") ¶¶ 15, 21–22 (quoting Pub. L. No. 89-329, §§ 301(a), 302, 79 Stat. 1219, 1229). Following the HEA's enactment in 1965, federal reports and congressional testimony documented a persistent problem: Hispanics were underrepresented in higher education and concentrated in a small set of local, under-resourced institutions whose campuses Title III funds failed to consistently reach. *Id.* ¶¶ 24–25, 38, 41, 46–47. By 1980, Hispanic students made up less than 4% of full-time undergraduates nationally, and Hispanic undergraduates were concentrated in roughly 2% of all U.S. colleges and universities. *Id.* ¶ 46.

Congress responded incrementally. The 1986 HEA amendments—a bipartisan bill co-sponsored by 27 Democrats and 22 Republicans, and ultimately signed by President Reagan—first directed Title III funding to "Hispanic Institutions," adopting a 20% enrollment criterion after draft proposals set at 40% and 30% were rejected as capturing too few of the institutions that were primarily educating Hispanic students. *Id.* ¶¶ 49–51, 56. The enrollment threshold operated as an additional criterion layered on top of Title III's existing requirements of low expenditures and high

enrollment of needy students. *See* 20 U.S.C. § 1101a. And Congress adopted it only after considering several alternative approaches for identifying the institutions that needed targeted support, including directing funds to community colleges and limiting eligibility to institutions in regions with substantial Hispanic populations. Valdez Rep. ¶ 58. But Congress ultimately rejected these alternative approaches in favor of "an enrollment standard . . . [that] better reflected the Act's emphasis on institutional need rather than on geography or sector." *Id.*

In the 1992 HEA reauthorization, which was signed by President George H.W. Bush, Congress formally defined "Hispanic-Serving Institutions" at the 25% enrollment level. *Id.* ¶ 53. Congress adjusted the enrollment threshold upward in response to testimony and demographic data showing where Hispanic students were enrolling and which institutions had a true need for these funds. *Id.* ¶ 63. Stakeholders testified that institutions at the 25% threshold, though roughly 4% of all colleges and universities, enrolled almost one-half of all Hispanic students in higher education. *Id.* ¶ 59. Stakeholders also highlighted the "demographic reality" that with Hispanics comprising the country's fastest-growing minority group, there would "indeed be more Hispanic-serving institutions of higher education." *Id.* ¶ 60. Congress also drew from prior legislative proposals in setting the threshold at 25%. *Id.* ¶ 61. A 1989 proposal had urged a 25% threshold, linking it "to evidence that Hispanic educational attainment and college-going lagged behind national averages" and to the need for institutions with substantial Hispanic enrollment to have adequate capacity "to respond to changing demographic realities." *Id.* In turn, the 25% marker that Congress ultimately adopted preserved Title III's need-based eligibility criteria while identifying the point at which Congress believed Hispanic enrollment and financial need were great enough that institutional capacity must respond. *Id.* ¶¶ 62–64.

In 1998, with President Clinton's signature, Congress relocated the HSI Program to Title V.

*Id.* ¶¶ 65–66. In 2007, President George W. Bush signed the legislation extending this institutional capacity-building model to STEM education through Title III. *Id.* ¶ 69.

Today, HSIs continue to be underfunded and under-resourced relative to their peer institutions. HSIs are "generally cash-strapped and receive less federal and state funding than non-HSIs—bringing in only about 68 cents for every federal dollar non-HSIs receive." Stephanie Aguilar-Smith, *Serving Many in Many Ways: Hispanic-Serving Institutions as Drivers of Opportunity and Socioeconomic Mobility*, Third Way (May 22, 2024), available at https://perma.cc/A2ZM-G6ZL. Because of this persistent funding gap, HSIs have extensive unmet infrastructure needs. An estimated 43% of building space at HSIs requires repair or "total replacement," and 67% of HSIs cite a lack of federal funding as a challenge to addressing their needs. U.S. Gov't Accountability Off., GAO-24-106162, Higher Education: Hispanic-Serving Institutions Reported Extensive Facility and Digital Infrastructure Needs 7, 37 (2024).

## III. HSI Eligibility Tracks Organic Demographic Growth.

The emergence and growth of HSI-eligible institutions have been driven largely by organic growth in the U.S. Hispanic population. Ex. B, Expert Report of Dr. Marcel Roman ("Roman Rep.") ¶¶ 13, 24, 40. The present location of HSI-eligible institutions follows the growth of the U.S. Hispanic population since 1970 and that population's migration from the Southwest and Florida to counties across the country. *Id.* ¶¶ 15, 25, 30. When considering those counties with the largest Hispanic population shares, more than 80% of postsecondary institutions meet the eligibility threshold, and the likelihood that a county contains at least one HSI-eligible institution exceeds 40%. *Id.* ¶¶ 16, 37. Due to these trends, institutions primarily cross the 25% enrollment threshold because of natural increases in the Hispanic populations of their surrounding areas. *Id.* ¶¶ 40–41; *see also* Hands-Decl. ¶ 4. And as reflections of their communities, many HSIs enroll substantial numbers of Hispanic students but remain majority non-Hispanic—such as Southern

Adventist University, a private HSI in Tennessee. Dkt. 17 at 2.

## IV. Procedural Background

### A. Tennessee and Students for Fair Admissions File Suit.

On June 11, 2025, Tennessee and Students for Fair Admissions, Inc. ("SFFA") filed this action against the Department and Secretary Linda McMahon, in her official capacity (collectively, "Defendants"), alleging that the HSI Program's 25% enrollment threshold denies equal protection and exceeds Congress's Spending Clause authority. Dkt. 1 ¶¶ 56–75. Tennessee and SFFA sought a declaratory judgment that the enrollment threshold is unconstitutional and a permanent injunction prohibiting its application "to Tennessee's institutions of higher education." *Id.* at 16.

The Complaint identifies eight Tennessee public institutions that have general eligibility or approved eligibility applications but enroll fewer than 25% Hispanic full-time undergraduates. *Id.* ¶¶ 36–38. None is a current grantee under the HSI Program. *Id.* Tennessee's asserted injuries are that its universities cannot compete for HSI grants and that students and professors in Tennessee would "benefit" from HSI money. *Id.* ¶¶ 33, 35–43, 50. SFFA, for its part, sues only on behalf of its members: Member A, a professor at a non-HSI; Members B and C, students at a non-HSI; and Member D, a student at another non-HSI. *Id.* ¶¶ 51–53, 55; Blum-Decl. ¶¶ 9–10.

### B. HACU, NAS, and FASORP Intervene in This Action.

On July 24, 2025, the Hispanic Association of Colleges and Universities ("HACU" or "Defendant-Intervenor")—which represents 370 member institutions, including 287 HSIs, and advocates for the appropriation and distribution of HSI Program funding—moved to intervene in this action to defend the statute. Dkt. 16.[2] The next day, Solicitor General John Sauer informed

[2] HACU advocates for all HSIs, *see* Dkt. 17 at 3, and its current membership includes 287 HSIs and 83 non-HSIs, *see* Ex. C at 9650–52. There are more than 600 HSIs. Ex. D at 9636. Plaintiffs' assertion that HACU's "membership" includes "all existing HSIs," Mot. 13, is wrong.

Congress that Defendants would not defend the constitutionality of the HSI Program. Dkt. 32.

On August 8, 2025, the National Association of Scholars ("NAS") and Faculty, Alumni, and Students Opposed to Racial Preferences ("FASORP") (collectively, "Plaintiff-Intervenors") moved to intervene as plaintiffs. Dkt. 23. On October 10, 2025, the Court granted the motions to intervene, Dkt. 34, and NAS and FASORP filed their Complaint in Intervention, alleging the same claims as Tennessee and SFFA and seeking a declaratory judgment and injunctive relief as to themselves. Dkt. 35 ¶¶ 50–67. NAS and FASORP sue on behalf of their members who study or work at non-HSIs: Individual B, a professor and member of NAS and FASORP; Individual C, an undergraduate student and FASORP member; and Individual E, an administrator and FASORP member. Individual-B-Decl. ¶ 19; Individual-C-Decl. ¶¶ 2–3; Individual-E-Decl. ¶¶ 9–10, 16, 18.

**C. The HSI Program Is Reprogrammed.**

On September 10, 2025, the Department announced that it was reprogramming funds away from both Title V sub-programs to support other priorities, purportedly following *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023). Dkt. 45-1 at 4–7. On December 2, 2025, at the Department's request, the Office of Legal Counsel ("OLC") issued an opinion declaring all three sub-programs unconstitutional, including Title III, Part F. *Constitutionality of Race-Based Dep't of Educ. Programs*, 2025 WL 4055305, at *1, 11–14 (O.L.C. Dec. 2, 2025) ("*OLC*"). The Department agrees with OLC's opinion. Dkt. 59-3.

The Department has failed to reopen applications for grants under Title III, Part F this year. *See* Ex. E (showing "Application Status" as "Closed"). Since the sub-program's inception in 2010, the Department has awarded grants every five years, with applications opening in the spring. *See* Ex. F at 16748 (announcing project periods of "up to 60 months" and application periods from March 25 to April 29, 2011; March 4 to May 31, 2016; and April 30 to June 14, 2021). Tomorrow, September 30, is the final date for existing Title III, Part F grant projects to incur new program

costs. *See generally* Ex. G (listing September 30, 2026 as the deadline to meet grant objectives). But this year, the Department did not open Title III applications on schedule. *See* Ex. E; Hands-Decl. ¶ 9. Instead, the Department told Congress in April that it needed no funds for the Title III or V sub-programs for 2027 because it did not plan to grant any new awards, citing its goal of "[e]limination of these programs." Ex. H at 5–6, 24. And on September 21, all unused Title III HSI-STEM funds from fiscal year 2026 were reallocated to other programs. *See* Ex. I at 5.

### D. HACU Moves for Dismissal and Judgment on the Pleadings.

On December 2, 2025, HACU moved to dismiss the Complaint in Intervention under Rule 12(b)(1) for lack of standing and, in the alternative, to dismiss the Title V claims as moot. Dkt. 45. On January 8, 2026, HACU moved for judgment on the pleadings under Rule 12(c) against SFFA and Tennessee on the same grounds. Dkt. 58. Those motions remain pending.

## LEGAL STANDARD

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, a party may rely on any materials in the record, including "documents" and "affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), so long as those materials can be reduced to admissible evidence, *Mangum v. Repp*, 674 F. App'x 531, 536–37 (6th Cir. 2017). Where, as here, the parties have cross-moved for summary judgment, a court must evaluate each motion on its own merits, "draw[ing] all reasonable inferences against the party whose motion is under consideration." *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016).

## ARGUMENT

The Court should grant summary judgment for HACU and deny Plaintiffs' motion because the record confirms that no Plaintiff has standing and this challenge is moot. If the Court reaches the merits, it should hold that the HSI Program is constitutional. To the extent that the Court

disagrees, it should sever any invalid provisions from the remainder of the HSI Program.

## I. Plaintiffs Lack Article III Standing.

Because Plaintiffs have not met their burden to come forward with evidence supporting each element of standing—injury in fact, traceability, and redressability, *see Rice v. Vill. of Johnstown, Ohio*, 30 F.4th 584, 591 (6th Cir. 2022)—the Court lacks subject matter jurisdiction.[3]

### A. Tennessee Lacks Standing.

Tennessee has not carried its burden to show it has suffered an injury in fact under any of its three theories of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (party invoking standing bears burden to establish every element). And even if it had, each theory independently suffers fatal redressability and traceability defects.

***Proprietary Injury.*** Tennessee attempts to claim proprietary injury based on its universities' purported exclusion from competition in a voluntary grant program, Mot. 14, but none of its cases supports this theory. Tennessee cannot show that a "state enti[ty] reliant on the states' coffers will 'become subject' to federal regulations that threaten those coffers," *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 587 (6th Cir. 2024) (citation omitted), because the HSI Program does not regulate Tennessee's entities or touch its coffers. In *Biden v. Nebraska*, 600 U.S. 477 (2023)—one of Plaintiffs' primary cases for this theory—the Supreme Court held that Missouri had standing because its public student-loan servicing corporation stood to lose an estimated "$44 million a year in fees" from the challenged debt cancellation, which "directly harm[ed]" the corporation by cutting off an existing revenue stream. *Id.* at 490, 493–94. In contrast, Tennessee has nothing more than an abstract desire for its universities to have more money. That is not enough.

[3] HACU's pending Rule 12 motions explain why Plaintiffs' pleadings fail to allege standing. Dkts. 45, 58, 67, 68. HACU incorporates those arguments as relevant and shows below that the summary judgment record likewise fails to establish standing and thus subject matter jurisdiction.

Tennessee cannot sidestep the foundational requirements of proprietary-injury standing by alluding to its universities' alleged denial of an equal opportunity to compete because the doctrine of equal protection does not apply to states. Tennessee attempts to lean on *Northeastern Florida Chapter of Associated General Contractors v. City of Jacksonville*, 508 U.S. 656 (1993), which along with its progeny addresses "the denial of equal treatment resulting from the imposition of [a] barrier." *Vitolo v. Guzman*, 999 F.3d 353, 359 (6th Cir. 2021) (quoting *Jacksonville*, 508 U.S. at 666). But the constitutional guarantee of equal protection protects people, not states. *See South Carolina v. Katzenbach*, 383 U.S. 301, 323 (1966). Tennessee simply "has no equal protection rights of its own." *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023).

***Sovereign and Quasi-Sovereign Injury.*** Tennessee's gesture at a sovereign injury also fails because that theory requires a federal action that "purports to preempt state law" or "intrude[s] upon areas traditionally within states' control." *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022). Tennessee offers no evidence that the HSI Program does either. Tennessee cannot manufacture a sovereign injury by speculating that the "HSI program incentivizes" its schools to break the law and that such law-breaking may "infringe[]" on Tennessee's "anti-discrimination laws," Mot. 17, because that conduct is independently unlawful, *see Harvard*, 600 U.S. at 230. Unlike in *Department of Education*, 104 F.4th at 594, Tennessee identifies no *actual* conflict such that it would be "trapped" between enforcing its laws and receiving federal funds. *Contra* Mot. 18. To the extent Tennessee instead asserts a quasi-sovereign "interest in securing residents from the harmful effects of discrimination," Mot. 17, or recasts harms to students and professors as harms to Tennessee, that is a *parens patriae* theory that it cannot raise against the federal government, *see Haaland*, 599 U.S. at 294–96 & n.11. That bar cannot be waived. *Cmty. First Bank v. Nat'l Credit Union Admin.*, 41 F.3d 1050, 1053 (6th Cir. 1994).

***Special Solicitude.*** Tennessee's invocation of "special solicitude," Mot. 17, does not fill these gaps. Whatever force that doctrine retains, it could never displace Article III's baseline requirements. *See Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 957 (6th Cir. 2020) (concluding that special solicitude doctrine "did not abandon the constitutional baseline").

***Causation and Redressability.*** Even if Tennessee had an injury in fact, which it does not, it would still lack standing because remedying its purported harms under any of its theories would require a cascade of discretionary responses by third parties—exactly the sort of attenuated chain Article III forbids. *See Brintley v. Aeroquip Credit Union*, 936 F.3d 489, 494 (6th Cir. 2019). Plaintiffs' own declarations confirm the guesswork.[4] Even if the challenged enrollment threshold disappeared, whether any Tennessee school ever applies for, receives, or benefits from an HSI grant would remain wholly dependent on the "unfettered choices" of "independent actors" not bound by the judgment. *Lujan*, 504 U.S. at 562.[5]

**B. SFFA, NAS, and FASORP Have Not Established Standing.**

SFFA, NAS, and FASORP (the "Associations") fail to establish that the members they identified have "standing to sue in their own right"—the threshold requirement for associational standing. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Their evidence

[4] For example, Tydings does not say the community colleges she oversees would apply—only that she "would encourage" 13 separate institutions, each with its own governance and priorities, to do so. Tydings-Decl. ¶ 6. The Chancellor of UTC explained that even when a grant is identified, UTC's grant office must "consult with the appropriate UTC executive[s]" and then "if the decision is made to apply," they must identify an appropriate administrator. Bruce-Decl. ¶ 5.

[5] Tennessee also claims that it is "predictable" that its universities would apply for HSI grants if permitted to do so because HACU purportedly "refused to identify" an "HSI that has never applied" for an HSI grant. Mot. 16 (citation omitted). But HACU never "refused" Plaintiffs' discovery request; instead, it met and conferred with Plaintiffs and confirmed after "reasonable inquiry" that it does not have "historical information" regarding its members' grant applications in its possession, custody, or control. App.2561–62, 2598–2600. Plaintiffs' remaining "evidence" that "most" HSIs have applied for funding, Mot. 16 (citing App.2534), is inadmissible hearsay-within-hearsay, *see Alpert v. U.S.*, 481 F.3d 404, 409 (6th Cir. 2007).

in support of standing is inadmissible, violates Rule 56(c)(4), and is legally insufficient on its own terms.[6] Accordingly, this Court lacks subject matter jurisdiction over the Associations' claims.[7]

### 1. The Associations Fail to Identify a Single Member with Standing.

***Faculty.*** The Associations' attempt to advance an equal-opportunity-to-compete theory of injury through their faculty members fails because the faculty members are not the competitors; their institutions are. Mot. 18–19; *but see* Member-A-Decl. ¶ 16 ("I regularly apply in the ***university's*** name") (emphasis added); *see* 20 U.S.C. § 1101a(a)(2) ("The term 'eligible institution' means an ***institution*** of higher education . . . .") (emphasis added). And their employers' exclusion from an institution-only competition is not an injury to them. Without a direct injury, all they offer is a generalized "grievance about government." *Lujan*, 504 U.S. at 573–74. That does not suffice.[8]

***Students.*** The four student members advance three theories of injury: (i) three claim they are "ethnically classifie[d]"; (ii) all claim harm from their schools' lost funding; and (iii) SFFA Member D claims the criteria affected his school choice. Mot. 19–20. Each theory fails.

*First*, the classification theory. SFFA's Members B and C and FASORP's Individual C, who attend non-HSIs, claim they are ethnically classified because the Department counts them in

---

[6] Plaintiffs submit declarations in support of the Associations' standing that are replete with statements that do not satisfy Rule 56(c)(4). Plaintiffs' declarants use the phrase "I understand" to introduce inadmissible hearsay and speculation no fewer than 20 times. *See, e.g.*, Individual-B-Decl. ¶¶ 12, 16–18; Individual-C-Decl. ¶¶ 5–10; Individual-E-Decl. ¶¶ 6–9, 12, 14; *see also* Blum-Decl. ¶¶ 8–11 (attempting to relay facts about the purported injuries of SFFA Members A–D). The Court must "strik[e]" any parts of these declarations that are "based upon belief." *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015).

[7] If the Court chooses to treat the third prong of the *Hunt* test as a "prudential" requirement, *see* Charles A. Wright *et al.*, Fed. Prac. & Proc. § 3531.9.5 (3d ed.), it should find that the Associations' claims do require individual participation. Discovery has only confirmed that the alleged injuries are member- and institution-specific.

[8] Individual E's claimed injury—that he is ineligible for the E. Kika De La Garza Fellowship Program, Individual-E-Decl. ¶¶ 6–11—is even further afield because that fellowship is a U.S. Department of Agriculture program not challenged here and not administered by these Defendants.

determining whether their schools meet the 25% enrollment threshold. Mot. 19–20; Blum-Decl. ¶ 9. But they offer no evidence that they are being ethnically classified—nor could they, because the enrollment threshold does not classify individual students. *See infra* at 19. Even accepting the students' unsupported claims that they are being generally classified, that type of generalized stigmatic injury is still not enough. *See Allen v. Wright*, 468 U.S. 737, 755 (1984). An alleged stigmatic "injury accords a basis for standing only to 'those persons who are personally denied equal treatment,'" *id.* (citation omitted), and the student members have not been denied admission or any benefit of the academic experience due to their race.

*Second*, the funding theory. The Complaint alleges that the students "are harmed by the lack of federal funding for better equipment . . . and the like." Dkt. 1 ¶ 54. But no student identifies a single program, class, piece of equipment, scholarship, or opportunity they have actually been denied *as a result of* the HSI Program. They offer only generalized, institution-level grievances and conjecture—not a concrete, imminent injury to any identified student. *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013) ("[A] generalized grievance, no matter how sincere, is insufficient to confer standing.") (cleaned up). Members B and C try to claim a "pocketbook injury" because their school recently lost *non-HSI* federal funding and cited this as *one* reason for increasing tuition and fees next year. Mot. 20; Blum-Decl. ¶ 9. The funding their school lost was not HSI funding, so its loss cannot be traced to the enrollment threshold. *See infra* at 15.

*Finally*, the school-choice theory. SFFA's president claims that SFFA Member D was injured because he initially turned down his preferred and current school (a non-HSI) and enrolled at an HSI so he could apply for the Coast Guard through its College Student Pre-Commissioning Initiative. Blum-Decl. ¶ 10. Member D chose his own school to pursue a scholarship under an entirely separate program, administered by a different agency, and now attempts to attribute the

consequences of *his* choice to the Department. A plaintiff "cannot manufacture standing merely by inflicting" a "harm on [himself]." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

***The Remaining Theories.*** NAS and FASORP's last two injury theories—that its students at HSIs are harmed because the statute requires funds to be spent to benefit Hispanic students, Dkt. 35 ¶ 38, and that HSIs illegally discriminate against their faculty members, *id.* ¶¶ 44–47—both fail at the threshold. NAS and FASORP have not identified a single member injured in this capacity; no student claims to be given fewer opportunities than their Hispanic classmates, and no faculty member claims a hiring or promotion injury. Without an "identified member," these vague theories cannot support associational standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

***Causation and Redressability.*** The Associations independently lack standing because their own affidavits confirm that they have not shown causation and redressability: These professors and students are not the regulated parties here—their institutions are. Causation and redressability therefore "depend on how regulated third parties not before the court will act in response to the government regulation or judicial relief." *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025). The members claim to be injured by a lack of access to downstream benefits of HSI grants, Mot. 18–20, so redress would require universities to choose to apply and ultimately receive a grant. That chain goes well beyond "merely speculative." *Lujan*, 504 U.S. at 562. For example, Members B and C's school is "increasing students' tuition and fees next year" because of—according to the school—"the recent end of federal funding and uncertainty about the ability to get more federal funding," *not* the HSI Program. Blum-Decl. ¶ 9. So even if this Court enters the declaratory judgment Plaintiffs seek, there is no guarantee the school will receive discretionary HSI funding or that the funding will be enough to avoid a tuition increase. The "uncertainty"

would remain. All the more so because the requested declaratory judgment expressly preserves the government's "flexibility" to eliminate the HSI Program entirely. Mot. 27.

Member D and Individual E assert injuries caused by federal entities that are not parties here. They object not to anything the Department did to them, but to the use of HSI eligibility criteria anywhere in the federal government. But federal courts do not "exercise general legal oversight of the Legislative and Executive Branches," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021), or serve as "a vehicle for the vindication of the value interests of concerned bystanders," *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982) (citation omitted). Member D's claimed injury arises from a Coast Guard program, Blum-Decl. ¶ 10, and Individual E's from a USDA program, Individual-E-Decl. ¶¶ 6–10. Neither agency is a party, and an injunction against the Department would not bind either agency or alter their eligibility criteria. *Vapor Tech. Ass'n v. FDA*, 977 F.3d 496, 502 (6th Cir. 2020). And because Member D is now enrolled at his preferred school, he is not entitled to prospective relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983).

At bottom, the Associations assert abstract injuries that lack the necessary causal connection between the relief they seek and their members' purported harms. All that remains is a "generalized grievance" with the federal government. *Lujan*, 504 U.S. at 575.

## II. Plaintiffs' Challenge Is Moot.

Article III "demands a live case-or-controversy." *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981 (6th Cir. 2012) (citation modified). But recent events confirm that today no live case or controversy exists with respect to *any* of the challenged sub-programs. The Department froze previously allocated Title V funds in September 2025 and unequivocally declared the entire HSI Program unconstitutional in December 2025. Dkt. 45-1 at 4; Dkt. 59-3. Then the Department did not reopen Title III grant applications on schedule last spring. Ex. E;

Hands-Decl. ¶ 9. Instead, it stated its intent to "wind[] down," Dkt. 59-3 at 3, and "eliminate" all three HSI sub-programs, Ex. J at 42 (listing zero new or continuation grants under Title III and Title V for 2027); *see also* Ex. H at 53–54.[9] Because no institution can compete for new funds, this case is moot—no matter "how vehemently the parties continue to dispute the lawfulness of" the HSI Program. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

A claim for declaratory relief is moot when there is no longer a "substantial controversy . . . of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Thompson v. DeWine*, 7 F.4th 521, 524 (6th Cir. 2021) (citation and emphasis omitted). As detailed in HACU's Rule 12 motions, Dkt. 45 at 18–23, Dkt. 58 at 21–24, all claims based on the Title V sub-programs are moot because the Department defunded those sub-programs on September 10, 2025 and announced it was "redirecting financial support away from ineffective and discriminatory programs" into charter schools. *See* Ex. K; Dkt. 45-1 at 4; *see also* Dkt. 45 at 7; Dkt. 58 at 6–7. And all claims based on the Title III sub-program are also moot: No new costs on existing grants may be incurred after tomorrow, opportunities to compete for new grants were never opened, and the Department has taken concrete action to reject further funding in service of the HSI Program's "elimination." *See* Ex. G; Ex. H at 5–6; Hands-Decl. ¶ 9; Mulcaire-Decl. ¶¶ 7, 12.

With the sub-programs shut down, Plaintiffs can no longer claim to be "exclude[d] . . . from obtaining funding for their facilities, their work, and their services," Dkt. 35 ¶ 46, "den[ied] the . . . opportunity to compete for streams of federal funding," *id.* ¶ 47, or "unable to compete on

[9] As with all federal grants, grantees have 120 days after the end of the project period to complete payment of all costs incurred during the project period, 2 C.F.R. § 200.344(c), and may request a one-time extension to the project period of 12 months, which "may not be exercised for the sole purpose of using unobligated balances." 2 C.F.R. § 200.308(g)(2). The Department has expressly foreclosed the possibility of granting any such extension in its repeated public statements that it is discontinuing the HSI Program, planning for no new grants, and seeking termination of funding.

an equal footing," Dkt. 1 ¶¶ 40, 54. There are no longer opportunities for Plaintiffs' members, or *any* institutions, to compete for "tens of millions of dollars . . . allocated to HSI programs," *id.* ¶ 74. The HSI Program is "no longer in place," *Thompson*, 7 F.4th at 525, and any risk of harm is no longer "sufficiently imminent and substantial" to sustain a claim, *TransUnion*, 594 U.S. at 435.

## III. The HSI Program Complies with the Constitution.

Even if the Court exercises jurisdiction over this action, it should nonetheless rule for HACU on the merits of Plaintiffs' claims. Plaintiffs contend that the HSI Program denies equal protection because it draws a racial "classification on its face" and "discriminates in its purpose and effect."[10] Mot. 21–22 (citation omitted). They are wrong. "When a statute makes an express classification on the basis of race, it is subject to strict scrutiny." *U.S. v. Myrie*, 167 F.4th 876, 879 (6th Cir. 2026). A facially neutral statute, however, triggers strict scrutiny only "if it produces a disparate impact and if a discriminatory purpose was a motivating factor for its enactment." *Id.* In contrast, where a statute neither racially discriminates nor burdens a fundamental right, rational basis review applies. *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005). A statute should be upheld under this standard if "any reasonably conceivable state of facts" could rationally justify its enactment. *U.S. v. Skrmetti*, 605 U.S. 495, 522 (2025) (citation omitted). Because the HSI Program is facially neutral and neither produces a disparate impact nor intentionally discriminates, it is subject to—and readily satisfies—rational basis review.[11]

---

[10] The Fifth Amendment's Due Process Clause contains an equal protection component that binds the federal government and is coextensive with the Equal Protection Clause of the Fourteenth Amendment. *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011).

[11] Plaintiffs claim that, "by extension" of the equal protection violation they allege, the HSI Program exceeds Congress's power under the Spending Clause. Mot. 21. Because the HSI Program does not deny equal protection or require institutions to "take any affirmative action at all," this derivative Spending Clause claim also fails. *See, e.g.*, *Cutter v. Wilkinson*, 423 F.3d 579, 588–90 (6th Cir. 2005) (rejecting Spending Clause claim where the funding condition was not "independently barred by another constitutional provision" and imposed no mandatory

### A. The HSI Program Does Not Contain a "Racial Classification" Because It Does Not Treat Individuals Differently Because of Their Race.

The HSI Program does not contain a "racial classification" on its face. The Supreme Court has long recognized "[a] law that 'neither says nor implies that *persons* are to be treated differently on account of their race' is not a racial classification." *Schuette v. Coal. to Defend Affirmative Action*, 572 U.S. 291, 331 (2014) (Scalia, J., concurring) (emphasis added) (quoting *Crawford v. Bd. of Educ. of City of Los Angeles*, 458 U.S. 527, 537 (1982)). In the education context, a law classifies by race only when it sorts "students" according to their "race" and then "rel[ies] on that classification" in allocating benefits to students. *Spurlock v. Fox*, 716 F.3d 383, 394 (6th Cir. 2013). In other words, strict scrutiny applies "when the government distributes burdens or benefits on the basis of individual racial classifications." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007).

The HSI Program does not trigger strict scrutiny because it does not require any individual "student[]" to be treated differently on account of her "race." *Spurlock*, 716 F.3d at 394. To receive HSI funding, an otherwise eligible institution must enroll "at least 25 percent Hispanic students" in full-time undergraduate studies. 20 U.S.C. § 1101a(a)(5)(B). This threshold does not mandate race-based differential treatment. *See, e.g.*, Hands-Decl. ¶¶ 7–8; Mulcaire-Decl. ¶ 5. For example, it does not require institutions to consider any applicant's race in making individual admissions decisions and thus does not implicate the concerns at issue in *Harvard*. *See* 600 U.S. at 218–21 (admissions programs impermissibly used race "as a 'negative' and . . . a stereotype" to the detriment of individual students). And an institution can meet the threshold without taking any

---

obligations). Although Plaintiffs have claimed that the HSI Program also violates the Spending Clause because it does not pursue the "general welfare," *see, e.g.*, Dkt. 1 ¶ 60, Congress determined that the HSI Program is in the "national interest" and thus serves the general welfare, 20 U.S.C. § 1101(a)(6), and that decision is entitled to "substantial[]" deference, *Cutter*, 423 F.3d at 588.

deliberate steps to enroll Hispanic students or address their needs. Even Plaintiffs acknowledge that the growth of HSIs is "due to increases in America's Hispanic population." Mot. 2; *see also* Hands-Decl. ¶ 4. Indeed, "the emergence and growth of HSI-eligible institutions" is "primarily driven by organic demographic growth in the U.S. Hispanic population." Roman Rep. ¶ 13.

Plaintiffs assert that strict scrutiny nonetheless applies because the "definition of HSI withholds money from *schools* based on the ethnicity of their *students*." Mot. 22. As support for this novel proposition, Plaintiffs rely primarily on OLC's assessment that "distinguishing between educational institutions" can trigger strict scrutiny. Mot. 21 (quoting *OLC*, 2025 WL 4055305, at *13). But despite binding "Executive Branch agencies" like the Department, *Campaign for Accountability v. U.S. Dep't of Just.*, 155 F.4th 724, 727 (D.C. Cir. 2025), OLC opinions do not bind courts, *see U.S. v. Benson*, 179 F.4th 470, 482 (6th Cir. 2026). And neither OLC nor Plaintiffs identify any case finding a racial classification where, as here, a law does not treat individuals differently based on their race. To the contrary, courts agree that a law "utilizes a 'racial classification' when, on its face, it explicitly distinguishes between *people* on the basis of [race]." *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 355 (5th Cir. 2015) (emphasis added) (quoting *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999)).

Plaintiffs seek to overcome this rule by analogizing to cases applying strict scrutiny to laws benefiting minority-owned businesses. *See* Mot. 22. For example, in *Vitolo*, the Sixth Circuit invalidated a law that granted "priority status" for coronavirus relief to restaurants that were at least "51% owned and controlled by . . . the 'socially and economically disadvantaged,'" with racial minorities presumed to qualify. 999 F.3d at 357 (citation omitted). And in *City of Richmond v. J.A. Croson Co.*, the Supreme Court invalidated an ordinance requiring certain contractors to subcontract with at least one minority-owned business. 488 U.S. 469, 477–78 (1989); *see also*

*Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 206–08 (1995) (similar). These cases confirm that finding a racial classification requires individual discrimination. In each case, the government effectively granted benefits to "individuals"—the owners of businesses—"based explicitly on their race." *Vitolo*, 999 F.3d at 360. Unlike those businesses, colleges and universities eligible for HSI funding are not owned by individuals. The 25% enrollment threshold does not rely on any individual's race and thus is not a racial classification.

Lacking support in doctrine, Plaintiffs resort to rhetoric. They claim that if the enrollment threshold is not a racial classification, then "White Serving Institutions," "a program that *withheld* funding from schools whose students were at least 25% Hispanic," and "a statute that *denies* funding to any school that has 'too many' Hispanic students" would be constitutional. Mot. 1, 22. But even if Congress could justify a so-called "White Serving Institutions" program, it cannot distribute burdens or benefits on the basis of any individual's race. And a law that categorically denied funds to schools because of their substantial Hispanic enrollments would almost certainly trigger strict scrutiny. Unlike the HSI Program, such a law would be motivated by animus toward an identifiable group. *See* Part III.C, *infra*.

**B. The HSI Program Permissibly Incorporates Demographic Data.**

The 25% enrollment threshold is akin to policies that courts have held to comply with equal protection principles. As Justice Kennedy explained in his concurrence in *Parents Involved*—which is "controlling" in this Circuit, *Spurlock*, 716 F.3d at 395—the "dangers presented by individual [racial] classifications" are diminished when the government enacts "race-conscious measures that do not rely on differential treatment based on individual classifications." *Parents Involved*, 551 U.S. at 797. As previously explained, the 25% threshold mentions race without requiring any differential treatment of individuals. This "race consciousness does not lead inevitably to impermissible race discrimination." *Spurlock*, 716 F.3d at 399 (citation omitted). As

the Sixth Circuit has explained, the "prohibition of racial classifications 'has nothing to do' with the use of racial demographic data in policymaking, so long as the policy itself does not classify people by race." *Id.* at 394 (quoting *Parents Involved*, 551 U.S. at 745).

The Sixth Circuit's decision in *Spurlock* and the Supreme Court's decision in *Parents Involved* illustrate the distinction between the permissible use of racial demographic data in policymaking and impermissible racial classifications. In *Spurlock*, a community task force developed a new student-assignment plan for the Nashville public school system by relying on the racial breakdown of students attending schools under an existing plan and projections of student enrollment by race. 716 F.3d at 388, 394. The Sixth Circuit concluded that the task force's consideration of racial data did not mean that the new plan employed a racial classification because the plan itself did not use race to determine any student's school assignment or mandate racial balancing. *See id.* at 394, 396. In contrast, in *Parents Involved*, the Supreme Court struck down school policies that "used a student's racial classification . . . as an important stand-alone factor in determining school assignments and that used a predetermined range of racial enrollment percentages to adjust the racial 'balance' in individual schools." *Spurlock*, 716 F.3d at 394 (quoting *Parents Involved*, 551 U.S. at 709–17). Because the school districts in *Parents Involved* "distribute[d] burdens or benefits on the basis of *individual racial classifications*," their action was subject to strict scrutiny. 551 U.S. at 720 (emphasis added).

Courts have applied this distinction to confirm that laws like the HSI Program do not deny equal protection. *Spurlock* and *Parents Involved* recognized that race-conscious policies such as the Minority Science and Engineering Improvement ("MSEI") Program, 20 U.S.C. § 1067 *et seq.*, "do[] not offend the Constitution." *Spurlock*, 716 F.3d at 399. The MSEI Program employs an enrollment threshold that mirrors the HSI Program's threshold. Specifically, it authorizes grants

to eligible "minority institutions" of higher education "whose enrollment of a single minority or a combination of minorities . . . exceeds 50 percent of the [institution's] total enrollment." 20 U.S.C. § 1067k(3). The dissent in *Parents Involved* argued that the plurality's reasoning risked invalidating the MSEI Program and other "race-conscious statutes," 551 U.S. at 828 (Breyer, J.), but the plurality responded that "the examples the dissent mention[ed] . . . have nothing to do with the" bar on racial classifications, *id.* at 745. Based on that response, *Spurlock* observed that the Supreme Court "has acknowledged that demographic data is used in a variety of legislative and policymaking contexts" without running afoul of that bar. 716 F.3d at 394–95, 399. Such statutes are permissible because they "do not lead to different treatment based on . . . race." *Id.* at 395 (quoting *Parents Involved*, 551 U.S. at 789 (Kennedy, J., concurring)). Like the MSEI Program, the HSI Program's enrollment threshold does not deny equal protection.

**C. The HSI Program Does Not Discriminate in Its Purpose or Effect.**

Plaintiffs also argue that the HSI Program is subject to strict scrutiny even if it is facially neutral because it "discriminates in its purpose and effect." Mot. 21 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)). But a facially neutral statute only triggers strict scrutiny "if it produces a disparate impact *and* if a discriminatory purpose was a motivating factor for its enactment." *Myrie*, 167 F.4th at 879 (emphasis added). To establish a discriminatory purpose, Plaintiffs must show that Congress enacted the HSI Program "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). To establish a disparate impact, they must show that the HSI Program "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (citation omitted). Plaintiffs have shown neither.

Plaintiffs first try to turn the discriminatory purpose requirement on its head, arguing that Congress's intent to *benefit* Hispanic students equates to an "invidious discriminatory purpose"

under *Arlington Heights*, 429 U.S. at 266. Mot. 22. But in the Sixth Circuit, "discriminatory purpose" means an intent to inflict "*adverse* effects upon an identifiable group." *Myrie*, 167 F.4th at 880 (citation omitted; emphasis added).[12] This requires evidence of "animus," which Plaintiffs do not even attempt to prove. *Doe v. Knox Cnty. Bd. of Educ.*, 2024 WL 5111942, at *15 (E.D. Tenn. Dec. 13, 2024) (Crytzer, J.). Merely observing, as Plaintiffs do, that Congress sought to "expand opportunities 'for . . . Hispanic students'" and improve their academic attainment, Mot. 22 (quoting 20 U.S.C. § 1101(b)(1)), is not enough. It is well established that policymakers may employ "race-neutral tools," *Tex. Dep't of Hous. & Cmty. Aff. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015), to diminish "racial achievement gap[s]," *Spurlock*, 716 F.3d at 399. And to the extent that Plaintiffs imply—without offering any evidence—that Congress was aware of potential consequences on non-Hispanic students from the HSI Program's enactment, that is also insufficient. "Discriminatory purpose" requires "more than intent as volition or intent as awareness of consequences." *Feeney*, 442 U.S. at 279.

Plaintiffs' reliance on *Louisiana v. Callais*, 146 S. Ct. 1131 (2026), to support their discriminatory purpose argument is misplaced. Plaintiffs cite *Callais* to attempt to show that strict scrutiny applies to the HSI Program so long as race "play[ed] even one 'role'" in Congress's decision-making. Mot. 23 (quoting *Callais*, 146 S. Ct. at 1146). But as courts have since recognized, *Callais*'s tightening of the standards for proving liability under § 2 of the Voting

[12] Plaintiffs cite *Associated General Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730 (6th Cir. 2000), and *Vitolo*, 999 F.3d 353, for the proposition that "[i]ntentional discrimination includes not only the intent to harm, but also the intent to 'prefe[r]' a particular ethnicity." Mot. 21. But like *Vitolo*, *Drabik* simply applied strict scrutiny to a law that contained a racial classification on its face because it used "racial or ethnic criteria" to award "preferential" treatment to "minority-owned businesses." *Drabik*, 214 F.3d at 733–34; *accord Vitolo*, 999 F.3d at 360. Neither case alters the standard for proving discriminatory purpose under *Arlington Heights* and *Feeney*, which the Sixth Circuit recently reaffirmed in *Myrie*, 167 F.4th at 879.

Rights Act did not change the *Arlington Heights* framework, which still requires proof that the government acted "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Walls v. Sanders*, 2026 WL 2256862, at *3 (E.D. Ark. Aug. 5, 2026) (citation omitted).[13] Plaintiffs fall far short of making this showing.

Nor have Plaintiffs established that the HSI Program "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (citation omitted). To prove this element, a plaintiff must proffer "statistical analysis" and "other expert testimony" showing that the law in question caused "a disproportionate adverse effect upon the targeted group." *Lewis*, 806 F.3d at 359–60 (citation omitted). Indeed, Plaintiffs' own authority confirms that establishing a "disparate impact" requires evidence that a law has a "substantial" negative impact on the targeted group. *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 369–70 (6th Cir. 2002) (finding disparate impact where the defendants conceded that a Michigan law "ha[d] a substantial impact on" the voting rights of "African–American citizens" but declining to apply strict scrutiny because the plaintiffs failed to also establish discriminatory purpose).

Plaintiffs have not offered any evidence nearing the necessary level of rigor. Instead, Plaintiffs cite a HACU fact sheet showing that HSIs enroll "68.2% of all Hispanic undergraduates" nationwide and that most HSIs are in Puerto Rico and states with large Hispanic populations. Mot. 22–23 (citing App.2454). Setting aside that this does not prove any "disproportionate *adverse* effect" on Hispanic or non-Hispanic students, *Lewis*, 806 F.3d at 359 (emphasis added), such raw statistics are "woefully inadequate" because Plaintiffs fail to trace these trends to any government action, *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1261 (9th Cir. 2016). Nor could

[13] *Hunter v. Underwood*, 471 U.S. 222 (1985), is not to the contrary. *Contra* Mot. 23. In *Hunter*, the Supreme Court found an "equal protection [violation] under *Arlington Heights*" where a law's "enactment was motivated by a desire to discriminate against blacks." 471 U.S. at 233.

they, as Hispanic enrollment at HSIs and the emergence of HSI-eligible institutions "are primarily driven by organic demographic growth." Roman Rep. ¶ 13. Plaintiffs' additional claim that universities' grant proposals evidence a disparate impact because they are "designed" to benefit Hispanic students and purportedly "exclude non-Hispanics" fares no better. Mot. 23. The proposals Plaintiffs identify merely set out initiatives directed toward Hispanic and low-income students and institutions' "objectives," "[a]nticipated results," or "[g]oals" as to the same—they do not describe any efforts to exclude non-Hispanic students or say anything whatsoever about actual adverse outcomes traceable to the HSI Program. *See, e.g.*, App.1557, 1559, 1640.

Lastly, to the extent that Plaintiffs contend that the HSI Program produces a disparate impact because it purportedly "incentivizes" discrimination, *see* Mot. 17, such an "inference" or "bare assertion" of discrimination cannot defeat summary judgment, *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 529 (6th Cir. 2023) (affirming summary judgment for defendants on equal protection claim). Rather, Plaintiffs must present "'affirmative evidence'" of discrimination post-*Harvard*. *Id.* (citation omitted). Plaintiffs cannot do so because HSIs generally reflect their communities, *see* Roman Rep. ¶¶ 13, 16, 37, and many are majority non-Hispanic. In fact, as Plaintiff-Intervenors have acknowledged, most "students at HSIs are not Hispanic." Dkt. 35 ¶ 38.

**D. The HSI Program Readily Satisfies Rational Basis Review.**

Because the HSI Program does not racially discriminate, it is subject to "highly deferential" rational basis review. *Spurlock*, 716 F.3d at 403 (citation omitted). Under this standard, the Court must uphold the HSI Program if its eligibility criteria are "rationally related to a legitimate state interest." *Id.* at 402. Plaintiffs must "negat[e] all possible rational justifications" for its eligibility criteria, *LULAC v. Bredesen*, 500 F.3d 523, 536 (6th Cir. 2007), of which there are many. For instance, the HSI Program seeks to expand the educational capacity of institutions principally serving a growing Hispanic population by addressing funding shortfalls to those institutions. *See,*

*e.g.*, Valdez Rep. ¶¶ 10, 69. Congress recognized that schools with substantial enrollments of Hispanic students were underfunded relative to other institutions. *See id.* ¶¶ 43–44, 63–64. Remedying this funding gap is a legitimate state interest. *Cf. Spurlock*, 716 F.3d at 403 ("attaining a more efficient allocation of educational resources indisputably qualifies as a legitimate state interest"). And the 25% enrollment threshold and needy-student requirements rationally relate to the problem Congress sought to remedy. These criteria enable the targeted allocation of funding to those schools where Congress concluded "Hispanic enrollment and need were sufficiently great that institutional capacity had to be oriented toward that student population." Valdez Rep. ¶ 62. Thus, the HSI Program readily passes rational basis review.

## IV. Even If Strict Scrutiny Applies, the HSI Program Meets That Standard.

If the Court determines that strict scrutiny applies, then the HSI Program should be upheld if it is "narrowly tailored to achieve a compelling government interest." *Spurlock*, 716 F.3d at 394 (quoting *Parents Involved*, 551 U.S. at 720). The application of strict scrutiny is "not 'fatal in fact.'" *NetChoice, LLC v. Yost*, 180 F.4th 268, 289 (6th Cir. 2026) (opinion of Clay, J.) (quoting *Adarand*, 515 U.S. at 237). Instead, an alleged racial classification will "survive narrow-tailoring analysis" if the defendant shows "serious, good faith consideration of workable race-neutral alternatives." *Vitolo*, 999 F.3d at 362 (quotation omitted). "This requires the government to engage in a genuine effort to determine whether alternative policies could address the alleged harm." *Id.* The HSI Program also meets this standard.

### A. The Enrollment Threshold Serves Multiple Compelling Interests.

The HSI Program remedies specific instances of past discrimination and aims to expand the educational capacity of institutions principally serving the nation's growing Hispanic population by addressing funding shortfalls to those institutions. The government's interest in "remediating specific, identified instances of past discrimination" is a recognized compelling

interest, and the interest in expanding the educational capacity of HSIs is both "exceedingly persuasive" and "concrete enough to permit judicial review." *Harvard*, 600 U.S. at 207, 217.

A panoply of evidence demonstrates that Congress created the HSI Program to remedy specific episodes of intentional discrimination involving the government. *See Vitolo*, 999 F.3d at 361. In the decades preceding the statute's enactment, witnesses testified before Congress that Hispanic students faced discrimination in school systems across the country. *See, e.g.*, Valdez Rep. ¶¶ 25 & n.20, 31–32. This testimony was consistent with the myriad decisions of federal courts documenting official discrimination against Hispanic students.[14] But in at least some cases, the federal government knowingly allowed discrimination to continue.[15] This failure to address official discrimination, combined with the federal government's fiscal relationship with local-government perpetrators, confirms that the federal government was a "passive participant" in a nationwide, state-sanctioned system of racial exclusion. *Vitolo*, 999 F.3d at 361 (citation omitted).

This history of exclusion predictably caused Hispanic students to be underrepresented in higher education and caused those few colleges educating substantial numbers of Hispanic students to be under-resourced relative to need, as witnesses before Congress repeatedly testified throughout the 1970s and 1980s. *See, e.g.*, Valdez Rep. ¶¶ 32, 34, 38, 47–48.[16] Congress drew

---

[14] *See, e.g.*, *Keyes v. Sch. Dist. No. 1*, 413 U.S. 189, 198 (1973) (acknowledging the proven "existence of intentional school segregation" in Denver and citing federal reports documenting "educational inequities" facing Hispanic students in the Southwest); *Cisneros v. Corpus Christi Indep. Sch. Dist.*, 467 F.2d 142, 144 (5th Cir. 1972) (holding that "the [M]exican-[A]merican children of Corpus Christi are segregated in violation of the Constitution").

[15] *See, e.g.*, U.S. Comm'n on Civil Rts., Toward Quality Education for Mexican Americans 50 (1974) (documenting instances where a federal agency knowingly "failed to take steps to enforce compliance with Title VI [of the Civil Rights Act of 1964]" to protect Hispanic students).

[16] Contrary to Plaintiffs' arguments (at Mot. 25), HACU's expert evidence does not opine on legal issues and is instead relevant to whether Congress had a "sufficient evidentiary justification" to enact the HSI Program. *Drabik*, 214 F.3d at 738. Plaintiffs' cases holding that expert testimony on legal issues is not entitled to "deference" are thus inapposite. *See Nathan v. Alamo Heights Indep. Sch. Dist.*, 173 F.4th 576, 607 (5th Cir. 2026) (testimony from law professors on "questions

upon this history when it chose to define and support HSIs. *See, e.g.*, *id.* ¶¶ 34, 54. Indeed, consistent with this legislative record, Congress expressly found that Hispanic Americans are "at high risk of not enrolling or graduating from" college and that "[d]isparities between the enrollment of non-Hispanic white students and Hispanic students" in college were "increasing" when it enacted the HSI Program in 1992. 20 U.S.C. § 1101(a)(1)–(2). Considering these findings and the federal government's acquiescence in racial exclusion for decades before the HSI Program's enactment, Congress was "not disqualified" from seeking to remedy these "lingering effects of racial discrimination." *Adarand*, 515 U.S. at 237.[17]

In addition to its remedial interest, Congress had a compelling interest in expanding the educational capacity of institutions that principally serve our nation's growing Hispanic population. When Congress enacted the HSI Program, it understood that certain institutions may need additional support to expand the offerings available to their entire student bodies because of their increased Hispanic populations. *See* Valdez Rep. ¶¶ 69, 71–72. In the preceding decade, Hispanic undergraduates were "concentrated in roughly 2 percent of all U.S. colleges and universities." *Id.* ¶ 46. That trend continued into the late 1990s, with a small share of degree-granting institutions enrolling the majority of the nation's growing number of Hispanic undergraduates. *Id.* ¶ 65. After a decade of deliberation and hearings, Congress determined that

---

of law"); *Killion v. KeHE Distributors, LLC*, 761 F.3d 574, 593 (6th Cir. 2014) (testimony sought to "define legal terms"); *U.S. v. Mazumder*, 800 F. App'x 392, 395 (6th Cir. 2020) (same).

[17] Given this evidence, the HSI Program is also a valid exercise of Congress's power under Section 5 of the Fourteenth Amendment to "enforce, by appropriate legislation," the equal protection guarantee. U.S. Const., amend. XIV, § 5. Congress need not have explicitly "recit[ed]" its Section 5 power in enacting the HSI Program. *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948). Here, Congress passed the HSI Program to remedy "pervasive unequal treatment" of Hispanic students by the government. *Tennessee v. Lane*, 541 U.S. 509, 524 (2004). As explained above, Congress was well aware of this history when it created the HSI Program. Particularly as it seeks to remedy discrimination in the "critical area[]" of "education," the HSI Program is a valid exercise of Congress's remedial powers under Section 5. *Lane*, 541 U.S. at 529 (citation omitted).

these institutions "receive significantly less in State and local funding, per full-time equivalent student, than other institutions of higher education." 20 U.S.C. § 1101(a)(4). Moreover, HSIs had higher low-income enrollment while employing "fewer full-time faculty" and paying "lower average faculty salaries than other institutions, indicating that they continued to operate with comparatively limited resources relative to their responsibilities and peers." Valdez Rep. ¶ 65.

Congress enacted the HSI Program to improve these institutions' educational capacity. By design, HSI grants help institutions enhance academic offerings, support institutional stability, and increase educational opportunities and graduation rates, with authorized uses including facility improvements, curriculum development, student support services, and endowment building. 20 U.S.C. §§ 1101a, 1101b. Expanding the educational capacity of under-resourced institutions experiencing increased Hispanic enrollment is an "exceedingly persuasive justification" for the HSI Program. *Harvard*, 600 U.S. at 217. After all, "education is . . . the very foundation of good citizenship." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). And this interest is sufficiently "concrete," *Harvard*, 600 U.S. at 217, because the success of the HSI Program can be benchmarked against Congress's finding that HSIs "receive significantly less" funding per student than other institutions of higher education. 20 U.S.C. § 1101(a)(4).

**B. The Enrollment Threshold Is Narrowly Tailored.**

The enrollment threshold is the least restrictive means of achieving the compelling interests described above for at least four reasons: (1) no workable race-neutral alternatives could replace the threshold; (2) the threshold is neither overbroad nor underinclusive; (3) the threshold does not use race as a negative or rely on racial stereotypes with no logical end point; and (4) the threshold is not a "quota." *See Vitolo*, 999 F.3d at 362; *Harvard*, 600 U.S. at 218.

*First*, before enacting the threshold, Congress engaged in "a genuine effort to determine whether alternative policies could address the alleged harm," but it reasonably concluded that "no

workable race-neutral alternative" was available. *Vitolo*, 999 F.3d at 362. In the decades leading up to the HSI Program's enactment, the Title III Strengthening Developing Institutions program provided a race-neutral baseline. *See* Valdez Rep. ¶¶ 35, 53, 55. But Title III failed to "consistently reach[] campuses enrolling large numbers of Hispanic students, even though many of these institutions met the spirit of the 'developing institutions' concept." *Id.* ¶ 38. For example, although 43% of all U.S. Hispanic students were concentrated in only 55 institutions across the mainland and Puerto Rico by the late 1970s, Title III funded only 24 such institutions. *Id.* ¶ 44. Moreover, Congress considered directing funding to community colleges or according to geography, but it ultimately determined that applying an enrollment threshold on top of Title III's existing criteria "better reflected the . . . emphasis on institutional need." *Id.* ¶ 58. The threshold also ensures that the HSI Program remains tied to "current data" and "current needs," *Shelby Cnty. v. Holder*, 570 U.S. 529, 553 (2013), by requiring that institutions support their grant applications with current "enrollment data," 20 U.S.C. § 1103(a); *see also id.* § 1101a(a)(5).

Plaintiffs identify a grab bag of other race-neutral measures that Congress purportedly could have used in deciding whether to award grants, including academic outcomes, presence of "low-income individuals," or evidence of past discrimination. Mot. 26. But Congress was not required to exhaust "every conceivable race-neutral alternative" to satisfy narrow tailoring. *Fisher v. Univ. of Tex.*, 579 U.S. 365, 377 (2016) (citation omitted). In any event, none of Plaintiffs' proposals is a workable alternative. Congress found that Title III failed to reach the relevant institutions despite containing a need-based component. Valdez Rep. ¶ 38. And Congress had no need to consider academic outcomes because Title III already requires eligible institutions to be nationally "accredited" or "making reasonable progress toward accreditation." 20 U.S.C. § 1101a(a)(2)(A)(iv). Finally, although Plaintiffs posit that "Congress could have tied the funding

to a showing of past discrimination," Mot. 26 (citing *W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 998 (9th Cir. 2005)), they identify no evidence that the HSI Program applies to "States in which the effects of discrimination are [not] actually present," *W. States Paving Co.*, 407 F.3d at 998. It is thus clear that no alternative policies could replace the HSI Program.

*Second*, the enrollment threshold is not "overbroad or underinclusive." *Vitolo*, 999 F.3d at 362. Congress relied on enrollment data and nearly a decade of experience to ensure that the 25% threshold was narrowly tailored. The threshold traces back to a 1984 proposal that would have required that institutions enroll at least 40% Hispanic students in full-time undergraduate studies to receive funding. Valdez Rep. ¶¶ 49–50. Under this proposal, only about 24 institutions outside of Puerto Rico would have qualified, reaching at most a third of Hispanic students. *Id.* ¶ 56. Advocates countered at 30% and, in 1986, Congress set the threshold at 20% to account for "need" and "underfunded institutions educating a large population with low-English literacy skills." *Id.* ¶¶ 50, 55–56. In 1992, Congress raised the threshold to 25% to "better encompass those higher education institutions that would be likely to have a true need for the funds." *Id.* ¶¶ 53, 63. Through this process, Congress identified what it considered to be the "point at which the scale of Hispanic enrollment at an institution is great enough that federal capacity-building support" is warranted, while excluding institutions without genuine need. *Id.* ¶¶ 62, 64.

*Third,* the enrollment threshold does not implicate the concerns identified in *Harvard*. Unlike the admissions programs at issue there, the threshold does not use race as a "negative" or "stereotype." *Harvard*, 600 U.S. at 218. As explained above, the threshold neither requires an individualized assessment of students nor penalizes individual students based on their race; non-Hispanic students at HSIs receive the same benefits as Hispanic students. The HSI Program also has a "logical end point." *Id.* at 221. Congress enacted the HSI Program because it found that

HSIs "receive significantly less in State and local funding, per full-time equivalent student, than other institutions of higher education." 20 U.S.C. § 1101(a)(4). This finding provides the baseline for measuring the continuing need for the HSI Program. Today, HSIs remain "cash-strapped" and "bring[] in only about 68 cents for every federal dollar non-HSIs receive." Aguilar-Smith, *supra*. The continuing need for the HSI Program is thus both concrete and readily apparent.[18]

*Finally*, Plaintiffs repeatedly mischaracterize the enrollment threshold as a "rigid quota" and suggest that this supplies an additional reason the threshold is not narrowly tailored. Mot. 25. But the threshold is not a "quota" because it does not *require* universities to take any action to achieve or maintain an undergraduate student body that is at least 25% Hispanic. *Compare* 20 U.S.C. § 1101a(a)(5), *with Croson*, 488 U.S. at 477, 508 (noting that a policy that "*required* prime contractors to . . . subcontract at least 30% of the dollar amount of the contract to one or more Minority Business Enterprises" was a "rigid numerical quota") (emphasis added). According to Plaintiffs' own authority, "[q]uotas impose a fixed number or percentage which must be attained, or which cannot be exceeded." *W. States Paving Co.*, 407 F.3d at 994 (citation omitted).

## V. The Enrollment Threshold Is Severable From the Remainder of the HSI Program.

If the Court finds that the enrollment threshold denies equal protection—which it does not—the Court should sever the threshold instead of invalidating the HSI Program entirely. The Supreme Court has long applied a "strong presumption of severability" under which courts must "presume[] that an unconstitutional provision in a law is severable from the remainder of the law."

[18] Plaintiffs' argument that the enrollment threshold's use of the term "Hispanic" necessarily "promotes stereotyping" under *Harvard* is devoid of context. Mot. 26. Whereas the use of the term in an admissions program to "benefit some applicants but not others" may stereotype individual students, *Harvard*, 600 U.S. at 217, that is not the case when a school submits aggregate enrollment data for institutional funding that is self-reported by students and not subject to the school's own conclusions regarding the proper "touchstone of an individual's identity," *id.* at 231.

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 625 (2020) (plurality). "In general, 'when confronting a constitutional flaw in a statute,'" courts invalidate "the 'problematic portions while leaving the remainder intact.'" *U.S. v. Arthrex*, 594 U.S. 1, 23 (2021). Thus, when a statute and the Constitution conflict, courts "give 'full effect' to . . . whatever portions of the statute are 'not repugnant' to the Constitution." *Id.* at 24 (citation omitted). This applies in all cases save for the "unusual" circumstance where the remaining provisions would not be "capable of functioning independently" and "'fully operative' as law." *Barr*, 591 U.S. at 628 (citation omitted).

The enrollment threshold is severable under this standard because the remainder of the HSI Program could function independently without it. The threshold operates as an additional criterion that is layered on top of the existing eligibility requirements of low expenditures and high enrollments of needy students. *See* 20 U.S.C. § 1101a(a)(5); *see also* Valdez Rep. ¶ 57. Without the threshold, those eligibility requirements would remain in place to direct funds to qualifying institutions, even if not all of those institutions are HSIs. Indeed, that version of the HSI Program would mirror the Title III Strengthening Developing Institutions program. Accordingly, if the 25% threshold is unconstitutional, the Court should sever it.[19]

Plaintiffs skip over the severability inquiry and instead request that the Court issue a

---

[19] Although inquiries into "congressional intent" are disfavored, *Barr*, 591 U.S. at 625, courts applying severability doctrine sometimes ask whether what remains of the statute post-severance comprises legislation that Congress "would not have enacted." *Cam I, Inc. v. Louisville/Jefferson Cnty. Metro Gov't*, 460 F.3d 717, 720 (6th Cir. 2006) (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987)). The 25% enrollment threshold is also severable under this alternative framework. The key inquiry here is whether "the statute's text or historical context makes it 'evident' that Congress, faced with the limitations imposed by the Constitution, would have preferred no [grant program] at all" to a grant program that benefits all HEA-eligible institutions, including HSIs. *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 509 (2010) (quoting *Alaska Airlines*, 480 U.S. at 684). Nothing in the text or historical context of the HSI Program supports that result, which would harm the very HSIs that Congress sought to support by enacting the HSI Program. Nor could declaring the entire HSI Program unconstitutional be reconciled with Congress's goal of benefiting "low-income individuals" in addition to Hispanic students. 20 U.S.C. § 1101(b).

declaratory judgment—apparently applicable to "*everyone*"—that "the entire HSI program, as currently constituted, is unconstitutional." Mot. 27, 29. This request fails thrice over.

*First*, the Court must conduct a severability analysis notwithstanding this remedial request because "'[t]he relief the complaining party requests does not circumscribe' the severability inquiry." *Lindenbaum v. Realgy, LLC*, 13 F.4th 524, 529 (6th Cir. 2021) (citation omitted). If the Court finds the 25% threshold unconstitutional, it may—and should—sever the threshold even if that gives Plaintiffs "none of the relief [they] sought." *Id.* (citing *Barr*, 591 U.S. at 614).

*Second*, the requested declaratory judgment conflicts with the "typical[]" approach courts take in cases alleging unequal treatment, which is to sever the "discriminatory . . . classification" and thereby "extend[] the relevant statutory benefits or burdens to those previously exempted, rather than nullifying the benefits or burdens for all." *Barr*, 591 U.S. at 632. Indeed, Plaintiffs agree that "level[ing] up" to make HSI grants available without "the ethnic criteria" would resolve any constitutional problem. Mot. 27; *accord Sessions v. Morales-Santana*, 582 U.S. 47, 77 (2017).

*Third*, if the Court grants a declaratory judgment, it should limit relief to Plaintiffs and their schools. *Contra* Mot. 28. Declaratory relief cannot "directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Trump v. CASA, Inc.*, 606 U.S. 831, 844 (2025) (citation omitted). A declaration that the government cannot apply the threshold with respect to Plaintiffs and their schools would provide them "complete relief" regardless of what other entities are also allowed to compete. *See City of Chicago v. Barr*, 961 F.3d 882, 921 (7th Cir. 2020) (deeming program-wide relief from grant conditions unnecessary where "every grantee [is] allocated a set grant amount, independent from each other").

## CONCLUSION

The Court should grant Defendant-Intervenor's cross motion for summary judgment and deny Plaintiffs' joint motion for summary judgment.

Dated this 29th day of September, 2026.

Respectfully Submitted,

/s/ Grace E. Hart

Grace E. Hart*
Suzana Kondic*
Cesar E. Garcia*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-6372
GHart@gibsondunn.com
SKondic@gibsondunn.com
CGarcia@gibsondunn.com

Donovan J. Stone*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
(202) 955-8523
DStone2@gibsondunn.com

Francisca D. Fajana*
Namratha Somayajula*
LatinoJustice PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 219-3360
FFajana@latinojustice.org
NSomayajula@latinojustice.org

Zee Scout (BPR No. 042637)
American Civil Liberties Union
Foundation of Tennessee
P.O. Box 120160, Nashville, TN 37212
(615) 320-7260
ZScout@aclu-tn.org

*Admitted *Pro Hac Vice*

*Attorneys for Defendant-Intervenor, Hispanic Association of Colleges and Universities*